## Case No. 15,443.

### UNITED STATES v. INSURGENTS.

[Whart. St. Tr. 102; 2 Dall. 335.] [1]

Circuit Court, D. Pennsylvania. May 18, 1795.

CRIMINAL LAW—SUMMONING JURORS IN FEDERAL COURTS—JURY LISTS—COPY OF INDICTMENT.

[1. The twenty-ninth section of the judiciary act, which refers the federal courts to the state laws for certain regulations respecting juries, applies only to the mode of designating the jury by lot or otherwise, and to the qualifications of jurors, and not for the purpose of fixing the number of jurors. The number thereof must depend upon the common law, under which the court may direct any number of jurors to be summoned upon a consideration of all circumstances under which ·the venire is issued.]

[2. In the lists of jurors furnished to the prisoner the designation of their abode should state the township in which they. live, and a mere description of their residence as being within the state is insufficient.]

[3. A copy of the caption of an indictment must be delivered to the 'prisoner, along with the indictment of which it naturally forms a part.]

The act of congress of the 3d of March, 1791 [1 Stat. 199], which imposed a duty upon spirits distilled within the United States, produced at once great opposition, both in and out of congress. A majority of the Southern and Western members, even before the bill was passed, proclaimed an organized agitation for its repeal; and hardly had the president's signature been obtained before the measure was assailed violently from the country at large. It was branded with the name of an excise, a term very hateful to the people, as connected with the former oppressions of the British government. It was declared unnecessary and tyrannical. The legislatures of Maryland. Pennsylvania, Virginia, and North Carolina united in solemn declarations of rooted dislike, and of resistance, in some cases hardly to be reconciled with constitutional opposition; and by the latter state a position was assumed. which in later days would have been .called nullification. But it was in the western parts of Pennsylvania and Virginia. and particularly in the counties of Alleghany, Washington, Fayette, and Westmoreland, in the first-mentioned state, that resistance to the bill was most violent, and it

---

[1] [2 Dall. 335, contains only a partial report.]

was there an agitation was started which, in the course of a few years, ripened into an organized insurrection and involved its leaders in the crime of treason. The peculiar opposition of these portions of the Union may be accounted for by the circumstance that the war of the Revolution, by cutting off the trade in foreign spirits, had turned the attention of the grain growing districts of these states to the distillation of rum and whisky. This soon grew into a very considerable business; the greater part of the United States was supplied from these sources, and spirits were even exported into Canada. So lucrative did this trade soon become, that almost the whole local population, at the end of the Revolution, was connected with it. The "Western Country," as it was then called, swarmed with distilleries. Not only were whisky and rum articles of commerce and of consumption, but from the natural deficiency of specie in a wild country they also were used universally as currency. Payments were made in them; and they were received in satisfaction of debts. The agricultural interests became enlisted in the traffic by the immense amount of grain thus consumed. At one time, such was the quantity disposed of in this manner, that a famine was dreaded, and, moved by popular clamour, the legislature was compelled to interfere and pass a law to prevent the distillation of any kind of grain; which was, however, afterwards repealed, so far as regards rye and barley. The attention of the legislature of Pennsylvania was early called to this as a productive source of revenue. In the year 1772, even before the trade had acquired any great importance, an excise law was passed upon domestic and foreign spirits. At first, however, as to home distilled spirits it was not executed, and, indeed, hardly any steps were taken for the purpose, particularly in the older counties. But, during the Revolutionary war, the necessities of the state, and a temporary unpopularity of distillation, before alluded to, rendered the collection of the duties both necessary and practicable; and a considerable revenue was thereby obtained. Towards the end of the war it again ceased.

In 1780 congress resolved that an allowance of an additional sum should be made to the army, to compensate for the depreciation of its pay. This was distributed among the states for discharge. Pennsylvania made several appropriations for the purpose, but the funds so applied turned out to be unproductive. The depreciation fund having always been treated as a favoured claim, on application of the officers of the Pennsylvania line another effort was made, the revenue arising from the excise was appropriated to this end, and vigorous measures were taken for its collection. If the duties on domestic spirits could have been enforced, there was no doubt, such had been the increase in the business in the few years previous, that, in a short time, it would have paid both principal and interest of the fund. Aware of this, in the year 1786 Mr. Robert Morris offered to farm the revenue, and to pay into the state treasury the sum of £70,000 per annum. This was, however, rejected, from a prejudice to the mode, which was supposed to be peculiar to despotic government; but there was no question at the time that that sum could have been so produced, if it could have been collected. The ordinary means were therefore to be adopted. But great changes had taken place in the disposition of the people since the first imposition of these duties. The neighbouring states were free from the burthen; and in New Jersey, where a law had been passed for the purpose, its execution had been entirely prevented by a powerful combination. The Pennsylvania law, therefore, met with great opposition; especially from the inhabitants of the counties west of the Alleghanies, as they more particularly felt its rigour. Outrages of a very serious character were perpetrated upon the inspectors, and others were threatened. The opposition was successful. A very small sum was collected, and that with difficulty. The act of congress of 1791 was, therefore, received with great dislike by a people who had just been successful in their resistance to a similar law of their own state. Added to this, from the western parts of Pennsylvania had sprung the greatest opposition, so far as that state was concerned, to the ratification of the constitution of the United States. And the resentment which had been excited in the undisciplined minds of the settlers by the destruction of their hopes of an independent ultramontane empire, had not been subdued by lapse of time, or by a better acquaintance with the federal system. Under this state of things, and encouraged by the legislature of their own state, who had, by a resolution, emphatically expressed their disapprobation of the course of congress in this respect, it was not likely that the inhabitants of Western Pennsylvania and Virginia would suffer a law which so materially affected their interests to pass quietly into operation.

The first indication of a spirit of discontent was manifested in the general circulation of opinions unfavourable to the law, and calculated to discourage the acceptance of offices under it, or any compliance on the part of those who might be so disposed. This was soon followed by a pretence of a cessation of distilling. Then succeeded secret associations to abstain from compliance with the law, which were very general. These were found ineffectual. The law went into operation in June, 1791, and the offices were pretty generally accepted. The officers then became marks for insult and opprobrium. Threats against them were frequent. Soon actual violence was resorted to, to prevent the execution of the law. Before these, however, another engine was employed—the expression of discontent by means of public meetings. The first of these meetings of any

moment was held at Redstone Old Fort, on the 27th of July, in the same year. It was there resolved to petition congress for a repeal of the obnoxious act, and a committee was appointed to meet at Pittsburg and draught one. The committee was authorized to correspond with citizens of other parts of the country who might be disposed to join in such a petition. It was also recommended to the different counties to appoint committees to superintend the signing of the petitions and the forwarding of them to congress. On the 23d of August following, one of these committees met in the county of Washington, when some very intemperate resolutions were passed, and afterwards published in the Pittsburg Gazette. These contained a violent censure of the law; and declared that any person who had accepted, or might accept, an office under congress in order to carry it into effect, should be considered as inimical to the country; and they recommended to the citizens of Washington county to treat every person so accepting office with contempt, and absolutely to refuse all kinds of intercourse with such officers, and to withhold from them "all aid, support, and comfort." Not content with this proscription of those who might consider it their duty, as officers, to aid in the execution of this law, the meeting then proceeded to attack the government on topics entirely foreign to the objects of the meeting; evincing thus rather a determination to render that government generally odious, than merely a dislike of a particular law. This meeting deputed three of its members to meet delegates from the counties of Westmoreland, Fayette, and Alleghany, on the first Tuesday of the following September, for the purpose of petitioning congress on the subject of the excise, and other grievances. On the 7th of September, accordingly, a meeting took place at Pittsburg, at which there appeared persons in the character of delegates from the western counties. This meeting passed resolutions more comprehensive than any of the former, and fully as dangerous. They contained attacks not only on the excise, but also on the national bank, the salaries of officers, the public debt, and the administration itself. A petition to congress, and a remonstrance to the legislature of Pennsylvania, were prepared by this meeting, published, together with their other proceedings, in the Pittsburg Gazette, and afterwards presented to the respective bodies to whom they were addressed. These meetings were all composed of the most influential men in the several counties; and there can be no doubt that their injudicious and intemperate language, on these occasions, served to inflame and encourage the spirit of resistance among the people, already of a serious character. The effect was perceived immediately.

On the 6th of September, 1791, the opposition broke out into open violence. Robert Johnson, a collector of the revenues for the counties of Alleghany and Washington, was seized at a place on Pigeon Creek, in the latter county, by a body of armed men, who stripped him, cut off his hair, tarred and feathered him, deprived him of his horse and money, compelling him to travel, in that state, a considerable distance on foot. A complaint was immediately entered by Johnson, and the case was brought before the district court of Pennsylvania, out of which process issued against John Robertson, John Hamilton, and Thomas McComb, three of the persons engaged in the outrage. The deputy marshal, to whom the service of the process was committed, met with much opposition, and was threatened with personal violence in endeavouring to perform his duty. The reality of the danger was confirmed by General Neville, the inspector. The deputy marshal considered it, therefore, more safe to transmit the process by a private messenger, and under cover. The person who was thus sent, though ignorant of the contents of the papers, was seized by the parties, tarred and feathered, and, after having his horse and watch taken from him, was blindfolded and tied in the woods, in which situation he remained for about five hours. It was thus found that the ordinary course of civil justice was inefficient to crush the resistance of the distillers. Some more stringent means should be adopted. But at this time many things concurred in rendering it imprudent to proceed at once to extremities. No means had as yet been provided by congress by which the executive could come to the assistance of the judiciary, in the enforcement of the laws. The constitution had been in operation but a short time; the actual strength of the government was not known; it was, therefore, advisable not to put forth its energies unless with certainty of success. There were a number of alterations which the law required, which might have the effect of concessions to prejudice without yielding the principle. It was accordingly determined to postpone coercive measures till the laws had gone into more extensive operation, and congress had had the opportunity, by revising the system, to remove what was really objectionable, and to strengthen the means of its execution. It was hoped that this forbearance, together with time, would have the effect of mitigating the opposition.

This reluctance on the part of government to press matters, had only the effect of encouraging the discontented. The outrages soon became only more bold and violent. Another officer of the government, Mr. Wells, the collector for Westmoreland and Fayette counties, was ill-treated at Greensburg, and afterwards at Uniontown; and many private citizens, who had declared their determination to support the laws, were exposed to insult, and even personal violence. But the worst instance of these outrages was the fol-

lowing. In October, 1791, an unfortunate man of the name of Wilson, who was quite insane, fancying himself a collector of the revenue, or invested with some office in connection therewith, told a number of people that he was engaged in an important inquiry in regard to the excise, and that he was to ascertain and report to congress those who had not entered their stills. A few days after this declaration he was pursued by a party of men in disguise, taken out of his bed, and carried about five miles into the country, to a smith's shop. He was there stripped of his clothes, and, after having been inhumanly burnt in several places with hot irons, he was tarred and feathered. At day-light he was set at liberty — naked, wounded, and suffering — to find his way home as he best could. During the whole of the torture, the poor maniac is said to have behaved with all the heroism of a man suffering for a principle. What is more extraordinary is, that men of the best standing and consideration in the county were understood to have been actors in this cruel outrage. Not long after this, a person of the name of Rossberry was tarred and feathered for advocating the excise law. An armed band seized and carried off two persons who were witnesses in the case of Wilson. Many attempts against the person of the inspector, General Neville, were made, in order to force him into a resignation. On one occasion, a large body of armed men, disguised, awaited him in the town of Washington, where he was expected, and their schemes were only frustrated by his abandoning the visit. The act of 1791 came up for revision before the congress which assembled in October of the same year. By an act passed May 8, 1792 [1 Stat. 267], several material alterations were thereto made; the duties were reduced to so moderate a rate as to obviate any complaint on that score. The other changes were also favourable to distillers.

The effect of this was, at first, as favourable as could have been anticipated. In several districts where opposition had arisen it subsided, and hopes began to be entertained that the western counties would acquiesce in the peaceable execution of the law. This expectation was, however, soon disappointed, and a fresh agitation was started. The act of 1792 required that there should be an office for collection in every county. It was therefore supposed, on the part of the discontented, that if the establishment of these offices was prevented, a material point would be gained. A plan of intimidation was accordingly pursued, directed against those who might be disposed to allow their houses to be used for the obnoxious purpose. Threats of personal violence and of destruction of property were made, and in some cases actually executed. It became, therefore, in a short time, almost impossible to obtain suitable places for the revenue offices.

After much difficulty, in August, 1792, General Neville obtained the house of one William Faulkner, a captain in the army, for an office of inspection in Washington county. Soon after this, Captain Faulkner was met by a large number of people, in the same neighbourhood where Johnson had been maltreated the preceding year. A knife was put at his throat, and the assailants threatened to scalp, tar and feather him, and to burn his house, unless he would promise to prevent its further use as an office. He was compelled to make the promise; and, in consequence, wrote a letter to the inspector, countermanding the permission to use his house.

Another means of resistance was then put into operation. Agreeably to a previous notification, a number of persons, styling themselves "A Meeting of Sundry Inhabitants of the Western Counties of Pennsylvania," met, and passed a set of resolutions not less objectionable than those of the former meetings. The preamble suggests that a tax on spirituous liquors is unjust in itself, and oppressive upon the poor; that internal taxes upon consumption must, in the end, destroy the liberties of every country in which they are introduced; that the law in question, from certain local circumstances which are specified, would bring immediate distress and ruin upon the western country; and concludes with the sentiment, that they think it their duty to persist in remonstrances to congress, and in every other legal measure that may obstruct the operation of the law.[2] The resolutions then proceed, first, to appoint a committee to prepare, and cause to be presented to congress, an address stating objections to the law, and praying for its repeal; secondly, to appoint committees of correspondence for Washington, Fayette, and Alleghany, charged to correspond with each other, and with such committee as should be appointed for the same purpose in the county of Westmoreland, or with any committees of a similar nature that might be appointed in other parts of the United States; and also, if found necessary, to call together either general meetings of the people in their respective counties, or conferences of the several committees; and, lastly, to declare that they will, in future, "consider those who hold offices for the collection of the duty as un-

[2] Mr. Hamilton, then secretary of the treasury, in his report to the president, upon the insurrection, says of the resolutions of this meeting: "The idea of pursuing legal measures to obstruct the operation of a law needs little comment. Legal measures may be pursued to procure the repeal of a law, but to obstruct its operation presents a contradiction in terms. The operation, or, what is the same thing, the execution of a law, cannot be obstructed, after it has been constitutionally enacted, without illegality and crime. The expression quoted is one of those phrases which can be only used to conceal a disorderly and culpable intention under forms that may escape the hold of the law."

worthy their friendship, that they will have no intercourse or dealings with them, will withdraw from them every assistance; withhold all the comforts of life which depend upon those duties that, as men and fellow-citizens, we owe each other, and will, upon all occasions, treat them with contempt, earnestly recommending to the people at large to follow the same line of conduct towards them." The proceedings of this meeting, which placed the opposers of the law in a state of direct hostility to the government, were reported by the secretary of the treasury to the president. Impressed with the danger of permitting the continuance of such resistance, he issued a proclamation on the 15th of September, 1792. It earnestly admonished and exhorted "all persons whom it might concern to refrain and desist from all unlawful combinations and proceedings whatsoever, having for their object, or tending to obstruct the operations of the laws aforesaid; inasmuch as all lawful ways and means would be put in execution for bringing to justice the infractors thereof, and securing obedience thereto: and charged and required all courts, magistrates, and officers whom it might concern, according to the duties of their several offices, to exert the powers in them respectively vested by law; and thereby also enjoined and required all persons whomsoever, as they valued the welfare of their country, the just and due authority of government and the preservation of the public peace, to aid and assist therein according to law." It likewise directed that prosecutions should be instituted against the offenders in all cases where the law would support them, and the requisite evidence could be obtained.

In pursuance of instructions, the attorney general, Mr. Bradford, and the district attorney, Mr. Rawle, attended at a circuit court which was held at York in October, 1792, for the purpose of instituting prosecutions in proper cases. Much pains was taken to obtain evidence of the various outrages. For this purpose, the supervisor of the revenue was sent into the disaffected districts. His mission was, however, very unsuccessful. He obtained only evidence of those who composed the Pittsburg meeting, and of two of those engaged in the attack on Faulkner. The attorney general, however, being of opinion, that it was a very doubtful point whether the proceedings of the meeting at Pittsburg contained indictable matter, no prosecution was attempted against those who composed it. Indictments were presented and found against those supposed to have been engaged in the Faulkner riot, and prosecutions were commenced. But it appeared afterwards, upon satisfactory testimony, that there had been some mistake as to the persons accused, and the matter was dropped. The result of this business was injurious to the government. The violators of the law were encouraged by the

hope of impunity; and the officers of the government became proportionately lax in their efforts. The outrages continued; and the efforts to prevent the establishment of offices of inspection were redoubled. In April, 1793, a party of armed men, in disguise, made an attack on the house of Wells, the collector of revenue, who resided in Fayette county. He was not, however, at home that night; and they, therefore, were obliged to content themselves with breaking open his house, threatening, terrifying, and abusing his family. Warrants were issued for apprehending some of the rioters on this occasion by the assistant judges of Fayette county, which were delivered to the sheriff of the county. The sheriff refused to serve them, for which he was afterwards indicted, so that this matter, also, fell to the ground. In the following June, the inspector, General Neville, was burnt in effigy in Alleghany county, at a place and on a day of public election, and in the presence of the magistrates and other public officers, without any interruption whatever. On the 22d of November, in the same year, another party of men, disguised and armed, went to the house of Wells. They broke into it, and demanded a surrender of his commission and official books. On his refusal, a pistol was put at his head, and he was compelled to comply under threats of death. Not content with this, the rioters, before they departed, ordered him, under pain of another visit and the destruction of his house, to publish his resignation within two weeks.

During this period, however, a spirit of compliance appeared to be gaining ground in some quarters. Several principal distillers, who had formerly held out, entered their stills, and others evinced a disposition to comply, though restrained by the fear of violence. But these favourable appearances did not continue long. In January, 1794, there were fresh outbreaks. William Richmond, who had given information against some of the rioters in the affair of Wilson, had his barn burnt, with all the grain and hay that it contained; and the same thing happened to Robert Shawhan, a distiller, who had been among the first to accede to the law, and who had always spoken favourably of it. James Kiddoe and William Coughran, who had entered their stills, were first threatened and then attacked. The grist-mill of the former was mutilated, and the still of the latter destroyed, and his saw and grist-mills rendered useless. They were also ordered to publish what they had suffered in the Pittsburg Gazette. A previous attack had been made upon Kiddoe, when his still was partially destroyed. June being the month for receiving the annual entries of stills, endeavours were made to open offices in Westmoreland and Washington counties, where it had hitherto been found impracticable. With much difficulty places were procured for the purpose. The office in Westmoreland was repeatedly

attacked in the night by armed men, who fired upon it: but it was defended with so much courage by Wells, the collector, and Regan, the owner of the house, as to maintain it for the remainder of the month. That in Washington, after repeated attempts, was suppressed. The first effort was confined to pulling down the sign of the office, and threats of future destruction. These were soon realized. About midnight, on the 6th of June, a number of persons armed, and painted black, broke into the house of John Lynn, where the office was kept. By promises of safety to himself and his house, they treacherously got him into their power, when they seized and tied him, threatening to hang him. They carried him to a retired part of the neighbouring woods, and there, after cutting off his hair, and tarring and feathering him, they compelled him to swear that he never would allow his house to be used again as an office. never again to have any agency in the excise, and never to disclose their names. After this they bound him naked to a tree, and left him in that situation till the morning, when he succeeded in extricating himself. Not content with this, the rioters came again, pulled down part of his house, and compelled him to become an exile from his own home. After this, many of the distillers who had at first entered their stills withdrew them, and refused payment of the duties.

In the congress of 1792–93, a bill for altering and amending the former laws on the subject was introduced, but was dropped in the hurry of the close of the session. On the 5th of June, 1794 [1 Stat. 378], another act, emendatory of the act of 1791, was passed. By it, the former law was extended to the Northwest Territory; the necessity of having an office in each county was dispensed with; the state courts were given jurisdiction over offences against the revenue laws in certain cases; and various other emendations and alterations were made. After the passage of this act, a plan was adopted, which was intended to give increased efficiency to the system. It was determined (1) to prosecute delinquents for non-compliance, in all cases where it could clearly be done; (2) to intercept the surplus produce of the distillers of the non-complying counties on its way to the markets; (3) to confine the purchase of spirits for the army to those in respect to which there had been an actual compliance with the law. It was hoped, by thus cutting off the trade of these counties, and prosecuting delinquents with rigour, that submission could be enforced. Here, again, the expectations of the government were disappointed. Process issued against a number of non-complying distillers; and indictments having been found at a circuit court holden at Philadelphia, in July, 1799, against Robert Smilie and John McCulloch, two of the rioters in the attack on Wells, the collector, in Fayette county, process issued against them also. Warned by the ill success of the pre-vious attempts to serve process by deputy, the marshal of the district, Mr. Lenox, determined to go for that purpose in person. Before this intention of the marshal was known, a design to suppress the office of the inspector was manifested. It was currently reported that a party of four or five hundred men were to march to General Neville's house to destroy his papers, and effect the suppression. On the 4th of July, 1794, at a muster at Colonel Parker's, a paper, to which every one who opposed the excise was to put his name, was circulated among the militia men. Only one man refused to sign it, and he incurred the odium of the rest, and was threatened therefor. At this place violent and inflammatory speeches were made against the law and against congress. The success of the rioters in suppressing the collector's office in Washington county was referred to; it was urged in strong terms to the people to hold out, and not to submit to the law; and they were openly advised to take up arms and resist it. After the marshal's arrival, and when his purpose was learned by the insurgents, he also became an object of hatred; and a very large meeting was held to consider the means of opposing his mission. The people were collected by means of expresses sent over the country, and considerable numbers came armed. It was there resolved that the marshal should be seized, and brought before the meeting; but what was to be done thereupon was left uncertain. If any opposition was made, or they were fired upon, they were to burn and destroy everything that came in their way. A party, headed by a Captain Pearsol, was accordingly selected, who were ordered to intercept the marshal; and if any opposition was made, to return it. The remainder set out for General Neville's. The marshal had executed his trust without opposition, though under very discouraging circumstances, in Fayette county. But while in Alleghany county, being there accompanied by General Neville, on the 15th of July, he was met by the party sent to intercept him, then amounting to thirty or forty men, who fired on them. but without injury. This was but the beginning of greater outrages.

General Neville had received warnings for some time previous, that an attack was intended on his house. He had been met in the spring of the year by a number of disorderly persons, who, though they did him no personal injury, yet threatened him with vengeance in a very significant manner. He had obtained information of the proceedings of the muster at Colonel Parker's. Several other indications of a plan against him were manifested. Acting on these intimations, he had had his house prepared for resistance. The windows were filled up with thick plank, and the negroes abundantly supplied with arms and ammunition. These precautions were not idle. About day-break on the 16th, the party from the meeting before-mentioned, under the command of one John Holcroft,

counting about forty guns, appeared at the house of the inspector. On being asked what they wanted, and replying in a suspicious manner, they were fired upon from the house. They returned the fire; but being unexpectedly attacked by the negroes in the out-houses, they precipitately retired, with six of their number wounded and one killed. The inspector's family received no injury. Though thus far entirely successful, General Neville had every reason to suppose that the business would not terminate thus, and to anticipate a renewed and more dangerous attack. He accordingly made application to the judges, generals of militia, and sheriff of the county for protection. A reply to his application, on the part of these officers, informed him that the laws could not be executed, so as to afford him protection, owing to the too general combination of the people in that part of Pennsylvania, to oppose the revenue law; and expressed a fear, that should the posse comitatus be ordered out in support of the civil authority, very few could be found who were not of the party of the rioters. A detachment of eleven men, regulars, was obtained, however, from Fort Pitt, and command was taken by Major Kirkpatrick, a relative of General Neville. On the day following the attack, the rioters assembled again at Couche's Fort, a few miles from the residence of General Neville, to the number of five or six hundred men. Mortified at their defeat, and enraged at the number of wounded, they allowed their passions to swallow up all regard for consequences. A plan was concerted there to proceed at once to General Neville's, to compel the resignation of his office, and the delivery of his papers, and to seize the marshal. A committee of three, in imitation of the national commissioners that then attended the French armies, were elected to superintend the enterprise; and they appointed a certain James McFarlane,[3] formerly a lieutenant in the Pennsylvania line, and then a major in the militia, to command the party, subject to their supervision. The orders were to demand and obtain the inspector's commission and papers, and to offer no violence to his person or property, farther than was necessary for accomplishing their object. On the 17th, accordingly, they marched to the inspector's house. The horses were left under a guard in the woods; and the committee seated themselves on an eminence at some distance from the house. When McFarlane and the assailants approached the house, one David Hamilton was sent with a flag, by the committee, to demand of the inspector his papers. On answer being returned, that the inspector had left the house on the approach of the party, the flag was sent a sec-

ond time, requiring the inspector to resign, and that six good, reputable citizens should be admitted to examine and seize the papers, promising that in that case no further injury should be done.[4] This was refused at once. Notice was given, by a third flag, for the women and children to withdraw. The attack then commenced.

In about a quarter of an hour the defenders of the house ceased firing, and a call was heard thence, which was mistaken by the assailants for a parley. Their leader, McFarlane, then stepped from behind a tree, where he had for greater safety posted himself, to order the firing to stop, when he was hit in the groin by a musket-ball from the house, and instantly killed. The firing then recommenced, and a message was sent to the committee to know whether the house should not be stormed. In the meantime the out-houses and the adjacent buildings were set fire to. The intensity of the heat, and the danger of an immediate communication of the conflagration to the house, compelled Major Kirkpatrick and his small party to come out and surrender themselves. The attack lasted for about an hour, during which the assailants had two killed and several wounded; and three of the soldiers were wounded. The privates were suffered to depart without injury, but Major Kirkpatrick was arrested, and ordered to give up his musket. He refused to do so, whereupon one presented a gun at his breast, and was about to fire, when he dropped upon his knees and asked quarter. The mansion was then set on fire, and it and the out-buildings were consumed, except a small out-house, which was preserved at the request of the negroes, as containing their bacon. While the house was burning, the rioters broke open the cellar, and drunk up the wine, and many things of value were supposed to be stolen therefrom. The marshal, with Colonel Presley Neville (the son of General Neville) and several others, were taken on their way to the house. They were arrested and put under guard. After a short time, all but the two former were permitted to escape. Colonel Neville begged to be permitted to go on, and engaged that all their demands should be complied with. He was refused, however, and was compelled to remain during the period of the attack in sight of the house; in painful uncertainty as to the fate of his father and family.

After the return of the people from the house, they carried with them Colonel Nev-

---

[3] McFarlane had served during the Revolution with reputation: and, according to Judge Brackenridge (Incidents, p. 18), was a man of good private character, and had acquired a handsome property by his industry after the conclusion of the war.

[4] This David Hamilton was a justice of the peace in Alleghany county. General Hamilton, in his report to the president, asserts that it was also demanded that the soldiers should march out and ground their arms. This is not in itself at all improbable, considering the lengths to which the rioters had already gone, and their present inflamed disposition. It is, however, not sufficiently supported by the evidence, and is expressly denied by Findley in his History of the Insurrection, though the latter cannot be implicitly relied on.

ille and the marshal, who were soon in great personal danger from the multitude, most of whom, from the liquors obtained from the inspector's house, were intoxicated. The marshal, after a long but fruitless struggle, was forced to promise, under threats of immediate death, to serve no process on the west of the mountains. The rioters also endeavoured to make him enter into an engagement not to return the process that he had served. The marshal firmly and decidedly refused, though at the risk of his life; alleging that this was out of his power, he having taken an oath of office to return them. This manly and courageous behaviour compelled respect from even the most violent, and he and Colonel Neville were suffered to depart without requiring them to give any further promises. After being thus dismissed they fell in with another party, almost all of whom were very much intoxicated. The marshal was taken again by these, and carried by them towards Couche's Fort, to which the party was returning, where both the peril and the insults to which he had been subjected were renewed and increased. Several of the party repeatedly presented their pieces at him, and were with difficulty restrained from shooting him by the more prudent of the party. He succeeded, however, at about one or two o'clock in the morning, in making his final escape. The insurgents, repenting of their lenity, sent, on the 18th, David Hamilton and John Black, two of their number, to Pittsburg, where the marshal then was, to require of him a surrender of the processes in his possession, intimating that his compliance would satisfy the people and add to his safety; and to demand of General Neville, in peremptory terms, the resignation of his office, threatening, in case of refusal, to attack the town and take it by force. The officers, of course, refused to comply. As it was ascertained that no protection could be expected from the magistrates or inhabitants of Pittsburg, it became necessary for the marshal and inspector to quit the place. As the usual routes were beset by the insurgents, they concluded to descend the Ohio, and proceed by a circuitous route to Philadelphia. They began their journey on the night of the 19th, and arrived at their destination in safety.

Before separating, after the attack on the inspector's, the insurgents appointed a meeting to be held on the 23d of July, at Mingo Creek Meeting House, in Washington county. At this meeting, which was composed of those who had been engaged in the attack, and a large number from the neighbouring counties, first appeared Brackenridge, Marshall, Bradford, and Parkinson, who afterwards became so prominent.[5] Bradford addressed the meeting in a tone of violent declamation. He declared his approbation of what had been done, and called upon those

assembled to pledge themselves to support it. Brackenridge then followed in a temperate and ingenious speech, by which he managed to show them that they had committed acts of treason, and to persuade them against any precipitate action, without endangering his safety, and without appearing to be adverse to their cause. It was finally determined to postpone their final determination to a more general assemblage. The following call for another meeting was made, and published in the Pittsburg Gazette of the 26th July: "By a respectable number of citizens who met on Wednesday, the 23d instant, it is recommended to the townships of the four Western Pennsylvania counties, and the neighbouring counties of Virginia, to meet and choose representatives, to meet at Parkinson's Ferry, on the Monongahela, on the 14th of August next, to take into consideration the situation of the Western country."[6]

In order to ascertain the strength of the insurgents, and to discover whether there were any latent enemies yet remaining unsuspected, Bradford, who had now assumed the direction of affairs, planned and executed another enterprise. The mail between Pittsburg and Philadelphia was robbed, near Greensburgh, on the 26th of July, by a party sent for that purpose, and the Pittsburg and Washington packet taken out. This was taken to Canonsburg, a village about seven miles from Washington, by Parkinson. A convention was held by the leaders to open and consider the letters. Those from Washington were unobjectionable. But some of those from Pittsburg contained very severe animadversion on the conduct of the insurgents, and showed no friendly disposition on the part of the writers. Bradford and the convention at Canonsburg immediately issued circular letters, directed to the militia officers of the four counties, for a meeting to be held at Braddock's Field, on the Monongahela, on the 1st of August.[7] The objects which were contemplated, it is said, were to take a march to Pittsburg, to seize the magazine and military stores, and also to take the writers of the letters, and imprison them in Washington jail. The burning of the town was even spoken of.

In the meantime, the inhabitants of Pittsburg, by means of the post-boy, who had been sent back with the remainder of the mail, obtained information of the projected march of the insurgents. Opposition was impossible. It was therefore deemed prudent to remove the causes of objection. A town meeting was immediately held; and with their consent, and for their safety, the obnoxious persons, "Ed. Day, James Bryson, and Ab. Kirkpatrick," were formally banished. The town meeting then went on to profess great warmth for the cause, to promise the attendance of the inhabitants at Brad-

---

[5] See note 1 at end of case.

[6] See note 2 at end of case.

[7] See note 3 at end of case.

dock's Field, and to make arrangements to send delegates to the Parkinson's Ferry meeting. The number of people present at Braddock's Field, on the day appointed, is estimated to have been about seven thousand persons. Almost all these were fully armed and equipped. A very warlike disposition was manifested on the occasion by the majority of those present. There was a continued firing of guns; and the conversation of the militia men was anything but subdued. Bradford, who had assumed the title of major-general, reviewed the troops on the ground, and received tokens of the most infatuated submission. A committee was appointed at the rendezvous, who had resolved that General Gibson and Colonel Neville should be expelled, and authorized the Pittsburg committee to put this in execution. It was resolved, also, that the army, as it was called, should march to Pittsburg. The design of attacking the garrison was, however, abandoned. The people of Pittsburg were remarkably hospitable on the occasion. The army marched through the town very peaceably, and crossed the Monongahela. The well disposed then retired to their homes, but a number remained, who created some disturbances. Major Kirkpatrick's barn was burnt, and an attempt was made to set fire to his dwelling house, which was prevented by the interposition of the leaders.

A few days after this meeting, another attack was again made upon the residence of Wells, the collector of Fayette county. His house was burned, and he was compelled to resign his commission, and swear never to hold the office for the future. Threatening letters were sent into Westmoreland county, to excite the people to go against Webster, the collector of Bedford. Webster was a man extremely obnoxious, for other and better reasons than his holding an office under the excise law. He had been very oppressive to the poor in the discharge of his office, and had, in several instances at least, by the judgment of the inspector, acted illegally, though no redress was obtained. It was not difficult to get a party to go against him. The attack was made upon his house, but he offered not the slightest resistance. He brought out his commission and papers himself, tore them up and trod them under foot. No other violence was done him than insulting language.

The insurrection had now reached a point at which the temporizing policy of the government could be pursued no longer. The execution of the laws had at length been resisted by open force, and a determination to persevere in these measures was unequivocally avowed. The alternative of subduing this resistance, or of submitting to it, was presented to the government. The act of congress which provided for calling out the militia "to execute the laws of the Union, suppress insurrections, and repress invasions," required, as a prerequisite to the ex-

ercise of this power, "that an associate justice or judge of the district should certify that the laws of the United States were opposed, or their execution obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshal." In the same act, it was provided, "that if the militia of the state, where such combinations may happen, shall refuse, or be insufficient, to suppress the same, the president may employ the militia of other states." Affidavits of all the previous matters were laid before Judge Wilson, who granted the necessary certificate on August 4th, 1794.

The executive being now authorized to adopt such measures as the occasion required, the subject was seriously considered in the cabinet; and Governor Mifflin, of Pennsylvania, was also consulted respecting it. To avoid military coercion, if obedience to the laws could be produced by other means, was the universal desire. All concurred, therefore, in advising the appointment of commissioners on the part of the government, and also from the state, to warn the insurgents of their impending danger, and to convey a full pardon for past offences, on condition of future submission. But as regarded ulterior measures, in case of continued resistance, a difference of opinion existed. The act before mentioned, made it the duty of the president, before the employment of military force, to issue his proclamation, commanding the insurgents to disperse within a limited time. The secretary of state (and the governor of Pennsylvania concurred with him) was of opinion that the conciliatory mission should be unaccompanied by any measure that might bear the appearance of force. It was supposed by him that the militia could not serve; or if they did, the introduction of, as it were, foreign troops into the state, would have the effect of inflaming incurably the resentment of the insurgents.[8] The secretary of the treasury, the secretary of war, and the attorney-general, were of opinion that the president was bound by the most high and solemn obligations to enforce obedience to the laws, and they recommended the employment of a force that would render resistance impossible. The insurgents could, at the most, muster only about seven thousand men; if the government should raise an army of twelve thousand men, it would be amply sufficient to overawe and to crush opposition in the bud. The president adopted the latter of these opinions. Forbearance, he agreed, had been too long the policy of the government. It had been hitherto tried without success. It was more than probable that, if it were continued, the range of disaffection would be extended, and the disorders become incurable. Washington, therefore, determined at once to issue

---

8 See, for correspondence, note 7 at end of case.

the proclamation that was to precede the employment of force,—which was done on the 7th of August.[9]

On the same day, a requisition was made on the governors of New Jersey, Pennsylvania, Maryland, and Virginia. for their several quotas of militia to compose an army of twelve thousand men, who were to be immediately organized, and prepared to march at a minute's warning.[10] While steps were being taken to bring this force into the field, a last attempt was made to render its employment unnecessary. James Ross, Jasper Yeates, and William Bradford, three distinguished citizens of Pennsylvania, were appointed commissioners, to bear to the insurgents a general amnesty for past offences on the sole condition of a future obedience.[11] As it was deemed advisable that the executive of the state should act in concert with that of the United States, Governor Mifflin also issued a proclamation, and appointed as commissioners, to act with those of the general government, Chief Justice McKean and General William Irvine. Meanwhile the insurgents omitted nothing to enlarge the circle of disaffection. Efforts were made to draw the adjacent counties of Virginia into their cause, and their spirit extended to Morgantown. in that state, at which place an inspector resided. who saved himself by flight, and protected himself by advertising that he had resigned his office. Similar excursions were made into the contiguous counties with success. Numbers were found to join them. The impression was general that the great body of the people were ready to take up arms against the government, and that the resistance commenced by them would spread through the Union, and terminate in a revolution.

On the day appointed, there was a tolerably large assemblage at Parkinson's Ferry. There were upwards of three hundred delegates present—three of whom were from Virginia. Among these were a number who had been engaged in the previous outrages, and threatening letters were sent to the more orderly. A liberty pole was placed in sight of the meeting. with the motto, "Liberty and no excise, and no asylum for cowards and traitors." Colonel Cook was appointed chairman, and Albert Gallatin, secretary. Bradford opened the meeting with a statement of the events that had taken place, and concluded by reading the letters which had been taken from the intercepted mail; with some inflammatory comments on them. The arrival of the commissioners. with powers for restoring order in the Western country, was then announced. Some satisfaction was expressed on the part of the better disposed. but it was determined nevertheless to go on with the business of the meeting. A series of resolutions, prepared by Bradford and Marshall, was then proposed. The first resolution, against taking citizens for trial out of the vicinage, met with no objections. The second, and most important, ran thus: "Resolved, That a standing committee be appointed, to consist of —— members from each county, to be denominated a 'committee of Public Safety,' whose duty it shall be to call forth the resources of the Western country, to repel any hostile attempts that may be made against the citizens, or the body of the people." This was nothing more nor less than an attempt to form a combination hostile to the state and to the United States. Mr. Gallatin had the courage to oppose this, and the skill to oppose it successfully. He objected to the word "hostility" as improper, as the coercion hitherto exercised had been by means of the judiciary. He moved to refer the resolution to a select committee. So great was the fear of the people among the delegates, that this was not seconded. After some delay, however, Marshall, the mover of the resolution. offered to withdraw it, on condition that a committee of sixty should be appointed. with power to call a field meeting of the people or their deputies. This was at once agreed to. The resolution was then modified so as to meet the views of all. The subsequent resolutions were agreed to without much difficulty, except the last. This was to support the laws of the United States, except the excise law. Mr. Gallatin succeeded in obtaining the omission of the "except." The resolutions were then committed for remodelling and passed the next day with ease. The committee of sixty was appointed to meet at Redstone Old Fort, and in the mean time a sub-committee of twelve members, was chosen to confer with the commissioners from the president.[12] On the 21st of August the commissioners on both sides met at Pittsburg.[13]

The conference was begun by the commissioners representing the government of the United States, who "expressed their concern at the events that had occasioned the meeting; but declared their intention to avoid any unnecessary observations upon them. as it was their business to endeavour to compose the disturbances which prevailed. and to restore the authority of the laws by measures wholly of a conciliatory nature." It was then stated that "formal resistance which had arisen to the laws of the United States. vio-

---

[9] See note 4 at end of case.

[10] This requisition was afterwards augmented to fifteen thousand men.

[11] See note 5 at end of case.

[12] This committee was John Kirkpatrick, George Smith. and John Powers. from Westmoreland county: David Bradford. James Marshall. and James Edgar, from Washington county: Edward Cook, Albert Gallatin. and James Lang, from Fayette county: Thomas Morton. John Lucas, H. H. Brackenridge. from Alleghany. William McKinley. William Sutherland. and Robert Stevenson. also acted with the others. as delegates from Ohio county, Va.

[13] See note 6 at end of case.

lated the great principle on which republican government is founded; that every such government must, at all hazards, enforce obedience to the general will." They then represented the obligation which lay on the president of the United States to enforce the execution of the law; the measures that he had taken for the purpose; his desire to avoid extremities, and the general nature of the powers that they had been entrusted with. They then requested to know whether the conferees could give any assurances of a disposition on the part of the people to submit to the law. The conferees then entered into a narrative of the causes of discontent which so generally prevailed. Many of these, they insisted, "had long existed, and some of them from the settlement of the country." They complained "of the decisions of the state courts, which discountenanced improvement, and gave the preference to paper titles; of the war which had so long vexed the frontiers, and of the manner in which that war had been conducted," adding, that they "had been unnecessarily harassed with militia duty;" that the general government had been unattentive to the execution of the treaty of 1783, respecting the western posts, and remiss in asserting the claim to the navigation of the Mississippi; that "the acts for raising a revenue on distilled spirits were unequal and oppressive, in consequence of their local circumstances; that congress had neglected their remonstrances and petitions, and that there was great hardship in being summoned to answer for penalties in the courts of the United States, at a distance from the vicinage." To this they added, as causes of irritation, the suspension of the settlement at Presqu'isle, and the engrossing of large quantities of land in the state by individuals; the killing of certain persons at General Neville's house, and the sending of soldiers from the garrison at Pittsburg to defend that house. The appointment of General Neville as inspector was also referred to as peculiarly offensive. The conferees said, that they were persuaded that the actors in the late disturbances had not originally intended to have gone so far as they had gone; but had been led into it "from the obstinacy of those who refused to do what was demanded of them;" and that if there were any prospect of redress, no people would be more ready to show themselves good citizens.

Great surprise was naturally felt by the commissioners at the nature and extent of these grievances; and it was intimated, that "if these were really the causes of discontent, no government would be able to satisfy them." They stated what was supposed to be the intentions and course of the government as regards the navigation of the Mississippi, and the other general grievances. The acts of congress, however, that were complained of, could be only reached through constitutional action in congress itself. The western counties were better represented in congress than they were, in point of population, entitled to be. Their petitions and remonstrances "had never been overlooked, nor their interest disregarded." The act complained of had passed by a considerable majority, among whom might be found the names of men who had always been considered as the warmest friends of that country. Several modifications had been introduced in the last session, one of which removed one of the chief grounds of objection, by giving to the state courts concurrent jurisdiction with those of the United States in suits for penalties under the act. It was then asked whether there was anything, within the power of the president, yet remaining to be done to make the execution of the act "convenient and agreeable to the people." The terms upon which submission would be considered as satisfactory, and the powers of the commissioners, were then submitted in writing. After some alterations, the conferees expressed their approbation of the proposals, and engaged to recommend them to the people. They added, that they were persuaded, that however they might be received, nothing further could be done on the part of the commissioners.

But whatever may have been the desires of the conferees, the responsive meetings called by them of their constituents soon made it apparent that by this process submission was not to be obtained. The tone of the disaffected was as violent as their proceedings were evasive; and at last, convinced that if the pending negotiations were continued on the same basis, the executive would be subjected to fresh humiliations, the federal commissioners required that the people of the several townships and districts should be severally called on, under every circumstance of solemnity, so to express their "opinion whether or not there was such a general submission that the laws could be carried peacefully into execution." Unfortunately for the success of this plan, about this time the rebellion spread to the east of the Alleghanies, and showed itself in the midland parts of Pennsylvania, and in Maryland. All who came from that part of the country, brought to the insurgents the most favourable accounts of the sympathy of the people; and brought, or pretended to bring messages, desiring the country to hold out. Various publications in the Pittsburg Gazette, both threatening and satirical, tended to prejudice the public mind against submission.[14] This feeling displayed itself very strongly in some places; and on one occasion, on the return of the commissioners, it broke out into open violence and insult against their persons. At Greensburg, the inn at which they stayed was attacked by a party of disorderly persons, who broke the windows and abused them violently. They were compelled to pass the night armed.

---

[14] See note 7 at end of case.

The commissioners reported, on the 24th of September, the result of the county meetings to be, that in the returns made to them, there are no opinions certified that there is so general a submission, in any one of the counties, that an office of inspection could be safely established there; on the contrary, the report from Westmoreland county expressly stated that such a measure would not be safe. No returns whatsoever were received from Alleghany or Bedford counties, though it appeared that a majority in the former county were in favour of resistance. The number of signatures received in favour of submission was very insignificant when compared with the number of people, and though the commissioners still rested in the hope that a majority of the people at large was disposed to support the government throughout, yet in the face of the evidence produced before them, they felt that they had no other course but to return that "there was no probability that the act for raising revenue on distilled spirits could be enforced by the usual course of civil authority, and that some more competent force was necessary to cause the laws to be duly executed, and to insure to the officers and well-disposed citizens that protection which it is the duty of government to afford." [15] This last appeal having failed, it became the duty of the president to vindicate the authority of the government at once. He issued a third proclamation on the 25th of September, describing in energetic terms the obstinate and perverse spirit with which all the propositions of amnesty had been met; and declaring his fixed determination, in obedience to the high duty assigned to him by the constitution, to take care that the laws be faithfully executed by the president of the United States of America. The militia were to be put in motion immediately. The troops from New Jersey and Pennsylvania were directed to rendezvous at Bedford, and those of Maryland and Virginia at Cumberland, on the Potomac. The command of the expedition had been conferred on Governor Lee, of Virginia; and the governors of New Jersey and Pennsylvania commanded the militia of the several states, under him. The circumstances attending the calling out of the militia are thus concisely stated by Chief Justice Marshall (2 Life of Washington, 346):

"From the same causes, among which was disaffection to the particular service, the prospect of bringing the quota of troops required from Pennsylvania into the field, was at first unpromising. But the assembly, which had been summoned by the governor to meet on the 1st of September, expressed in strong terms its abhorrence of this daring attempt to resist the laws, and to subvert the government of the country; and a degree of ardour and unanimity was displayed by the people of other states which exceeded the hopes of the most sanguine friends of the administration. Some feeble attempts were, indeed, made to produce a disobedience to the requisition of the president, by declaring that the people would never be made the instruments of the secretary of the treasury, to shed the blood of their fellow-citizens; that the representatives of the people ought to be assembled before a civil war was commenced; and by avowing the extravagant opinion, that the president could not lawfully call forth the militia of any other state, until actual experiment had ascertained the insufficiency of that of Pennsylvania. But these insidious suggestions were silenced by the general sense of the nation, which loudly and strongly proclaimed that the government and laws must be supported. The officers displayed an unexampled activity; and intelligence from every quarter gave full assurance that, with respect to both numbers and time, the requisition of the president would be punctually observed. The governor of Pennsylvania compensated for the defects in the militia law of that state by his personal exertions. From some inadvertence, as was said, on the part of the brigade inspectors, the militia could not be drafted, and consequently the quota of Pennsylvania could be completed only by volunteers. The governor, who was endowed with a high degree of popular elocution, made a circuit through the lower counties of the state, and publicly addressed the militia at different places, where he had caused them to be assembled, on the crisis in the affairs of their country. So successful were these animating exhortations, that Pennsylvania was not behind her sister states in furnishing the quota required of her. The president in person visited each division of the army; but being confident that the force employed must look down all resistance, he left the secretary of the treasury to accompany it, and returned himself to Philadelphia, where the approaching session of congress required his presence. From Cumberland and Bedford the army marched in two divisions into the country of the insurgents. The greatness of the force prevented the effusion of blood. The disaffected did not venture to assemble in arms. Several of the leaders, who had refused to give assurances of future submission to the laws, were seized, and some of them detained for legal prosecution. But although no direct and open opposition was made, the spirit of insurrection was not subdued. A sour and malignant temper displayed itself, which indicated but too plainly that the disposition to resist had only sunk under the pressure of the great military force brought into the country, but would rise again should that force be withdrawn. It was, therefore, thought advisable to station, for the winter, a detachment, to be commanded by Major-

---

[15] See note 6 at end of case, where the report of the commissioners is given at large.

General Morgan, in the centre of the disaffected country." [16]

These judicious measures had the effect of totally checking opposition, and of enabling the good sense and love of order of the community to display itself. [17] Though many complaints and, perhaps, with reason, were made against the excesses of the soldiery, no further violations of the laws occurred. The excise was continued without opposition, and revenue collected under it till the year 1805, when it was repealed. After quiet had been thus restored and the civil authority was enabled to assert itself, the prosecutions of those concerned in the insurrection were resumed with vigour, and a number of arrests of those who took the most active part were made.

Indictments for high treason having been found against a number of these, a venire was issued in each case [18] for summoning a jury returnable to the April term, 1795; and to each writ the marshal returned a separate panel containing the names of thirty-six jurors from the city of Philadelphia, fifteen from the county of Delaware, nine from the county of Chester, and twelve from each county in which the treason was charged to have been committed, making seventy-two jurors on each panel, and one hundred and eight jurors summoned on the whole. The act of congress (1 Stat. 112, § 29) having directed "that any person who shall be accused and indicted of treason, shall have a copy of the indictment, and a list of the jury and witnesses to be produced on the trial for proving the said indictment, mentioning the names and places of abodes of such witnesses and jurors, delivered unto him at least three entire days before he shall be tried for the same," the attorney of the district had, in due time, delivered to the several prisoners copies of the indictment, of the panel of jurors, and of the list of witnesses; but he had omitted to deliver a copy of the caption of the indictment, and to specify the occupations, or the places of abode of the jurors and witnesses, otherwise then by mentioning the counties in which the jurors respectively resided.

On this state of facts, Mr. Lewis suggested the following exceptions, which, he said, were not so much designed for the existing cases, as to prevent the introduction of prece-

dents, injurious to the rights and safety of posterity:

(1) That the marshal had returned a greater number of jurors than the law authorized, and that he had returned a several panel in each case, instead of one general panel to try all the issues at this court. By the act of congress (1 Story's Laws, p. 63, § 29 [1 Stat. 88]) it is declared, that "in all cases punishable with death, that trial shall be had in the county where the offence is committed, or where that cannot be done, without great inconvenience, twelve petit jurors at least shall be summoned from thence. And jurors in all cases to serve in the courts of the United States shall be designated by lot, or otherwise, in each state respectively according to the mode of forming juries therein now practised so far as the laws of the same shall render such designation practicable by the courts or marshals of the United States; and the jurors shall have the same qualifications as are requisite for jurors by the laws of the state of which they are citizens, to serve for the highest courts of law of such state, and shall be returned as there shall be occasion for them from such parts of the district from time to time as the court shall direct, so as shall be most favourable to an impartial trial, and so as not to incur an unnecessary expense, or unduly to burden the citizens of any part of the district with such services." By the act of Pennsylvania for the better regulation of juries (volume 2, p. 263, § 4, Dallas' Ed.) it is declared, "that every sheriff, or any officer, to whom the return of venire facias juratores, or other process for the trial of causes before the judges of oyer and terminer, general jail delivery, and nisi prius doth belong, shall, upon return thereof, unless in cases where a special jury shall be struck by rule of court, annex a panel to the said writ containing the Christian and surnames, additions, and places of abode of a competent number of jurors, the names of the same persons to be inserted in the panel annexed to every such writ, for the trial of all issues in civil and criminal causes at the said courts in each respective county. which number of jurors, in any county, shall not be less than forty-eight, nor more than sixty, without the direction of the judge or judges appointed to go to the circuit, and sit as judge or judges of oyer and terminer, general jail delivery, or nisi prius in such county, who are hereby empowered and required, if he or they see cause, by order, under his hand, or their hands, to direct a greater number, not to exceed eighty," &c. By the same act, (section 5,) it is further declared, "that the sheriff of the county of Philadelphia, or other county, where the supreme court of judicature shall be holden, or other officer to whom the return of the venire facias juratores, or other process for the trial of causes at bar before the justices of the supreme court, doth belong, shall, upon return thereof, unless in cas-

---

[16] In preparing the statement of facts very free use has been made of Mr. Hamilton's report to the president. of August 5, 1794. Of all his official reports, there is no one which more fully than this exhibits his unrivalled powers of statement and description; and in those instances where his abstract of the depositions taken chimes in with the evidence afterwards adduced, his narrative has been ipsa verba, adopted. For Mr. Hamilton's notes of the progress of the army, see 10 Sparks, Wash. 449.

[17] See note 8 at end of case.

[18] From this point the report in [U. S. v. Insurgents of Pennsylvania] 2 Dall. [2 U. S.] 335 et seq. is followed.

es where a special jury shall be struck by rule of court. annex a panel to the said writ, containing the Christian and surnames, additions and places of abode, of a competent number of jurors, the names of the same persons to be inserted in the panel annexed to every such writ, for the trial of all issues to be tried at the bar of the said court during the ensuing term, which number of jurors shall be not less than forty-eight, nor more than sixty," &c. The law of the state being thus made the rule for the federal courts, Mr. Lewis contended that in no case, could the marshal be authorized to return more than eighty jurors; that the power of extending the panel to that number does not rest in the circuit court, sitting in its ordinary character, as the act only vests it in the courts of oyer and terminer, general jail delivery and nisi prius; but, that, in the present instance, even that number, and without the order of the court, had been far exceeded, since twelve jurors had been summoned from each of the four counties, in which the charges were laid, and sixty had been summoned from other parts of the state, making in the whole one hundred and eight, which he considered an unnecessary, as well as an expensive and oppressive call on the citizens. He insisted that, as different charges were laid in the four counties, forty-eight jurors should have been summoned from them, and only the number necessary to complete the panel of sixty, or in case of a special order, the panel of eighty might be summoned from any other part of the state. In England, the power of summoning jurors is limited to forty-eight, unless by the special order of the justices of oyer and terminer and general jail delivery. Keyl, 16. The act of congress does not direct. that the twelve jurors to be brought from the county where the offence was committed, shall be over and beyond the sixty jurors, directed by the state law to be summoned; nor does it permit the marshal to summon the jurors whence he pleases, without the express order of the court. The return of several panels for the trial of each issue, Mr. Lewis deemed to be equally inconsistent with the terms and policy of the Pennsylvania law. which the law of congress had likewise adopted. Great inconveniency had been experienced from such a practice; and the state legislature, as a reformation in the system of jurisprudence that previously prevailed. expressly enacted, that the panel annexed to every writ of venire facias juratores. should be "for the trial of all issues to be tried at the bar of the said court, during the said term."

(2) That a copy of the caption of the indictments as well as a copy of the indictments themselves, had not been delivered to the respective prisoners. The caption is material, for it must state the judges before whom, the grand jury by whom. the time when, and the place where the indictment was presented. For, if the judges sit without a commission, or the commission has expired; if the grand jury was composed of a number less than twelve, or the members of it were not qualified according to law; if the indictment was found at a place where the court was not authorized to sit, or at a time when, in fact, it was not sitting, the prisoner is entitled to take advantage of the defect, and he cannot have the opportunity of doing so, unless he is furnished with the caption of his indictment. On the same principle Foster contends for the same privilege; and declares it to be founded on the constant practice, though the act only mentions a copy of the indictment. Fost. Crown Law, 229. And Blackstone, as well as Foster, shows that it is of importance that the prisoner should receive the copy before arraignment, "for then is his time to take exceptions to the indictment by way of plea or demurrer." 2 Hawk. P. C. c. 25, § 118. In reason, and in effect, the caption is part of the indictment. Whenever it becomes necessary to exemplify the indictment the caption must accompany it; and no inference drawn from the practice respecting indictments for other offences (where the caption is not supplied as it is said till the record is finally made up) can be applicable to the present question, since in no other case but treason is a delivery of the copy of the indictment prescribed as a preliminary to the trial. Nor is there any essential distinction between this court and the courts to which the cited authorities relate; for although the jurisdiction of the court is ascertained and known. the constitutionality of the commissions of the judges who compose it; the legality of the number and qualification of the grand jury who attend it; the place of its sessions &c., will still afford ample materials for investigation and just objection.

(3) The lists furnished to the respective prisoners. do not contain a sufficient specification of the addition and places of abode of the jurors and witnesses. By the act of congress (1 [Story's Laws] 63. § 28 [1 Stat. 88]), as well as the act of Pennsylvania (vol. 2, p. 263) the specification of the place of abode of the jurors. is prescribed; and the Pennsylvania act (which is adopted by the other) calls likewise for the addition of the jurors. It is true, that in the copy of the panel the county is mentioned. from which the jurors respectively are summoned; but as the sheriff could not in a case arising under the state jurisdiction, summon any citizens as jurors, who were not inhabitants of the proper county, the act, when it requires a specification of the place of abode. cannot surely be satisfied by mentioning the county. The express relation between the state and federal laws on the subject demands an analogous conclusion. in a case arising under the jurisdiction of the general government; and the general reasons for furnishing such information to prisoners. acquire great additional force, from a consideration of the distance

between the place of trial, and the place where the offence is charged to have been committed.

In answer to these exceptions, Mr. Bradford (the attorney general of the United States) and Mr. Rawle (the attorney of the district) premised, that they were also impressed with the propriety and ·necessity of establishing sound and permanent principles on this first discussion of the doctrine of treason, as it applied to the existing constitution of the United States. But they contended:

(1) That the exception to the number of jurors returned, and to the mode of returning separate panels, ought not to be allowed. They observed, that the leading question on this point, called for a decision, whether, when a federal court was referred by an act of congress to state regulations for its government, the state law. in its strict words, or in the practice under it, should furnish the rule? But, even from the context of the judicial act of congress, an intention cannot reasonably be inferred, to incorporate all the provisions of the Pennsylvania act relating to jurors, into the practice of the federal courts. The reference to the state laws, respects only the mode of designating the jury by lot, or otherwise, and the qualification of the jurors; it does not respect the number to be returned on the panel. which is still left, under the power of framing writs suited to the exigency of every case (vol. 1, p. 58), in the discretion of the court, to be prescribed by venire, or at common law. But the Pennsylvania act, without admitting such a distinction, must produce the greatest embarrassment, for it prescribes a different number of jurors to be returned to different courts. and there is nothing in the act of congress to determine which number shall be adopted here. The act of Pennsylvania however had obviously an economical object in view, when it limited the number of jurors to sixty; as a compensation was originally allowed for their attendance, though it has since been repealed (volume 2. Dall. Ed. p. 268), and the practice of the supreme court, it is believed changed in consequence of the repeal. But even taking the act of Pennsylvania as an indispensable rule, it is substantially complied with. The act of congress introduced a particular regulation for the trial of offenders, which required that twelve jurors should be taken from the county where the offence is charged to have been committed; and this is done. The act of Pennsylvania authorized sixty jurors to be summoned; and in addition to the twelve from the proper county, the marshal has accordingly summoned sixty from the state at large. To each venire there are no more than seventy-two jurors returned. The return of a separate panel in each case is, likewise. perfectly consistent with law, practice, and public conveniency.· The indictments depending are all separate; none of them are joint. The exception, however, if it is at all available. goes to the venire, and not

to the panel; for the latter is in strict conformity to the former. After the court has prescribed that twelve of the jurors shall be brought from the proper county, the marshal has a legal direction to bring the rest from any part of the district that he pleases. The court will not, and cannot, interfere with the exercise of that power, unless it becomes necessary, in order to obtain an impartial jury. There must be as many panels as there are counties, in which offences are charged to have been committed; and if twelve jurors are taken from the proper county for each case, there can be no legal ground to object that the same sixty, to complete the panel of seventy-two, are returned to all the cases. But the adverse doctrine would require the jurors to be brought from every county in which the offence is charged. Suppose, therefore, five counties involved, sixty jurors would, of course, be returned from them; and if the court (as it has been contended) cannot increase that number, then a pirate, or any other felon, charged with an offence committed out of those counties, could not be brought to trial at the same term.

(2) That it is not necessary, nor is it material, to furnish the prisoner with a copy of the caption, as well as of the indictment. The act of congress must be presumed to have been passed with a full knowledge of the state law; and by the state law, evinced and supported by a constant practice, nothing more than a copy of the indictment was required. [Respublica v. Molder] 1 Dall. [1 U. S.] 33. Sufficient appears on the indictment to show, what it is incumbent on the prosecutor to show. The case referred to .in Fost. Crown Law, p. 229, was that of a special court, where a caption is undoubtedly necessary; and the distinction is expressly so taken. Id. Discourse I.; 2 Hawk. P. C. c. 25, § 126.

(PATTERSON, Circuit Justice. The cases of special courts, or of inferior courts, held by charter, &c., can furnish no analogy for this court, which is a court of original and permanent jurisdiction. The proceedings in the king's bench can alone be applicable.)

(3) That the addition of the jurors and witnesses, as to the place of abode, is sufficient; but if the court think otherwise, time will be allowed to amend it. The act of congress, however, does not require a specification of the occupation of the jurors and witnesses, but only of their names and places of abode; and it cannot be controlled by the provision of the state act, which is in that respect different; but must be deemed substantive and independent.

Before PATTERSON, Circuit Justice, and PETERS, District Judge.

PETERS. District Judge. I have considered the objections made to the panels. and do not conceive these objections relevant. Although, in ordinary cases. it would be well to accommodate our practice with that of

the state, yet the judiciary of the United States should not be fettered and controlled in its operations, by a strict adherence to state regulations and practice. But I see not, that in a liberal view and construction of the laws of the United States, on this subject, a rigid adherence to all the local and economical regulations of the state, is directed or necessary. It should seem, that the most pointed reference was had to the designation and qualification of jurors, and not to the exact numbers of which the panel should consist. The legislature of a state have in their consideration a variety of local arrangements, which cannot be adapted to the more expanded policy of the nation. It never could have been in the contemplation of congress, by any reference to state regulations, to defeat the operation of the national laws. Now, there are cases, which have been stated, in which some of the criminal laws of the United States may be rendered impracticable by an adherence to the rule of numbers prescribed as to jurors, in criminal cases, by the state law; and, especially, if there must be but one panel as has been contended. Yet, the most substantial requisites, to wit, the qualifications of jurors and mode of selection, may be adhered to. As to the clause in the law of the United States, directing that "the laws of the states (with great exceptions) shall be regarded as rules of decision, in trials at common law, in the courts of the United States," I do not think it applies to the case before us. All the arguments founded on the inconveniences to the defendants, if in this case particularly any such exist (of which I much doubt), weigh lightly, when set against the delays and obstructions which the objection would throw in the way of the execution of the laws of the nation.

PATTERSON, Circuit Justice. The objections that have been suggested on this occasion, are principally founded on the twenty-ninth section of the judicial act of congress, which refers the federal courts to the state laws, for certain regulations respecting juries. But the words of this reference are clearly restricted to the mode of designating the jury by lot, or otherwise; and to the qualifications which are requisite for jurors, according to the laws and practice of the respective states. Since, therefore, the act of congress does not itself fix the number of jurors, nor expressly adopt any state rule for the purpose, it is a necessary consequence, that the subject must depend on the common law; and by the common law, the court may direct any number of jurors to be summoned, on a consideration of all the circumstances under which the venire is issued. There are instances, indeed, where five juries have been summoned upon a trial for high treason, in order that after the allowance of the legal challenges, a competent number might still be insured. In the present instance, the precept requires the marshal to return at least

forty-eight jurors; and he has not in my opinion been guilty of any excess in the exercise of that discretion for returning a greater number, with which he is legally invested. Neither is the mode of making his return justly exceptionable. As the act of congress directs that twelve jurors shall be summoned from the county in which the offence was committed, I cannot conceive any more proper, or more legal way of proceeding, than by issuing a venire in each case; and then there must of course be a separate panel returned, in conformity to every writ. Thus, likewise, the act of congress and the state act have been reconciled, and both put into operation; twelve jurors being returned in pursuance of the former, and sixty jurors being returned in pursuance of the latter law. With respect to the objection, that a copy of the caption of the indictment has not been furnished to the prisoners, it may be observed, that, although the practice of Pennsylvania has been different, yet the caption and the indictment seem naturally to form but one instrument; and copies of both should, therefore, be delivered under the provisions of the act of congress. There can be little inconveniency in adopting this rule; and it is calculated to avoid much difficulty and controversy. The objection, that the place of abode of the jurors and witnesses has not been sufficiently designated, in the lists furnished to the prisoners, is, likewise, in our opinion a valid one. The object of the law was to enable the party accused, to prepare for his defence, and to identify the jurors who were to try, and the witnesses who were to prove, the indictment against him. It is contrary to the spirit and intent of such a provision, that the whole range of the state, or of a county, should be allowed, as descriptive of a place of abode; and it is the duty of the judges so to mould the practice and construction of statutes, as to render them reasonable and just. With regard to the place, therefore, we think the townships in which the jurors and witnesses respectively reside, should be specified; but the act of congress does not require a specification of their occupations, and the niceties of the state act are not, in that respect, incorporated into the federal system.

In consequence of this decision, the trials were suspended, in order to give the attorney of the district the three days required by the act of congress for delivering to the prisoners amended copies of the caption and indictment, and of the lists of jurors and witnesses.

NOTE 1. Hugh H. Brackenridge was then a lawyer of considerable standing in Pittsburg, and afterwards became a judge of the supreme court of Pennsylvania. He was a man of some learning and much eccentricity, and was the author of several books, the best known of which was a humorous novel, called "Modern Chivalry, or the Adventures of Captain John Farrago and His Servant Teague O'Regan," which was very successful in its day. One act of magnanimity on his part ought to be recorded, to preserve his memory from oblivion. In 1805,

Judges Shippen, Yeates, and Smith, of the supreme court of Pennsylvania, being out of favour with the legislature, were impeached for an alleged maladministration of justice in the case of Com. v. Passmore [3 Yeates, 441]. The charge was, that they had illegally imprisoned the defendant in that case for a contempt, in publishing a libel on certain proceedings in that court, but the matter wore an entirely political aspect. Judge Brackenridge was not present when the decision was pronounced, and was of the same political creed as the dominant party in the house of representatives. He, however, at once wrote to the committee of impeachment, requesting them to join him with the other judges in the proceedings, as he entirely approved of their decision, and, if he had been present, would have concurred in it. He considered it but fair and right, that, sharing the obnoxious opinions of his brethren. he should also share their punishment. The committee refused to accede to this, and the other judges were afterwards acquitted. Colonel Marshall, an Irishman, was a man of respectability and wealth. He had been sheriff of Washington county, member of the legislature, and of the convention for ratifying the constitution of the United States, against which he voted. As his character had been that of a moderate, prudent, industrious man, the part he took in the insurrection surprised every one. David Bradford, a Marylander by birth, had been a deputy of the attorney-general of the state for Washington county, ever since its creation. At the time of the adoption of the constitution he was a zealous Federalist. He was a man of great timidity of character, and yet a great demagogue. Before the attack on the inspectors, he had avoided giving open sanction to their proceedings. yet had encouraged the rioters. But, after that time, he was compelled by their threats to declare himself in their favour. He had thus got unexpectedly involved in the insurrection, and finding it too late to recede, endeavoured to carry out the most violent measures in order to save himself. All the wild proceedings afterwards adopted are attributable to him. Benjamin Parkinson, a native of Pennsylvania, was also a Federalist, and had formerly supported General Neville. He had been reputed a good citizen, and a man of influence in his neighbourhood, and had been a justice of the peace. He was one of the committee of superintendence at the attack on General Neville's house.

NOTE 2. The intended character of the meeting. notwithstanding the cautious wording of the notice. was no secret. The following letter from Bradford to the inhabitants of Monongahela, will show the spirit of the leaders:
"August 6th. 1794.
"Gentlemen: I presume you have heard of the spirited opposition given to the excise law in this state. Matters have been so brought to a pass here, that all are under the necessity of bringing their minds to a final conclusion. This has been the question amongst us some days: 'Shall be disapprove of the conduct of those engaged against Neville, the excise-officer, or approve?' Or, in other words. 'Shall we suffer them to fall a sacrifice to a federal prosecution, or shall we support them?' On the result of this business we have fully deliberated. and have determined, with head. heart, hand and voice, that we will support the opposition to the excise law. The crisis has now come. Submission or opposition. We are determined on the opposition; we are determined to act agreeably to system; to form arrangements guided by reason, prudence, fortitude, spirited conduct. We have proposed a general meeting of four counties of Pennsylvania, and have invited our brethren in the neighbouring counties of Virginia to come forward, and join us in council and deliberation, on this important crisis. and conclude upon measures interesting to the western counties of Pennsylvania and Virginia. A

notification of this kind may be seen in the Pittsburg paper. Parkinson Ferry is the place proposed as the most central, and the 14th of August the time. We solicit you, by all the ties that union of interests can suggest, to come forward to join with us in our deliberations. The cause is common to us all. We invite you to come, even should you differ with us in opinion. We wish you to hear our reasons influencing our conduct. Yours with esteem,
"David Bradford."

NOTE 3. The following is one of the circulars referred to in the text:
"Canonsburg, 28th July, 1794.
"Sir: Having been suspicious that the Pittsburg post would carry with him the sentiments of some of the people in the country respecting our present alarming situation; and the letters by the post being now in our possession by which certain secrets are discovered hostile to our interests, it is therefore now come to this crisis, that every citizen must express his sentiments, not by his words, but by his actions. You are thus called on, as a citizen of the western country, to render your personal service, with as many volunteers as you can raise, to rendezvous; at your usual place of meeting, on Wednesday next; and from thence you will march to the usual place of rendezvous at Braddock's Field, on the Monongahela, on Friday, the 1st day of August next, to be there at two o'clock in the afternoon, with arms and accoutrements in good order. If any volunteer should want arms or ammunition, bring them forward, and they shall be supplied as well as possible. Here, sir, you have an expedition proposed, in which you will have an opportunity of displaying your military talents, and of rendering service to your country. Four days provision will be wanted; let the men be thus supplied. We are, &c.,
"(Signed by)    J. Canon,
                "T. Bradford,
                "B. Parkinson,
                    "and Others."
Though it is alleged that the opening of the letters, and the indignation felt at their contents, were the causes of the first calling out of the militia, it is more than probable that the whole plan was arranged beforehand, and that the letters were only seized in order to give a pretext of some kind for its execution. Bradford and his colleagues knew well enough beforehand what the letters would contain.

NOTE 4. This paper was as follows:
"Whereas, combinations to defeat the execution of the laws levying duties upon spirits distilled within the United States and upon stills, have from the time of the commencement of those laws existed in some of the western parts of Pennsylvania. And whereas, the said combinations, proceeding in a manner subversive equally of the just authority of government and of the rights of individuals, have hitherto effected their dangerous and criminal purpose, by the influence of certain irregular meetings, whose proceedings have tended to encourage and uphold the spirit of opposition, by misrepresentations of the laws calculated to render them obnoxious, by endeavours to deter those who might be so disposed from accepting offices under them, through fear of public resentment and injury to person and property, and to compel those who had accepted such offices by actual violence to surrender or forbear the execution of them, by circulating vindictive menaces against all those who should otherwise directly or indirectly aid in the execution of the said laws, or who, yielding to the dictates of conscience and to a sense of obligation. should themselves comply therewith, by actually injuring and destroying the property of persons who were understood to have so complied, by inflicting cruel and humiliating punishments upon private citizens for no other cause than that of appearing to be the friends

of the laws, by intercepting the public officers on the highways, abusing, assaulting and otherwise ill-treating them, by going to their houses in the night, gaining admittance by force, taking away their papers and committing other outrages, employing for their unwarrantable purposes the agency of armed banditti, disguised in such manner as for the most part to escape discovery. And whereas, the endeavours of the legislature to obviate objections to the said laws, by lowering the duties and by other alterations conducive to the convenience of those whom they immediately affect (though they have given satisfaction in other quarters), and the endeavours of the executive officers to conciliate a compliance with the laws, by explanations, by forbearance, and even by particular accommodations founded on the suggestion of local considerations, have been disappointed of their effect by the machinations of persons whose industry to excite resistance has increased with every appearance of a disposition among the people to relax in their opposition and to acquiesce in the laws. insomuch that many persons in the said western parts of Pennsylvania have at length been hardy enough to perpetrate acts which I am advised amount to treason. being overt acts of levying war against the United States, the said persons having on the sixteenth and seventeenth of July last, proceeded in arms (on the second day amorning to several hundreds) to the house of John Neville, inspector of the revenue for the Fourth survey of the district of Pennsylvania, having repeatedly attacked the said house with the persons therein, wounding some of them, having seized David Lennox, marshal of the district of Pennsylvania, who previous thereto had been fired upon, while in the execution of his duty, by a party of armed men, detaining him for some time prisoner, till, for the preservation of·his life, and the obtaining of his liberty, he found it necessary to enter into stipulations to forbear the execution of certain official duties, touching processes issuing out of a court of the United States, and having finally obliged the said inspector of the revenue and the said marshal, from considerations of personal safety. to flv from that of the country, in order by a circuitous route to proceed to the seat of government, and having the motives of these outrageous proceedings an intention to prevent by force of arms the execution of the said laws, to oblige the said inspector of the revenue to renounce his said office, to withstand by open violence the lawful authority of the government of the United States, and to compel thereby an alteration in the measures of the legislature, and a repeal of the laws aforesaid. And whereas, by a law of the United States, entitled, 'An act to provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions,' it is enacted that whenever the laws of the United States shall be opposed, or the execution thereof obstructed, in any state by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by that act, the same being notified by an associate justice or the district judge, it shall be lawful for the president of the United States to call forth the militia of such state to suppress such combinations, and to cause the laws to be duly executed. And if the militia of a state where such combinations may happen, shall refuse or be insufficient to suppress the same, it shall be lawful for the president, if the legislature of the United States shall not be in session, to call forth and employ such numbers of the militia of any other state or states, most convenient thereto, as may be necessary, and the use of the militia so to be called forth, may be continued, if necessary, until the expiration of thirty days after the commencement of the ensuing session: Provided always, that wherever it may be necessary in the judgment of the president to use the military force hereby directed to be called

forth, the president shall forthwith and previous thereto, by proclamation, command such insurgents 'to disperse and retire peaceably to their respective abodes within a limited time.' And whereas, James Wilson, as associate justice, on the fourth instant, by writing under his hand, did, from evidence which had been laid before him. notify to me, 'that in the counties of Washington and Alleghany, in Pennsylvania, laws of the United States are opposed, and the execution thereof obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshal of that district.' And whereas, it is in my judgment necessary, under the circumstances of the case, to take measures for calling forth the militia, in order to suppress the combinations aforesaid, and to cause the laws to be duly executed, and I have accordingly determined so to do, feeling the deepest regret for the occasion, but withal the most solemn conviction, that the essential interests of the Union demand it, that the very existence of government, and the fundamental principles of social order, are materially involved in the issue; and that the patriotism and firmness of all good citizens are seriously called upon, as occasion may require, to aid in the effectual suppression of so fatal a spirit. Wherefore, and in pursuance of the proviso above recited, I, George Washington, president of the United States, do hereby command all persons, being insurgents as aforesaid, and all others whom it may concern, on or before the first day of September next, to disperse and retire peaceably to their respective abodes. And I do moreover warn all persons whomsoever, against aiding, abetting, or comforting the perpetrators of the aforesaid treasonable acts, and do require all officers and other citizens, according to their respective duties and the laws of the land, to exert their utmost endeavours to prevent and suppress such dangerous proceedings.

"In testimony whereof, I have caused the seal of the United States of America to be affixed to these presents, and signed the same with my hand. Done at the city of Philadelphia the seventh day of August, one thousand seven hundred and ninety-four, and of the Independence of the United States of America the nineteenth.

"By the President:

"Geo. Washington.    (L. S.)

"Edm. Randolph."

NOTE 5. The following are their instructions:

"To James Ross, Jasper Yeates, William Bradford—Gentlemen: The recent events in the neighbourhood of Pittsburg have called the attention of the president to the formation of some plan by which the insurrection may be suppressed. The intelligence which has been transmitted, having been laid before Judge Wilson, he has granted a certificate declaring that the opposition to the laws of the United States, in the counties of Washington and Alleghany, cannot be suppressed by the ordinary course of judicial proceedings, or the power of the marshal. A copy of that certificate is enclosed (No. 1). You or any one or more of you are, therefore, authorized and appointed forthwith, to proceed to the scene of the insurrection, and to confer with any bodies of men, or individuals, with whom you shall think proper to confer, in order to quiet and extinguish it. There is reason to believe that a collection of discontented individuals will be found at Mingo Creek on the fourteenth instant, and as the object of their assembling is undoubtedly to concert measures relative to this very subject, it is indispensably necessary that you should press thither with the utmost expedition. It is uncertain whether they will remain together for a long or short time—therefore the being on the ground first named for their meeting is necessary to prevent a miscarriage. These are the outlines of your communication: 1st. To state the se-

rious impressions which their conduct has created in the mind of the executive, and to dilate upon the dangers attending every government where laws are obstructed in their execution. 2d. To inform them that the evidence of the late transactions has been submitted to a judge of the supreme court, and that he has granted the above mentioned certificate, whence a power has arisen, to the president, to call out the militia to suppress the insurrection. (See the Act of May 2d, 1792.) 3d. To represent to them how painful an idea it is to exercise such a power, and that it is the earnest wish of the president, to render it unnecessary, by those endeavours which humanity, a love of peace and tranquility, and the happiness of his fellow citizens, dictate. 4th. You will then explain your appointment as commissioners, in a language and with sentiments most conciliatory, but reconcilable to the self-respect which this government ought to observe. 5th. Whether you are to proceed further, and in what manner, must depend upon your judgment and discretion, at the moment after an estimate of the characters with whom you are conversing, their views, their influence, &c. &c. 6th. Whensoever you shall come to the point at which it may be necessary to be explicit, you are to declare that, with respect to the excise law, the president is bound to consider it as much among the laws which he is to see executed as any other. That, as to the repeal of it, he cannot undertake to make any stipulation; that being a subject consigned by the constitution to the legislature, from whom alone a change of legislative measures can be obtained. That he is willing to grant amnesty and perpetual oblivion for every thing that is passed; and cannot doubt that any penalty to which the late transactions may have given birth, under the laws and within the jurisdiction of Pennsylvania, may be also wiped away—but upon the following conditions: That satisfactory assurances be given that the laws be no longer obstructed in their execution by any combinations, directly or indirectly, and that the offenders against whom process shall issue for a violation of, or an opposition to, the laws, shall not be protected from the free operation of the law. Nothing will be enforced concerning the duties of former years, if they will fairly comply for the present year. 7th. If they speak of the hardship of being drawn to the federal courts at a distance, to that no other reply can be made than this: That the inconvenience, whatsoever it may be, was the act of their own representatives, and is continued as being still their sense; that, however, on all occasions which will permit the state courts to be used without inconvenience to the United States, or danger of their being frustrated in the object of the suits and prosecutions, the state courts will be resorted to; but the choice of jurisdictions must always depend upon the discretion of the United States, and, therefore, nothing more specific can be said at present. 8th. Whensoever you shall choose to speak of the ulterior measures of the government, you will say, that orders have already issued for the proper militia to hold themselves in readiness, and that every thing is prepared for their movement, as will be seen by the proclamation (No. 3), and is known to yourselves from the communications of the government; but that these movements will be suspended until your return. 9th. These are said to be the outlines. You will fill them up and modify them so as most effectually to prevent, if possible, the last dreadful necessity which the president so much deprecates, and you may in particular assure any individuals of pardon who will expiate their offence by a compliance with the law. 10th. You will keep the executive minutely and constantly informed of all your proceedings, and will use expresses whensoever you think proper at the public expense. 11th. You will be allowed eight dollars per day and your expenses, and may employ a proper person to act as your clerk, who shall be paid whatsoever you may certify him to deserve. The sum of one thousand dollars is advanced to your account. 12th. William Bradford is empowered to add the name of Thos. Smith, or any other proper person, if either J. Ross or J. Yeates shall refuse or be unable to attend.

"Edm. Randolph, Secretary of State. "August 5th, 1794."

NOTE 6. Although a full abstract of the proceedings of the committee is given in the text, yet the great importance of the report, and the fact of its being now almost inaccessible, have induced the editor, at some risk of tautology, to insert it here:

"The commissioners appointed to confer with the citizens in the western counties of Pennsylvania in order to induce them to submit peaceably to the laws, and to prevent the necessity of using coercion to enforce their execution, respectfully report to the president of the United States:

"That in pursuance of their instructions, they repaired to the western counties; and, on their arrival there, found that the spirit of disaffection had pervaded other parts of the Fourth survey of Pennsylvania, besides those counties declared to be in a state of insurrection; that all the offices of inspection established therein had lately been violently suppressed; and that a meeting of persons chosen by most of the townships, was assembled at Parkinson's Ferry, for the purpose of taking into consideration the situation of the western country. This assembly, composed of citizens coming from every part of the Fourth survey, would have furnished a favourable opportunity for a conference and mutual explanation; but as they met in the open fields, and were exposed to the impressions of a number of rash and violent men (some of them armed) who surrounded them, an immediate communication with the whole body would have been inconvenient and hazardous. The meeting was probably of that opinion also; for, soon after the appointment of commissioners was announced to them, they resolved that a committee, to consist of three persons from each county, should be appointed to meet any commissioners that might have been, or might be, appointed by the government; and that they should report the result of their conference to the standing committee, which was to be composed of one person from each township. As soon as this committee of conference were nominated, they agreed to meet at Pittsburg on the 20th of the same month. The underwritten accordingly repaired to that place, and were soon after joined by the Honourable Thomas McKean and William Irvine, Esqs., who had been appointed commissioners on the part of the executive of Pennsylvania. A full and free communication was immediately had with those gentlemen as to the powers delegated, and the measures proper to be pursued at the expected conference.

"On the day appointed, a sub-committee of the conferees waited on the commissioners, and arranged with them the time, place, and manner of conference. It was agreed that it should be had the next morning, at the house of John McMasters, in Pittsburg, and should be private. On the 21st, all the commissioners met the conferees at the place appointed. Of the latter there were present, John Kirkpatrick, George Smith, and John Powers, from Westmoreland county; David Bradford, James Marshall, and James Edgar, from Washington county; Edward Cook, Albert Gallatin, and James Lang, from Fayette county; Thomas Morton, John Lucas, H. H. Brackenridge, from Alleghany county; together with William McKinley, William Sutherland, and Robert Stevenson, who were inhabitants of Ohio county, in Virginia. The conference was begun by the underwritten, who expressed the concern they felt at the events which had occasioned that meeting; but declared their intention to avoid any unneces-

sary observations upon them, since it was their business to endeavour to compose the disturbances which prevailed, and to restore the authority of the laws, by measures wholly of a conciliatory nature. It was then stated, that the formal resistance which had lately been given to the laws of the United States, violated the great principle on which the republican government is founded; that every such government must, at all hazards, enforce obedience to the general will; and that so long as they admitted themselves to be a part of the nation, it was manifestly absurd to oppose the national authority. The underwritten then proceeded to state the obligations which lay on the president of the United States to cause the laws to be executed; the measures he had taken for that purpose; his desire to avoid the necessity of coercion; and the general nature of the powers he had vested in them; and, finally, requested to know whether the conferees could give any assurances of a disposition in the people to submit to the laws, or would recommend such submission to them. The commissioners on the part of the state of Pennsylvania then addressed the conferees on the subject of the late disturbances in that country; forcibly represented the mischievous consequences of such conduct; explained the nature of their mission; and declared they were ready to promise, in behalf of the executive authority of the state, a full pardon and indemnity, for all that was past, on condition of an entire submission to the laws.

"On the part of the conferees, a narrative was given of those causes of discontent and uneasiness which very generally prevailed in the minds of the people in the western counties, and which had discovered themselves in the late transactions. Many of these, they said, had long existed, and some of them from the settlement of that country. Among other causes of discontent, they complained of the decisions of the state courts, which discountenanced improvement-titles and gave the preference to paper-titles; of the war which had so long vexed the frontiers, and of the manner in which that war had been conducted. They complained that they had been continually harassed by militia duty, in being called out by the state government to repel incursions, &c.; that the general government had been inattentive to the execution of the treaty of peace respecting the western posts, and remiss in asserting the claim to the navigation of the Mississippi; that the acts for raising a revenue on distilled spirits were unequal and oppressive, in consequence of their local circumstances; that congress had neglected their remonstrances and petitions; and that there was great hardship in being summoned to answer for penalties in the courts of the United States at a distance from the vicinage. They also mentioned the suspension of the settlement at Presqu'isle, the engrossing of large quantities of land in the state by individuals, the killing of certain persons at General Neville's house, and the sending of soldiers from the garrison at Pittsburg to defend his house, as causes of irritation among the people. To these they added the appointment of General Neville, as inspector of the survey, whose former popularity had made his acceptance of that office particularly offensive. They said, they were persuaded that the persons who were the actors in the late disturbances, had not originally intended to have gone so far as they had gone; but were led to it from the obstinacy of those who refused to do what was demanded of them; that the forcible opposition which had been made to the law was owing to the pressure of the grievance; but if there was any prospect of redress, no people would be more ready to show themselves good citizens.

"The commissioners expressed their surprise at the extent of these complaints, and intimated, that if all these matters were really causes of uneasiness and dissatisfaction in the minds of the people, it would be impossible for any gov-

ernment to satisfy them. But as some of these complaints were of a nature more serious than others, though they could not speak officially, they stated what was generally understood as to the conduct, measures, and expectations of government respecting the Mississippi navigation; the treaty of peace; the suspension of the settlement at Presqu'isle, &c.; that as to the acts of congress, which had been forcibly opposed, if it were proper they should be repealed, congress alone could do it; but that while they were laws, they must be carried into execution; that the petitions of the western counties had not been neglected, nor their interests overlooked; that in fact the local interests of those counties were better represented than those of any other part of the state; they having no less than three gentlemen in the house of representatives, when it appeared by the census that their numbers would not entitle them to two; that the acts in question had been often under the consideration of congress; that they had always been supported by a considerable majority, in which they would find the names of several gentlemen, considered, in those counties, as the firmest friends of their country; that although the general interests of the Union did not admit of a repeal, modifications had been made in the law, and some favourable alterations, in consequence of their representations; and that at the last session the state courts had been vested with a jurisdiction over offences against those acts, which would enable the president to remove one of their principal complaints; that the convenience of the people had been and would always be consulted by the government; and the conferees were desired to say, if there was anything in the power of the executive that yet remained to be done to make the execution of the acts convenient and agreeable to the people.

"One of the conferees then inquired, whether the president could not suspend the execution of the excise acts, until the meeting of congress; but he was interrupted by others, who declared that they considered such a measure as impracticable. The commissioners expressed the same opinion; and the conversation then became more particular, respecting the powers the commissioners possessed; the propriety and necessity of the conferees expressing their sense upon the proposals to be made, and of their calling the standing committee together before the 1st of September. But as it was agreed that the propositions and answers should be reduced to writing, the result is contained in the documents annexed, and it appears unnecessary to detail the conference further. The underwritten accordingly presented to the conferees a letter, of which a copy, marked No. 1, is annexed; and the following day they received an answer from them, in which they declare that they are satisfied that the executive had in its proposals gone as far as could be expected; that in their opinion it was the interest of the country to accede to the law, and that they would endeavour to conciliate not only the committee, to whom they were to report, but the public mind in general to their sense of the subject. A copy of this letter also is annexed, No. 2. The underwritten then proceeded to state in writing what assurances of submission would be deemed full and satisfactory, and to detail more particularly the engagements they had power to make. This detail was submitted to the inspection of a sub-committee of the conferees, who candidly suggested such alterations as appeared to them necessary to render the proposals acceptable. From a desire to accommodate, most of the alterations suggested by those gentlemen were adopted; and though some of them were rejected, the reasons given appeared to be satisfactory, and no further objections remained. A copy of this detail is marked No. 3. The conferees, on the following day, explicitly approved of the detail thus settled, engaged to recommend the proposals to the people, and added, that however it might be re-

ceived, they were persuaded nothing more could be done by the commissioners or them to bring the business to an accommodation. No. 4 is a copy of their letter. So far as this letter respects the gentlemen from Ohio county, in Virginia, a reply was made and some arrangements entered into with them, the nature and extent of which appear by the correspondence, copies of which are annexed, numbered 5, 6, 7, and 8.

"The hopes excited by the favourable issue of this conference, were not realized by a correspondent conduct in the citizens, who composed what was called 'the standing committee.' They assembled at Brownsville (Redstone Old Fort) on the 28th August, and broke up on the 29th, and on the following day a letter was received from Edward Cook, their chairman, announcing that difficulties had arisen, and that a new committee of conference was appointed; and, although the resolve which is annexed was passed, it did not appear that the assurances of submission which had been demanded, had been given. Copies of this letter and resolve are marked No. 9 and 10. The underwritten were informed by several of the members of that meeting, as well as other citizens who were present at it, that the report of the committee of conference and the proposals of the commissioners were unfavourably received; that rebellion and hostile resistance against the United States were publicly recommended by some of the members; and that so excessive a spirit prevailed, that it was not thought prudent or safe to urge a compliance with the terms and preliminaries prescribed by the underwritten, or the commissioners from the governor of Pennsylvania. All that could be obtained was the resolve already mentioned, the question upon it being decided by ballot; by which means each member had an opportunity of concealing his opinion, and of sheltering himself from the resentment of those from whom violence was apprehended. But notwithstanding this caution, the opinion was so far from being unanimous, that out of fifty-seven votes there were twenty three nays, leaving a majority of only eleven; and the underwritten have been repeatedly assured, by different members of that meeting, that if the question had been publicly put, it would have been carried in the negative by a considerable majority. With a view of counteracting the arts and influence of the violent, the underwritten, on the 27th August, addressed a letter to the late conferees, authorizing them to assure the friends of order, who might be disposed to exert themselves to restore the authority of the laws, that they might rely on the protection of government, and that measures would be taken to suppress and punish the violence of those individuals who might dissent from the general sentiment. This letter (a copy of which is marked No. 11) was delivered to one of the conferees going to Brownsville; but he afterwards informed the underwritten, that the gentlemen to whom it was addressed, did not 'think it prudent to make any use of it, as the temper which prevailed was such that it would probably have done more harm than good.' The conduct of the meeting at Brownsville, notwithstanding the thin veil thrown over it by the resolve already mentioned, was said to be considered by many, and especially by the violent party, as a rejection of the terms. It was certainly a partial rejection of those proposed by the underwritten, and a total one of the preliminaries prescribed by the state commissioners, who had required assurances from the members of that meeting only, and not from the people themselves.

"Having, therefore, no longer any hopes of an universal or even general submission, it was deemed necessary, by a solemn appeal to the people, to ascertain as clearly as possible the determination of every individual; to encourage and oblige the friends of order to declare themselves: to recall as many of the disaffected as possible to their duty, by assurances of pardon dependent on their individual conduct; and to learn with certainty what opposition government might expect if military coercion should be finally unavoidable. To secure these advantages, the underwritten were of opinion, that the assurances of submission required of the people ought not only to be publicly given, but ought also to be reduced to writing; and that the state of each county should be certified by those who were to superintend the meetings at which the disposition of the people was to be ascertained. On the first instant, nine of the gentlemen appointed by the meeting at Brownsville, assembled at Pittsburg, and in the afternoon requested a conference with the commissioners, which was agreed to. They produced the resolves by which they were appointed, and entered into some explanation of the nature of their visit; but being desired to communicate in writing they withdrew, and soon after sent a letter addressed to the commissioners of the United States, and of the state of Pennsylvania; to which an answer was immediately written. Copies of these letters are annexed, Nos. 12 and 13. As no part of their letter, although addressed to the commissioners from Pennsylvania, related to the preliminaries prescribed by them, they made no answer in writing; but in a conference held the next morning with those nine gentlemen, they verbally declared to them their entire concurrence in the sentiments contained in the letter from the underwritten; and they expressed at some length their surprise and regret at the conduct of the meeting at Brownsville. The conferees declared themselves satisfied with the answer they had received; avowed an entire conviction of the necessity and propriety of an early submission, in the manner proposed; and offered immediately to enter into the detail for settling the time, place, and manner of taking the sense of the people. A copy of their letter, which also expresses these sentiments, is annexed, No. 14.

"It was accordingly agreed between the commissioners on the one part, and these gentlemen on the other, that the people should assemble for the purpose of expressing their determination, and giving the assurances required, on the 11th inst.; and the mode of ascertaining the public sentiments of the citizens resident in the Fourth survey of Pennsylvania, was clearly and definitely prescribed by the unanimous consent of all who were present at the conference. It was evident, that circumstances might arise to prevent the real disposition of the citizens from being fully ascertained at these meetings, and that even arts might be used to procure such an expression of the public mind, that while it held up an appearance of submission, might be in reality a false and delusive representation of it. It was therefore necessary that persons of character. from every township or district (who might be able from their own knowledge or the comparison of all circumstances, justly to appreciate the public opinion) should assemble and jointly certify their opinion whether there was such a general submission in their respective counties, or not, that the laws could be peaceably carried into execution. For the same purpose it was agreed to be proper that the number of those who openly refused, as well as of those who promised to submit, in their respective townships or districts, should be reported to the commissioners. A copy of this agreement, marked No. 15, is annexed. It appears that meetings were held in the several counties, in pursuance of this agreement; but the underwritten, with extreme regret, find themselves obliged to report, that in the returns made to them no opinions are certified that there is so general a submission in any one of the counties that an office of inspection can be immediately and safely established therein; on the contrary, the report of those who superintended the meeting in Westmoreland, states their opinion to be that such a measure would not be safe. From Alleghany county no report whatever has been received, and although it is understood that a very great ma-

jority of those assembled in the Pittsburg district, actually subscribed the declarations required, yet there is no reason to believe that there was a favourable issue in any other district. Information has been received that great violence prevailed in one of them, and that in another the majority declared their determination not to submit to the laws of the United States. From Washington county a general return was duly transmitted to one of the commissioners at Uniontown, signed by twenty-eight of the superintendents of the meeting: they do not, however, state the number of the yeas and nays on the question for submission; they decline giving any opinion whether there is such a general submission that an office of inspection may be established therein, but certify their opinion and belief, 'that a large majority of the inhabitants will acquiesce and submit to the said law, under a hope and firm belief that the congress of the United States will repeal the law.' The report from the superintendents in Westmoreland county is equally defective, in not stating the numbers as required; but it certifies their opinion that as ill disposed, lawless persons could suddenly assemble and offer violence, it would not be safe immediately to establish an office of inspection in that county. The county of Fayette rejected the mode of ascertaining the sense of the people, which had been settled between the underwritten and the last committee of conference, at Pittsburg. The standing committee of that county directed those qualified by the laws of the state for voting at elections, to assemble in their election districts and vote by ballot, whether they would accede to the proposals made by the commissioners of the United States, on the 22d of August, or not. The superintendents of these election districts report, that five hundred and sixty of the people thus convened, had voted for submission, and that one hundred and sixty-one had voted against it; —that no judge or member of their committee had attended from the Fourth district of the county, to report the state of the votes there, and that they are of opinion that a great majority of the citizens who did not attend, are disposed to behave peaceably and with due submission to the laws. But it is proper to mention, that credible and certain information has been received, that in the Fourth district of that county (composed of the townships of Tyrone and Bullskin), of which the standing committee have given no account, six-sevenths of those who voted, were for resistance. Copies of the reports stated, are annexed, and numbered 16, 17, 18. From that part of Bedford county, which is comprehended within the Fourth survey of Pennsylvania, no report or returns have been sent forward, nor has any information been received that the citizens assembled there for the purpose of declaring their opinions upon questions proposed.

"The written assurances of submission which have been received by the commissioners, are not numerous, nor were they given by all those who expressed a willingness to obey the laws. In Fayette county, a different plan being pursued, no written assurances were given in the manner required. In the three other counties, which from the census taken under the laws of the state, appear to contain above eleven thousand taxable inhabitants (in which none under the age of twenty-one are included), the names subscribed to the papers received, barely exceed two thousand seven hundred, and of these a very considerable part have not been subscribed in the mode agreed on; being either signed at a different day,—unattested by any person,—or willfully varied from the settled form. From credible information received, it appears to the underwritten that in some townships the majority, and in one of them the whole of the persons assembled, publicly declared themselves for resistance; in some, although the sense of the majority was not known, yet the party for resistance was sufficiently strong to prevent any dec-

larations of submission being openly made; and in others, the majority were intimidated or opposed by a violent minority. But notwithstanding these circumstances, the underwritten firmly believe that there is a considerable majority of the inhabitants of the Fourth survey, who are now disposed to submit to the execution of the laws: at the same time, they conceive it their duty explicitly to declare their opinion, that such is the state of things in that survey, that there is no probability that the act for raising a revenue on distilled spirits and stills, can at present be enforced by the usual course of civil authority, and that some more competent force is necessary to cause the laws to be duly executed, and to insure to the officers and well disposed citizens that protection which it is the duty of government to afford. This opinion is founded on the facts already stated; and it is confirmed by that which is entertained by many intelligent and influential persons, officers of justice and others, resident in the western counties, who have lately informed one of the commissioners, that whatever assurances might be given, it was in their judgment absolutely necessary that the civil authority should be aided by a military force, in order to secure a due execution of the laws. James Ross.

"J. Yeates.

"Wm. Bradford.

"Philadelphia, Sept. 24. 1794."

The documents referred to in the aforegoing report:

(No. 1.)

From the commissioners on the part of the Union, to the committee of conference, assembled at Pittsburg:

"Pittsburg, August 24. 1794.

"Gentlemen: Having had a conference with you on the important subject that calls us into this part of Pennsylvania, we shall now state to you in writing, agreeably to your request, the nature and object of our mission hither. Considering this as a crisis infinitely interesting to our fellow citizens who have authorized you to confer with us, we shall explain ourselves to you with that frankness and sincerity, which the solemnity of the occasion demands. You well know that the president of the United States is charged with the execution of the laws. Obedience to the national will being indispensable in a republican government, the people of the United States have strictly enjoined it as his duty 'to see that the laws are faithfully executed,' and when the ordinary authorities of the government are incompetent for that end, he is bound to exert those high powers with which the nation has invested him for so extraordinary an occasion. It is but too evident that the insurrections which have lately prevailed in some of these western counties have suppressed the usual exercise of the civil authority; and it has been formally notified to the president, by one of the associate judges, in the manner the law prescribes, 'that in the counties of Washington and Alleghany, in Pennsylvania, laws of the United States are opposed, and the execution thereof obstructed, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or the powers vested in the marshal of that district.' He, therefore, perceives, with the deepest regret, the necessity to which he may be reduced, of calling forth the national force in order to support the national authority, and to cause the laws to be executed; but he has determined, previously to address himself to the patriotism and reason of the people of the western counties, and to try the moderation of government, in hopes that he may not be compelled to resort to its strength. But, we must not conceal it from you, that it is also his fixed determination, if these hopes should be disappointed, to employ the force, and if it be necessary, the whole force, of the Union, to secure the execution of the laws. He has, therefore, author-

ized us to repair hither, and by free conferences and the powers vested in us, to endeavour to put an end to the present disturbances, and to the opposition to the execution of the laws, in a manner that may be finally satisfactory to all our fellow citizens. We hope that this moderation in the government will not be misconstrued by the citizens to whom we are sent. The president, who feels a paternal solicitude for their welfare, wishes to prevent the calamities that are impending over them, to state to them clearly the inevitable consequences of further resistance, to recall them to their duty, and to prove to the whole world, that if military coercion must be employed, it is their choice and not his. The powers vested in us, will enable us so to arrange the execution of the acts for raising a revenue on distilled spirits and stills, that little inconvenience will arise therefrom to the people, to prevent as far as is consistent with the public interests the commencing prosecutions under those acts at a distance from the places where the delinquents reside, to suspend prosecutions for the late offences against the United States, and, even, to engage for a general pardon and oblivion of them.

"But, gentlemen, we explicitly declare to you, that the exercise of these powers must be preceded by full and satisfactory assurances of a sincere determination in the people to obey the laws of the United States, and their eventual operation must depend upon a correspondent acquiescence in the execution of the acts which have been opposed. We have not, and coming from the executive, you well know that we cannot have any authority to suspend the laws, or to offer the most distant hopes, that the acts, the execution of which has been obstructed, will be repealed. On the contrary, we are free to declare to you our private opinions, that the national councils, while they consult the general interests of the republic, and endeavour to conciliate every part by local accommodations to citizens who respect the laws, will sternly refuse every indulgence to men who accompany their requests with threats, and resist by force the public authority. Upon these principles, we are ready to enter with you into the detail necessary for the exercise of our powers, to learn what local accommodations are yet wanting to render the execution of the laws convenient to the people, to concert with you measures for restoring harmony and order, and for burying the past in oblivion; and to unite our endeavours with yours to secure the peace and happiness of our common country. It is necessary, however, to apprise you thus early, that at present, we do not consider ourselves as authorized to enter into any conferences on this subject, after the first of September ensuing. We therefore hope the business will be so conducted that some definitive answer may be given to us before that day. We cannot believe that, in so great a crisis, any attempts to temporize and procrastinate will be made by those who sincerely love their country, and wish to secure its tranquility. We also declare to you, that no indulgence will be given to any future offence against the United States, and that they who shall hereafter directly or indirectly oppose the execution of the laws, must abide the consequences of their conduct.                    James Ross.
                                   "J. Yeates.
                                   "Wm. Bradford."

(No. 2.)

The following is the answer of the committee:
                        "Pittsburg, Aug. 22, 1794.
"Gentlemen: Having in our conference, at considerable length, stated to you the grounds of that discontent which exists in the minds of the people of this country, and which has lately shown itself in acts of opposition to the excise law, you will consider us as waiving any question with regard to the nature of those acts, whether reasonable, or amounting only to riot and breach of the peace; of course as waiving

the question of the constitutional power of the president to call upon the force of the Union to suppress them. It is our object, as it is yours, to compose the disturbance. We are satisfied that in substance, you have gone as far as we could expect the executive to go. It only remains to ascertain your propositions more in detail, and to say, what arrangements it may be in your power to make with regard to convenience in collecting the revenue under the excise laws, how far it may be consistent with the public interest to prevent commencing prosecutions under those laws at a distance from the places where the delinquents reside, on what condition or circumstance prosecutions for the late violations of the laws shall be suspended; that is to say, whether on the individual keeping the peace, or on its being kept by the country in general, and also with regard to the general amnesty, whether the claiming the benefit of it by an individual shall depend on his own future conduct or that of the whole community. We have already stated to you in conference that we are empowered to give you no definitive answer with regard to the sense of the people on the great question of acceding to the law; but that in our opinion, it is the interest of the country to accede; and that we shall make this report to the committee to whom we are to report, and state to them the reasons of our opinion, that so far as they may appear to have weight they may be regarded by them. It will be our endeavour to conciliate, not only them, but the public mind in general to our sense on this subject: for this purpose we hope to be assisted by you in giving all that extent and precision, clearness and certainty to your propositions as may satisfy the understandings and engage the acquiescence of the people. It is to be understood that in acceding to the law, no inference is to be drawn, or construction made, that we will relinquish a constitutional opposition; but that we will invariably undeviatingly and constantly pursue every legal means and measure of obtaining a repeal of the law in question. As we are disposed with you to have the sense of the people taken on the subject of our conference as speedily as may be, with that view we have resolved to call the committee to whom our report is to be made, at an earlier day than had been appointed, to wit, to meet on Thursday the 28th inst., but have not thought ourselves justifiable in changing the place, to wit, at Redstone (Old Fort) on the Monongahela.

"By order of the committee.
                        "Edward Cook, Chairman.
"To the Commissioners on the Part of the Union."

(No. 3.)

"The commissioners appointed by the president of the United States, to confer with the citizens in the western parts of Pennsylvania, having been assured by the committee of conference, of their determination to approve the proposals made, and to recommend to the general committee appointed by the meeting at Parkinson's Ferry, a submission to the acts of congress, do now proceed to declare what assurances of submission will be deemed full and satisfactory, and to detail the engagements which they have power to make: (1) It is expected and required by the said commissioners, that the citizens composing the said general committee, do on or before the first day of September, explicitly declare their determination to submit to the laws of the United States, and that they will not directly or indirectly oppose the execution of the acts for raising a revenue on distilled spirits and stills. (2) That they do explicitly recommend a perfect and entire acquiescence under the execution of the said acts. (3) That they do, in like manner, recommend that no violence, injuries, or threats, be offered to the person, or against the property of any officer of the United States, or citizens com-

plying with the laws, and do declare their determination to support (as far as the laws require) the civil authority, in affording the protection due to all officers and citizens. (4) That measures be taken to ascertain by meetings in election districts. or otherwise. the determination of the citizens in the Fourth survey of Pennsylvania. to submit to the said laws; and that satisfactory assurances be given to the said commissioners that the people have so determined to submit, on or before the 14th of September next.

"The said commissioners, if a full and perfect compliance with the above requisition shall take place; have power to promise and engage in the manner following, to wit: (1) No prosecution for any treason. or other indictable offence against the United States. committed in the Fourth survey of Pennsylvania before this day, shall be commenced or proceeded on until the tenth of July next. (2) If there shall be a general and sincere acquiescence in the execution of the said laws until the said tenth day of July next, a general pardon and oblivion of all such offences shall be granted: excepting therefrom. nevertheless. every person who shall, in the meantime, wilfully obstruct, or attempt to obstruct the execution of any of the laws of the United States, or be in anywise aiding or abetting therein. (3) Congress having, by an act passed on the fifth day of June last, authorized the state courts to take cognizance of offences against the said acts for raising a revenue upon distilled spirits and stills, the president has determined that he will direct suits against such delinquents to be prosecuted therein; if, upon experiment, it be found that local prejudices, or other causes, do not obstruct the faithful administration of justice. But it is to be understood, that of this he must be the judge, and that he does not mean by this determination to impair any power vested in the executive of the United States. (4) Certain beneficial arrangements for adjusting delinquencies and prosecutions for penalties now depending, shall be made and communicated by the officers appointed to carry the said acts into execution.

"Given under our hands at Pittsburg, this 22d day of August, 1794.
"James Ross.
"J. Yeates.
"Wm. Bradford.
"To the Committee of Conference."

(No. 4.)
"Pittsburg, Aug. 23. 1794.
"Gentlemen: We presume it has been understood by you that the conference on our part consists of members not only from the counties of Pennsylvania west of the Alleghany mountains, but also from Ohio county in Virginia, and your propositions made in general by your first letter being addressed to this conference, the Ohio county was considered as included; yet in your propositions made in detail by your last, you confine them to the survey within Pennsylvania. We would request an explanation on this particular. We have only farther to say, we shall make a faithful report of your propositions. which we approve of, and will recommend to the people; and however they may be received. we are persuaded nothing more could have been done by you or us to bring this business to an accommodation.

"Signed by order of the committee,
"Edward Cook, Chairman.
"To the Commissioners on the Part of the Union."

To which the following answer was returned:

(No. 5.)
"Pittsburg, August 23. 1794.
"Gentlemen: Having received assurances of your approbation of the propositions made by us, and of your determination to recommend them

to the people, we have nothing further to add, except to reply to that part of your letter which relates to the gentlemen from Ohio county. The whole tenor of our letter of the 21st instant shows that we had come among you in consequence of the disturbances which had prevailed in the western parts of Pennsylvania; to prevent the actual employment of military coercion there, as contemplated in the president's proclamation; and that the late offences referred to, were the insurrections which had prevailed in some of these western counties. We therefore cannot extend our propositions. In addition to this, we are well assured that the people of Ohio county have not, generally, authorized these gentlemen to represent them, and we cannot at present undertake to make any definite arrangement with them. We are, however, willing to converse with these gentlemen on this subject; and we have no doubt, that on satisfactory proofs of their determination to support the laws of their country, and of an entire submission to them by those from whom they come being given, the president will, upon our recommendation, extend a similar pardon to any late offences committed against the United States, if such there be committed. We are willing, on receiving such assurances from them, to recommend such application accordingly.
"James Ross.
"J. Yeates.
"Wm. Bradford.
"To the Committee of Conference."

The following communication was made to the commissioners by the person said to have been sent from Ohio county, in Virginia (in this and the following papers the spelling of the originals is preserved):

(No. 6.)
"Pittsburg, August 23, 1794.
"Gentlemen: We have seen by your letter of this day, that you have been well assured, that the people of Ohio county did not generally authorize us to represent them. All we have to say on that subject is, that we were authorized fuly and generally by such persons as met on that accasion. Wheather any of the inhabstance were dissatisfied with our being appointed for that purpose, or wheather there were any who did not wish an appointment to take place at all, we know not; but we pretent to have no other desire than that of representing such of the citizens of Ohio county as sent us here. Waving hower the mear personal subject, we think it a duty we owe our fellow-citizens, to wish (and we know it to have been the opinion of the whole committee of conference) that no distinction should be made between offences committed upon the same occasion, arising from the same source, and perpetrated at the same time, wheather they happenid in Pennsylvanah or in Virginia; and we therefore hope you will conceive it. upon full examenation, to be part of your present pacific mission, to satisfy the minds of the people of Virginia as well as thouse of Pennsylvana; and that you will give assurances that the same proofs which you require from the people of Pennsylvana, of their determination to submit to the laws, shall be deemed sufficient, when given by the people of Ohio county to enduce you to recommend to the president to extend a similar pardon to any offences committed there against the United States; and that whatever objects you may have to consider us in the same point of view with the other members of the committee of conference, you will not require different conditions from, or propose different terms to the citizens of the too states, &c. We have the honour to be with respect. gentlemen, your most obedient and very humble servants, Robt. Stephenson.
"William Sutherland.
"Wm. McKinley.
"To the Commissioners for the United States."

(No. 7.)

"Gentlemen: Having conversed with you on the subject of your letter of this date, we declare to you, that if the same declarations and assurances are made by you, which it is required should be made by the citizens to be assembled at Redstone, and if satisfactory assurances are also given to us of a sincere determination of those individuals in Ohio county who sent you hither, to submit to the laws for raising a revenue on distilled spirits and stills, on or before the 14th September next, in such case we will recommend to the president of the United States, your petition, requesting that a pardon may be granted for any indictable offence against the United States, committed in Ohio county since the 15th day of July last, and before the present day, on the same terms offered to the inhabitants of the fourth survey of Pennsylvania. But as certain bonds have been lately taken by force from Zaccheus Biggs, collector of the said revenue in Ohio county, it is to be clearly understood, that said pardon shall *not extend to prevent any civil remedy against those who have destroyed the said bonds, or are parties to them.

"Given under our hands, August 23, 1794.
                              "James Ross.
                              "J. Yeates.
                              "Wm. Bradford.
"To Messrs. Robert Stephenson, William Sutherland, and William McKinley."

To which the following reply was made:

(No. 8.)

                              "Pittsburg, 23 Aug. 1794.
"Gentl.: Having Concderd your Letter of this Deate since the Departur of the speache Comatie delegated from Westmoreland Washington Featt & Alegunie countis in Pensilvenea & Conidering our Selves a Justifyable repentation of those inhabtents of Ohio County by Whowe we were Deligated & a part of that speachell Comitee to whom your proposals wear mead and Accepted yesterday & the day posding, and relying on the faith alrdy pledged by you and Accepted by the Speachell Comatee we dclen entering any further on this Bussens untell we Consult our Constaituents & the Cometee of Safety. We are Gentl. with Esteem your most Obed. Humble Servt.,
                              "Robert Stephenson.
                              "William Sutherland.
                              "Wm. McKinly."

(No. 9.)

                              "Brownsville, August 29, 1794.
"Gentlemen: Difficulties having arisen with us, we have thought it necessary to appoint a committee to confer with you, in order to procure, if possible, some further time, in order that the people may have leasure to reflect upon their true situation. I am, gentlemen, Your most obedient humble servant,          Edward Cook.
"P. S. Inclosed you have a copy of the resolution on that subject.
"The Hon. the Commissioners of the United States."

(No. 10.)

At a meeting of the standing committee of the western counties, held at Brownsville (Redstone Old Fort), on the 28th and 29th August, 1794, the report of the committee appointed to confer with the commissioners of government, being taken into consideration, the following resolutions were adopted, to wit:
"Resolved: That in the opinion of this Committee, it is the interest of the people of this country to accede to the proposals made by the Commissioners on the part of the United States.
"Resolved: That a copy of the foregoing resolution be transmitted to the said Commissioners.
                              "Edw. Cook, Chairman.
"A true copy:  Albert Gallatin."

The following letter was delivered to Hugh H. Brackenridge, just before his departure to Redstone (Old Fort), directed, "To Messrs. Kirkpatrick, Smith, Powers, D. Bradford, Marshall, Edgar, Cook. Gallatin, Lang, Morton, Lucas, and Brackenridge, Late Conferees."

(No. 11.)

                              "Pittsburg, August 27, 1794.
"Gentlemen: Since your departure from Pittsburg, we have transmitted information of our proceedings to the secretary of state; and it being evident from them, that the satisfactory proofs of a sincere submission to the laws cannot be obtained before the 1st September, we may undertake to assure you that the movement of the militia will be suspended until further information is received from us. We also authorize you to assure the friends of order, who may be disposed to exert themselves to restore the authority of the laws, that they may rely upon all the protection the Government can give; and that every measure necessary to suppress and punish the violence of ill disposed individuals, who may dissent from the general sentiment (if there shall be any such), will be promptly taken in the manner the laws direct. We are, gentlemen, your most humble servants,
                              "James Ross.
                              "J. Yeates.
                              "Wm. Bradford."

(No. 12.)

                              "Pittsburg, Sept. 1, 1794.
"Gentlemen: The committee appointed by the committee of safety, at Redstone, the 28th August last, to confer with the commissioners of the United States and state of Pennsylvania, and agreeable to the resolutions of said committee, do request: 1st. That the said commissioners give an assurance on the part of the general government, to an indemnity to all persons as to the arrearage of excise, that have not entered their stills to this date. 2d. Will the commissioners aforesaid give to the eleventh day of October next, to take the sense of the people at large of the four counties west of Pennsylvania, and that part of Bedford west of the Alleghany Mountains, and the Ohio county in Virginia, whether they will accede to the resolution of the said commissioners, as stated at large in the conference with the committee of conference met at Pittsburg, the 21st day of August last?
"By order of the Committee.
                              "John McClelland.
"The Honourable the Commissioners on the Part of the United States and of the State of Pennsylvania."

(No. 13.)

                              "Pittsburg, September 1st, 1794.
"Gentlemen: We have received your letter of this date; and as time presses have determined to give it an immediate answer, although we shall be prevented thereby, from making so full and correct a reply, as the importance of the subject requires. In our correspondence with the late committee of conference, we detailed those assurances of submission to the laws, which would have been deemed full and satisfactory, and which were necessary to the exercise of the powers vested in us. This detail was minutely settled in a conference with a sub-committee of that body. From a desire on our part to accommodate and to render the proposals as unexceptionable as possible, they were altered and modified at their request, till being superior to all exception, they received the unanimous approbation of those gentlemen. The detail thus settled required from the standing committee assurances of their explicit determination to submit to the laws of the United States; that they would not directly or indirectly oppose the execution of the acts for raising a revenue upon distilled spirits and upon stills; and that they would support, as far as

the laws require, the civil authority, in affording the protection due to all officers and other citizens. These assurances have not been given. On the contrary, we learn, with emotions difficult to be repressed, that in the meeting of the committee, at Redstone, resistance to the laws and open rebellion against the United States were publicly advocated, and that two-fifths of that body, representing twenty-three townships, totally disapprove the proposals, and preferred the convulsions of a civil contest to the indulgence offered them by their country. Even the members composing the majority, although, by a secret and undistinguishing vote, they expressed an opinion, that it was the interest of the people to accede to the proposals, did not themselves accede to them, nor give the assurances, nor make the recommendations explicitly required of them. They have adjourned without day, and the terms are broken on their part. We had reason for requiring these declarations and recommendations from that body. They were a representation (in fact) of the different townships of the western counties—they were a body in whom the people had chosen to place confidence—there were among them men, whose advice and example have had influence in misleading the people, and it was proper they should be instrumental in recalling them to their duty: and an avowed determination to support the civil authority in protecting the officers, would have assisted in repressing the violence of turbulent individuals. Our expectations have been unfortunately disappointed: the terms required have not been acceded to. You have been sent hither to demand new terms; and it is now necessary for us to decide, whether we will return home, or enter into other arrangements.

"Upon reflection, we are satisfied that the president of the United States, while he demands satisfactory proofs that there will be in future a perfect submission to the laws, does not wish the great body of the people should be finally concluded by the conduct or proceedings of that committee: and if the people themselves will make the declarations required of the standing committee, and give satisfactory proofs of a general and sincere determination to obey the laws, the benefits offered may still be obtained by those individuals, who shall explicitly avow their submission as hereinafter mentioned. It is difficult to decide in what manner the said declarations and determinations of the people to submit peaceably should be taken and ascertained. We have thought much on this subject, and are fully satisfied, that a decision by ballot will be wholly unsatisfactory, and that it will be easy to produce by that means an apparent but delusive unanimity. It is, therefore, necessary that the determination of every individual be publicly announced. In a crisis, and on a question like this, it is dishonourable to temporize. Every man ought to declare himself openly, and give his assurances of submission in a manner that cannot be questioned hereafter. If a civil contest must finally take place, the government ought to know not only the numbers, but the names of the faithful citizens, who may otherwise be in danger of being confounded with the guilty. It, therefore, remains with you to say, whether you will recommend such a mode of procedure, and will immediately arrange with us the manner in which the sense of the people may be publicly taken, and written assurances of submission obtained, within the time already limited. We desire an explicit and speedy answer in writing

"You request us 'to give assurances, on the part of the United States, that an indemnity shall be granted, as to the arrears of excise, to all persons that have not entered their stills to this date.' If it were proper to remit all arrears of duty, we cannot conceive why those who have entered their stills, should not receive a similar indulgence with those who have refused to do so; nor why you demand peculiar favours for the op-

posers of the acts, while you abandon those who have complied to the strictness of the laws. We have gone on that subject as far as we think advisable. The clause was introduced at the request of the late committee of conference; and even the style of expressing it was settled with them. We, therefore, have nothing more to add to that subject. You require also that time be given until the 11th day of October, in order to ascertain the sense of the people. That is wholly inadmissible. On the day of the conference, the time allowed was deemed sufficiently long; and we are sorry to perceive, that delay only tends to produce an indisposition to decide. There are strong reasons, obvious to a reflecting mind, against prolonging the time a single hour. Nothing is required but a declaration of that duty which every man owes to his country, and every man before this day must have made up his mind on the subject. Six weeks have already elapsed since the ordinary exercise of civil authority has been forcibly suppressed, the officers of government expelled, and the persons and property of well disposed citizens exposed to the outrages of popular violence. The protection which is due to peaceable citizens—the respect which every government owes itself—and the great interests of the United States demand that the authority of the laws be quickly restored. To this we may add, that the militia (which by late orders from the president have been increased to 15,000 men, including 1500 riflemen from Virginia, under the command of Maj.-Gen. Morgan) have received orders to assemble, and we cannot undertake to promise that their march will be long suspended. All possible means to inform, to conciliate, and to recall our fellow citizens to their duty, have been used. If their infatuation still continues, we regret, but are persuaded that further moderation and forbearance will increase it.

"If the whole country shall declare its determination peaceably to submit, the hopes of the executive will be fulfilled: but if a part of the inhabitants of the survey shall persist in their unjustifiable resistance to the lawful authority of the United States, it is not the intention of the government to confound the innocent with the guilty. You may, therefore, assure the friends of order and the laws, that they may rely upon promptly receiving all the protection government can give, and that effectual measures will be taken to suppress and punish the violence of those individuals who may endeavour to obstruct the execution of the laws, and to involve their country in a scene of calamity, the extent and seriousness of which it is impossible to calculate. It is easy to perceive from the whole scope of this letter, that no part of it is addressed to the gentlemen of Ohio county, in Virginia.          James Ross.
                                   "J. Yeates.
                                   "Wm. Bradford.
"To Robert Dickey, John Probst, John Nesbitt, John Marshel, David Philips, John M'Cleland, George Wallace, and Samuel Wilson."

(No. 14.)
                              "Pittsburg, Sept. 2, 1794.
"Gentlemen: We have received your letter of yesterday, and, after having duly considered its contents, we are all of opinion that it is the interest and duty of the people in the western counties of Pennsylvania, to submit to the execution of the laws of the United States, and of the state of Pennsylvania, upon the principles and terms stated by the commissioners; and we will heartily recommend this measure to them. We are also ready to enter into the detail with you of fixing and ascertaining the time, place, and manner of collecting the sense of the people upon this very momentous subject.
"Signed by the unanimous order of the committee.                      John McCleland.
"To the Commissioners of the United States and of the State of Pennsylvania."

(No. 15.)

"At a conference between the commissioners from the United States and the state of Pennsylvania, on the one part, and Messrs. Probst, Dickey, Nesbit, Marshel, Philips, McCleland, Wallace, and Wilson, conferees appointed by the standing committee, at Brownsville (Redstone Old Fort), on the 28th and 29th days of August, 1794, it was agreed that the assurances required from the citizens in the Fourth survey of Pennsylvania, should be given in writing, and their sense ascertained in the following manner:

"That the citizens of the said survey (Alleghany county excepted) of the age of eighteen years and upwards, be required to assemble on Thursday, the 11th instant, in their respective townships, at the usual place for holding township meetings; and that between the hours of twelve and seven in the afternoon of the same day, any two or more members of the meeting who assembled at Parkinson's Ferry, on the 14th ultimo, resident in the township, or a justice of the peace of said township, do openly propose to the people assembled the following questions: 'Do you now engage to submit to the laws of the United States, and that you will not hereafter, directly or indirectly, oppose the execution of the acts for raising a revenue upon distilled spirits and stills? And you do also undertake to support, as far as the laws require, the civil authority, in affording the protection due to all officers and other citizens? Yea or nay.' That the said citizens resident in Alleghany county, shall meet in their respective election districts on the said day, and proceed in the same manner as if they were assembled in townships. That a minute of the number of the yeas and nays be made immediately after ascertaining the same. That a written or printed declaration of such engagement be signed by all those who vote in the affirmative, of the following tenor, to wit: 'I do solemnly* promise henceforth* to submit to the laws of the United States; that I will not directly nor indirectly oppose the execution of the acts for raising a revenue on distilled spirits and stills, and that I will support, as far as the law requires, the civil authority in affording the protection due to all officers and other citizens.' This shall be signed in the presence of the said members or justices, attested by him or them, and lodged in his or their hands. That the said persons so proposing the question stated as aforesaid, do assemble at the respective county court-houses on the 13th instant, and do ascertain and make report of the number of those who voted in the affirmative, in the respective townships or districts, and of the number of those who voted in the negative; together with their opinion, whether there be such a general submission of the people in their respective counties, that an office of inspection may be immediately and safely established therein. That the said report, opinion and written or printed declarations be transmitted to the commissioners, or any one of them, at Uniontown, on or before the 16th instant.

"If the said assurances shall be bona fide given in the manner prescribed, the commissioners on the part of the United States do promise and engage in manner following, to wit:

"1. No prosecution for any treason or other indictable offence against the United States, committed within the Fourth survey of Pennsylvania, before the 22d day of August last, shall be commenced or prosecuted before the 10th day of July next, against any person who shall within the time limited subscribe such assurance and engagement as aforesaid, and perform the same.

"2. On the said 10th day of July next there shall be granted a general pardon and oblivion of all the said offences, excluding therefrom, nevertheless, every person who shall refuse or

neglect to subscribe to such assurance and engagement in manner aforesaid, or shall after such subscription violate the same, or wilfully obstruct, or attempt to obstruct, the execution of the said acts, or be aiding or abetting therein.

"3. Congress having by an act passed on the 5th day of June last, authorized the state courts to take cognizance of offences against the said acts for raising a revenue upon distilled spirits and stills, the president has determined that he will direct suits against such delinquents to be prosecuted therein, if upon experiment it be found that local prejudices or other causes do not obstruct the faithful administration of justice; but it is to be understood, that of this he must be the judge, and that he does not mean by this determination to impair any power vested in the executive of the United States.

"4. Certain beneficial arrangements for adjusting delinquencies and prosecutions for penalties now depending, shall be made and communicated by the officers appointed to carry the said acts into execution.          James Ross.
                                        "J. Yeates.
                                        "Wm. Bradford.

"Signed in behalf of the committee representing the Fourth survey of Pennsylvania, unanimously by the members present· John Probst, Robert Dickey, John Nesbitt, David Philips, John Marshel, Samuel Wilson, George Wallace, John McClelland. Pittsburg, September 2, 1794.

"We the underwritten, do also promise, in behalf of the state of Pennsylvania, that in case the assurances now proposed, shall be bona fide given and performed, until the 10th day of July next, an act of free and general pardon and oblivion of all treasons, insurrections, arsons, riots, and other offences inferior to riots, committed, counselled or suffered, by any person or persons within the four western counties of Pennsylvania, since the 14th day of July last past, so far as the same concerns the said state or the government thereof, shall be then granted; excluding therefrom every person who shall refuse or neglect to subscribe such assurance, or who shall after such subscription wilfully violate or obstruct the laws of the state or of the United States.          Thomas McKean.
                                        "William Irvine."

(No. 16.)

"We, the subscribers, members of the committee who met at Parkeson's Ferry, on the 14th August last, and justices of the peace of the different townships in Washington county, met this 13th day of September, 1794, do find ourselves under great embarrassment to express our sentiments and opinions whether there be such a general submission of the people as that an office of inspection may be immediately and safely established in this county: yet we are free to declare, that no opposition shall arise from us the undersigned to the excise·law, or to any officer appointed under it, and we believe and are of opinion, that a large majority of the inhabitants of the respective townships in this county will acquiesce and submit to the said laws, under a hope and firm belief that the congress of the United States will repeal said law.

"Given under our hands, at Washington Court House, the 13th of September, 1794.
                    "David Bradford, and 27 Others."

(No. 17.)

"We the subscribers, judges of a general election held in the several townships of the county, for the purpose of ascertaining certain assurances required of the citizens by the commissioners on the part of the government, and agreed to on the part of the delegates, having met this day and taken into consideration the returns from said township, (true copies of which have been returned to one of the commissioners,) and finding that some gave only general assurances of

---

* Objections having been made to the words "solemnly" and "henceforth," the commissioners by a publication in the Pittsburg Gazette, declared their consent to their being struck out.

their submission and disposition for peace, without individually signing the same, and others in number according to the returns by them respectively made,—do certify, that in our opinion, as ill-disposed lawless persons could suddenly assemble and offer violence, it would not be safe in immediately establishing an office of inspection therein.

"Given under our hands at the court house at Greensburgh, this thirteenth day of September, in the year of our Lord one thousand seven hundred and ninety-four.                James McLean.
                    "Ebenezer Brady.
                    "Clements Burleigh.
                    "Hugh Martin.
                    "John Denniston.
                    "Chr. Finley.
                    "John Kirkpatrick.
                    "John Young.
                    "James Caldwell.
                    "Jas. Irwin.
                    "James Brady.
                    "John Anderson.
                    "John Findley.
                    "Jeremiah Muray.
                    "George Ament."

(No. 18.)

'Union Town, Sept. 16, 1794.

"We, the subscribers, having according to resolutions of the committee of townships, for the county of Fayette, acted as judges, on the 11th instant, at the meetings of the people of the said county respectively convened at the places in the First, Second, and Third election districts, where the general elections are usually held (no judge or member of the committee attending from the Fourth and last district, which consists of the townships of Tyrone and Bullskin), do hereby certify, that five hundred and sixty of the people thus convened on the day aforesaid, did then and there declare their determination to submit to the laws of the United States in the manner expressed by the commissioners on the part of the Union, in their letter dated the 22d day of August last; the total number of those who attended on that occasion, being only seven hundred and twenty-one, that is to say, something less than one-third of the number of citizens of the said three districts. And we do further certify, that from our previous knowledge of the disposition of the general body of the people, and from the anxiety since discovered by many (who, either from not having had notice, or from not having understood the importance of the question, did not attend) to give similar assurances of submission, we are of opinion that the majority of those citizens who did not attend are disposed to behave peaceably and with due submission to the laws.
                "Albert Gallatin
                "William Roberts.
                "George Dieuth.
                "James White.
                "John Jackson.
                "Andrew Rabb.
                "Thomas Patterson."

NOTE 7. The following squib appeared in this paper on the 23rd of August. It was generally attributed to Brackenridge, though he denies it in his "Incidents," in a rather lame way. It had a great deal of influence at the time:

### An Indian Treaty.

"Speeches intended to be spoken at a treaty now holding with the Six United Nations of White Indians, settled on the heads of the Ohio, at the town of Pittsburg, on the 20th of August, 1794, by the commissioners sent from Philadelphia for the purpose:

"Captain Blanket, an Indian chief, spoke as follows: 'Brothers: We welcome you to the old council fire at this place. It is a lucky spot of ground for holding Indian treaties. No good has attended your treaties at Beaver Creek, Muskingum, &c. As the proffer of this treaty has originated with your great council at Philadelphia, we therefore expect you have good terms to offer. But you know, brothers, that it has ever been a custom to pay Indians well for coming to treaties; and you may be assured that unless we are well paid or fully satisfied, your attempts of any kind; will not have the least effect. However, we doubt not but the pay is provided; and that you have a sufficiency of blankets and breech-clouts, powder and lead; and that the wagons are close at hand. You know, brothers, that our neighbors the British over the lakes, pay their Indians well; that they have inexhaustible stores of blankets and ammunition, and that if they were offering us a treaty they would not hesitate a moment to satisfy all our demands.'

"Captain Whisky spoke next: 'Brothers: My friend Captain Blanket has indulged himself in a little drollery about blankets &c., but I must speak to the point. I am told, that the people of your great council call us a parcel of drunken ragamuffins; because we indulge ourselves with a little of our homespun whisky, and that we ought to pay well for this extraordinary luxury. What would they think if the same was said of them for drinking beer and cider? Surely the saying will apply with equal force in both cases. We say that our whisky shall not be saddled with an unequal tax. You say it shall; and to enforce the collection of three or four thousand dollars per annum, of nett proceeds, you will send an army of 12,950 men, or double that number if necessary. This is a new fashioned kind of economy indeed. It is a pity that this army had not been employed long ago, in assisting your old warrior, General Wayne, or chastising the British about the lakes. However, I presume it is the present policy, to guard against offending a nation with a king at their head. But remember, brothers, if we have not a king at our head, we have that powerful monarch Captain Whisky to command us. By the power of his influence, and a love to his person, we are impelled to every great and heroic act. You know, brothers, that Captain Whisky has been a great warrior in all nations and in all armies. He is a descendant of that nation called Ireland; and to use his own phrase, he has peopled three-fourths of this western world with his own hand. We the Six United Nations of White Indians, are principally his legitimate offspring; and those who are not, have all imbibed his principles and passions,—that is, a love of whisky; and will, therefore, fight for our bottle till the last gasp. Brothers, you must not think to frighten us with fine arranged lists of infantry, cavalry and artillery, composed of your water-melon armies from the Jersey shore; they would cut a much better figure in warring with the crabs and oysters about the capes of Delaware. It is a common thing for Indians to fight your best armies, at a proportion of one to five; therefore, we would not hesitate to attack this army at the rate of one to ten. Our nations can upon emergency, produce 20,000 warriors; you may then calculate what your army ought to be. But I must not forget that I am making an Indian speech: I must therefore give you a smack of my national tongue—Tongath Getchie—Tongath Getchie, very strong man me Captain Whisky.'

"Captain Alliance next took the floor: 'Brothers: My friend Captain Whisky has made some fine flourishes about the power of his all conquering monarch, Whisky: and of the intrepidity of the sons of St. Patrick, in defence of their beloved bottle. But we will suppose when matters are brought to the test, that, if we should find ourselves unequal to the task of repelling this tremendous army, or that the great council will still persevere in their determination of imposing unequal and oppressive duties upon our whisky, who knows but some evil spirit might prompt us to a separation from the Union, and call for the alliance of some more

friendly nation. You know that the great nation of Kentucky have already suggested the idea to us. They are at present Mississippi mad, and we are Whisky mad; it is, therefore, hard to tell what may be the issue of such united madness. It appears as if the Kentuckians were disposed to bow the knee to the Spanish monarch, or kiss the Pope's a—e, and wear a crucifix rather than be deprived of their darling Mississippi; and we might be desperate enough rather than submit to an odious excise, or unequal taxes, to invite Prince William Henry, or some other royal pup, to take us by the hand, provided he would guarantee equal taxation and exempt our whisky. This would be a pleasing overture to the royal family of England; they would eagerly embrace the favourable moment, to add again to their curtailed dominions in America, to accommodate some of their numerous brood with kingdoms and principalities. We would soon find that great warrior of the lakes, Simcoe, flying to our relief, and employing those numerous legions of white and yellow savages, for a very different purpose to what they have now in view. If the Kentuckians should also take it into their heads to withhold supplies from your good old warrior Wayne, who is very often near starving in the wilderness, his army must be immediately annihilated, and your great council might forever bid adieu to their territory west of the mountains. This may seem very improbable indeed; but as great wonders have happened in Europe within the course of three years past.'

"Captain Pacificus then rose, and concluded the business of the day: 'Brothers: My friend Alliance has made some very alarming observations; and I confess they have considerable weight with me. A desperate people may be drove to desperate resources; but as I am of a peaceable disposition, I shall readily concur in every reasonable proposition which may have a tendency to restore tranquility, and secure our Union upon the true principles of equality and justice. It is now time to know the true object of your mission; if you are the messengers of peace, and come to offer us a treaty, why attempt to deliver it at the point of the bayonet! If you are only come to grant pardon for past offences, you need not have fatigued yourself with such extraordinary dispatch on the journey; we have not yet begged your pardon; we are not yet at the gallows or the guillotine, for you will have to catch us before you bring us there. But as I am rather more of a counsellor than a warrior, I am more disposed to lay hold of the chain than the tomahawk; I shall therefore propose, that a total suspension of all hostilities, and the cause thereof, shall immediately take place on both sides, until the next meeting of our great national council. If your powers are not competent to this agreement, we expect as you are old counsellors, and peaceable men, that you will at last report and recommend it to our good old father who sits at the helm. We know it was his duty to make proclamation, &c. &c., but we expect everything that can result from his prudence, humanity and benevolence towards his fellow creatures.' "

A belt, on which is inscribed, "Plenty of whisky without excise."

Soon after this, one John Gaston received the ensuing letter, which he had published in the same paper, the printer not daring to refuse it:

"To John Gasson—Sir: You will please to have printed in the Pittsburg paper, this week, or you may abide by the consequences. Poor Tom takes this opportunity to inform his friends throughout the country, that he is obliged to take up his commission once more, though disagreeable to his inclination. I thought, when I laid down my commission before, that we had got the country so well united, that there would have been no more need for me in that line; but my friends see more need for me than ever. They chose a set of men whom they thought they could confide in, but find themselves much mis-

taken; for the majority of them have proved traitors. Four or five big men from below have scared a good many; but few are killed yet. But I hope none of those are any that ever pretended to be a friend to Poor Tom; so I would have all my friends to keep up their spirits, and stand to their integrity, their rights, and liberty, and you will find Poor Tom be your friend. This is a fair warning; traitors, take care, for my hammer is up and my ladle is hot. I cannot travel the country for nothing. From your old friend,                   Tom, the Tinker."

"Tom-the-Tinker" was a nom-de-guerre of John Holcroft, who, it may be remembered, was a leader in the first attack on General Neville's house. He was a very prominent man among the insurgents, and acquired a good deal of notoriety at the time from the threatening letters that he wrote with the above signature.

### "A Proclamation.

"Whereas from a hope that the combinations against the constitution and laws of the United States in certain of the western counties of Pennsylvania would yield to time and reflection, I thought it sufficient in the first instance rather to take measures for calling forth the militia, than immediately to embody them; but the moment is now come, when the overtures of forgiveness with no other condition, than a submission to law have been only partially accepted; when every form of conciliation not inconsistent with the being of government has been adopted without effect; when the well disposed in those counties are unable by their influence and example to reclaim the wicked from their fury, and are compelled to associate in their own defence; when the proper lenity has been misinterpreted into an apprehension that the citizens will march with reluctance; when the opportunity of examining the serious consequences of a treasonable opposition has been employed in propagating principles of anarchy, endeavouring through emissaries to alienate the friends of order from its support, and inviting its enemies to perpetrate similar acts of insurrection; when it is manifest, that violence would continue to be exercised upon every attempt to enforce the laws; when, therefore, government is set at defiance, the contest being whether a small portion of the United States shall dictate to the whole Union, and at the expense of those who desire peace, indulge a desperate ambition.

"Now, therefore, I, George Washington, president of the United States, in obedience to that high and irresistible duty consigned to me by the constitution, 'to take care that the laws be faithfully executed,' deploring that the American name should be sullied by the outrages of citizens on their own government; commiserating such as remain obstinate from delusion, but resolved in perfect reliance on that gracious Providence which so signally displays its goodness towards this country, to reduce the refractory to a due subordination to the law; do hereby declare and make known, that with a satisfaction, which can be equalled only by the merits of the militia, summoned into service from the states of New Jersey, Pennsylvania, Maryland and Virginia, I have received intelligence of their patriotic alacrity in obeying the call of the present, though painful, yet commanding necessity; that a force, which, according to every reasonable expectation, is adequate to the exigency, is already in motion to the scene of disaffection: that those who have confided, or shall confide in the protection of government, shall meet full succour under the standard, and from the arms of the United States: that those who having offended against the law have since entitled themselves to indemnity, will be treated with the most liberal good faith, if they shall not have forfeited their claim by any subsequent conduct, and that instructions are given accordingly. And I do moreover exhort all individuals and bodies of men, to contemplate with abhorrence the measures leading directly or indi-

rectly to those crimes which produce this military coercion; to check in their respective spheres the efforts of misguided or designing men to substitute their misrepresentations in the place of truth, and their discontents in the place of stable government; and so call to mind that as the people of the United States have been permitted under the Divine favour in perfect freedom after solemn deliberation, and in an enlightened age, to elect their own government; so will their gratitude for this inestimable blessing be best distinguished by firm exertions to maintain the constitution and the laws. And lastly, I again warn all persons whomsoever, and wheresoever, not to abet, aid or comfort the insurgents aforesaid, as they will answer the country at their peril; and I do also require all officers and other citizens according to their several duties, as far as may be in their power to bring under the cognizance of the law all offenders in the premises.

"In witness whereof, I have caused the seal of the United States of America to be affixed to these presents, and signed the same with my hand. Done at the city of Philadelphia the twenty-fifth day of September, one thousand seven hundred and ninety-four, and of the independence of the United States of America the nineteenth.        Geo. Washington. [L. S.]

"By the President: Edm. Randolph.

"(True copy.  George Taylor.)"

This proclamation was preceded by the following correspondence between the president and the governor of Pennsylvania. The letters under the name of Governor Mifflin are understood to have emanated from Mr. Dallas, the then secretary of the commonwealth.

Communication from Governor Mifflin to the president of the United States, on the insurrection in the western counties of Pennsylvania:

"Sir: The important subject, which led to our conference on Saturday last, and the interesting discussion that then took place, having since engaged my whole attention, I am prepared, in compliance with your request, to state with candour the measures which, in my opinion, ought to be pursued by the commonwealth of Pennsylvania. The circumstances of the case evidently require a firm and energetic conduct on our part, as well as on the part of the general government; but as they do not preclude the exercise of a prudent and humane policy, I enjoy a sincere gratification in recollecting the sentiment of regret, with which you contemplated the possible necessity of an appeal to arms: for I confess that, and in manifesting a zealous disposition to secure obedience to the constitution and laws of our country, I too shall ever prefer the instruments of conciliation to those of coercion; and never, but in the last resort, countenance a dereliction of judiciary authority, for the exertion of military force. Under the influence of this general sentiment, I shall proceed, sir, to deliver my opinion relatively to the recent riots in the county of Alleghany, recapitulating, in the first place, the actual state of the information which I have received. It appears, then, that the marshal of the district having, without molestation, served certain process, that issued from a federal court, on various citizens who reside in the county of Fayette, thought it proper to prosecute a similar duty in the county of Alleghany, with the assistance, and in the company of General Neville, the inspector of the excise for the western district of Pennsylvania: that while thus accompanied he suffered some insults, and encountered some opposition: that considerable bodies of armed men having, at several times, demanded the surrender of General Neville's commission and papers, attacked, and ultimately, destroyed his house: that these rioters (of whom a few were killed, and many wounded) having taken the marshal and other prisoners, released that officer, in consideration of a promise, that he would serve no more processes on the western side of the Alleghany

Mountains: that, under the apprehension of violence, General Neville, before his house was destroyed, applied to the judges of Alleghany county for the protection of his property, but the judges on the 17th day of July, the day on which his house was destroyed, declared that they could not, in the present circumstances, afford the protection that was requested, though they offered to institute prosecutions against the offenders; and that General Neville and the marshal, menaced with further outrage by the rioters, had been under the necessity of withdrawing from the country. To this outline of the actual information respecting the riots, the stoppage of the mail may be added, as matter of aggravation; and the proposed convention of the inhabitants of the neighbouring counties of Pennsylvania and Virginia, as matter of alarm.

"Whatever constructions may be given, on the part of the United States, to the facts that have been recited, I cannot hesitate to declare on the part of Pennsylvania, that the incompetency of the judiciary department of her government, to vindicate the violated laws, has not at this period been made sufficiently apparent, and that the military power of the government ought not to be employed until its judiciary authority, after a fair experiment, has proved incompetent to enforce obedience, or to punish infractions of the law. The law having established a tribunal and prescribed the mode for investigating every charge, has likewise attached to every offence its proper punishment. If an opponent of the excise system refuses or omits to perform the duty which that system prescribes to him, in common with his fellow citizens, his refusal or omission exposes him to the penalty of the law; but the payment of the penalty expiates the legal offence. If a riot is committed in the course of a resistance to the execution of any law, the rioters expose themselves to the prosecution and punishment, but the sufferance of their sentence extinguishes their crime. In either instance, however, if the strength and audacity of a lawless combination shall baffle and destroy the efforts of the judiciary authority to recover a penalty, or to inflict a punishment, that authority may constitutionally claim the auxiliary intervention of a military power; but still the intervention cannot commence until the impotency of the judicial authority has been proved by experiment, nor continue a moment longer than the occasion for which it was expressly required. That the laws of the Union are the laws of the state, is a constitutional axiom that will never be controverted; that the authority of the state ought to be exerted in maintaining the authority of the Union, is a patriotic position which I have uniformly inculcated. But in executing the laws or maintaining the authority of the Union, the government of Pennsylvania can only employ the same means by which the more peculiarly municipal laws and authority of the state are executed and maintained. Till the riot was committed no offence had occurred which required the aid of the state government. When it was committed, it became the duty of the state government to prosecute the offenders, as for a breach of the public peace and the laws of the commonwealth, and if the measures shall be precisely what would have been pursued, had the riot been unconnected with the system of federal policy, all, I presume, will be done which good faith and justice can require. Had the riot been unconnected with the system of federal policy, the vindication of our laws would be left to the ordinary course of justice; and only in the last resort, at the requisition, and as an auxiliary of the civil authority, would the military force of the state be called forth. Experience furnishes the strongest inducements, to my mind, for persevering in this lenient course. Riots have heretofore been committed in opposition to the laws of Pennsylvania, but the rioters have

invariably been punished by our courts of justice. In opposition to the laws of the United States, in opposition to the very laws now opposed, and in the very counties supposed to be combined in the present opposition, riots have likewise formerly occurred; but in every instance, supported by legal proof, the offenders have been indicted, convicted, and punished before the tribunals of the state. This result does not announce a defect of jurisdiction, a want of judicial power, or disposition to punish infractions of the law, a necessity for an appeal from the political to the physical strength of the nation.

"But another principle of policy deserves some consideration. In a free country it must be expedient to convince the citizens of the necessity that shall, at any time, induce the government to employ the coercive authority with which it is invested. To convince them that it is necessary to call forth the military power for the purpose of executing the laws, it must be shown that the judicial power has in vain attempted to punish those who violate them; and, therefore, thinking as I do, that the incompetency of the judicial power of Pennsylvania has not yet been sufficiently ascertained, I remarked, in the course of our late conference, that I did not think it would be an easy task to embody the militia on the present occasion. The citizens of Pennsylvania (however a part of them may, for a while, be deluded,) are the friends of law and order, but when the inhabitants of one district shall be required to take arms against the inhabitants of another, their general character does not authorize me to promise a passive obedience to the mandates of government. I believe, that as freemen they would inquire into the cause and nature of the service proposed to them; and, I believe, that their alacrity in performing as well as in accepting it, would essentially depend on their opinion of its justice and necessity. Upon great political emergencies, the effect of every measure should be deliberately weighed. If it shall be doubted whether saying that the judiciary power is yet untried, is enough to deter us from the immediate use of military force, an anticipation of the probable consequences of that awful appeal will enable us perhaps satisfactorily to remove or overlook the doubt. Will not the resort to force inflame and cement the existing opposition? Will it not associate, in a common resistance, those who have hitherto peaceably, as well as those who have riotously expressed their abhorrence of the excise? Will it not collect and combine every latent principle of discontent arising from the supposed oppressive operations of the federal judiciary, the obstruction of the western navigation, and a variety of other local sources? May not the magnitude of the opposition, on the part of the ill disposed, or the dissatisfaction at a premature resort to arms on the part of the well disposed citizens of this state, eventually involve the necessity of employing the militia of other states? And the accumulation of discontent which the jealousy engendered by that movement may produce, who can calculate, or who will be able to avert? Nor, in this view of the subject, ought we to omit paying some regard to the ground for suspecting that the British government has already, insidiously and unjustly, attempted to seduce the citizens on our western frontier from their duty; and we know, that in a moment of desperation or disgust men may be led to accept that as an asylum, which, under different impressions, they would shun as a snare. It will not, I am persuaded, sir, be presumed, from the expression of these sentiments, that I am insensible to the indignation which the late outrages ought to excite in the mind of a magistrate, entrusted with the execution of the laws. My object at present is to demonstrate, that on the principles of policy, as well as of law, it would be improper in me to employ the military power of the state while its judiciary authority is competent to punish the offenders. But should the judiciary authority prove insufficient, be assured of the most vigorous co-operation of the whole force which the constitution and laws of the state entrust to me, for the purpose of compelling a due obedience to the government; and, in that unfortunate event, convinced that every other expedient has been resorted to in vain, the public opinion will sanctify our measures, and every honest citizen will willingly lend his aid to strengthen and promote them.

"The steps which under my instructions were taken, as soon as the intelligence respecting the riots was received, will clearly, indeed, manifest the sense that I entertain upon the subject. To every judge, justice, sheriff, brigade inspector, in short to every public officer residing in the western counties, a letter was addressed expressing my indignation and regret, and requiring an exertion of their influence and authority to suppress the tumults and punish the offenders. The attorney general of the state was, likewise, desired to investigate the circumstances of the riot, to ascertain the names of the rioters, and to institute the regular process of the law, for bringing the leaders to justice. In addition to these preliminary measures, I propose issuing a proclamation, in order to declare (as far as I can declare them) the sentiments of the government; to announce a determination to prosecute and punish the offenders; and to exhort the citizens at large to pursue a peaceable and patriotic conduct: I propose engaging three respectable citizens to act as commissioners for addressing those who have embarked in the present combination, upon the lawless nature, and ruinous tendency of their proceedings; for inculcating the necessity of an immediate return to the duty which they owe to their country; and for promising (as far as the state is concerned) a forgiveness of their past transgressions, upon receiving a satisfactory assurance that, in future they will submit to the laws; and I propose, if all these expedients should be abortive, to convene the legislature, that the ultimate means of subduing the spirit of insurrection, and of restoring tranquility and order, may be prescribed by their wisdom and authority.

"You will perceive, sir, that throughout my observations, I have cautiously avoided any reference to the nature of the evidence, from which the facts that relate to the riots are collected, or to the conduct which the government of the United States may pursue on this important occasion. I have hitherto, indeed, only spoken as the executive magistrate of Pennsylvania, charged with a general superintendence and care that the laws of the commonwealth be faithfully executed, leaving it as I ought implicitly to your judgment, to choose on such evidence as you approve, the measures for discharging the analogous trust which is confided to you in relation to the laws of the Union. But, before I conclude, it is proper, under the impression of my federal obligations, to add a full and unequivocal assurance, that whatever requisition you may make, whatever duty you may impose, in pursuance of your constitutional and legal powers, will on my part be promptly undertaken, and faithfully discharged. I have the honour to be, with perfect respect, sir, your excellency's most obedient humble servant, Thomas Mifflin.

"(True copy. George Taylor, Jr.)

"Philadelphia, 5th August, 1794.

"To the President of the United States."

Communication from the secretary of state to Governor Mifflin, in answer to his of 5th August to the president of the United States:

"Department of State, August 7, 1794.

"Sir: The president of the United States has directed me to acknowledge the receipt of your letter of the 5th instant, and to communicate to you the following reply. In re-

questing an interview with you on the subject of the recent disturbances in the western part of Pennsylvania, the president, besides the desire of manifesting a respectful attention to the chief magistrate of a state immediately affected, was influenced by the hope, that a free conference, guided by a united and comprehensive view of the constitutions of the United States and of Pennsylvania, and of the respective institutions, authorities, rights, and duties of the two governments, would have assisted him in forming more precise ideas of the nature of the co-operation, which could be established between them, and a better judgment of the plan which it might be advisable for him to pursue in the execution of his trust in so important and delicate a conjuncture. This having been his object, it is matter of some regret, that the course which has been suggested by you as proper to be pursued, seems to have contemplated Pennsylvania in a light too separate and unconnected. The propriety of that course, in most, if not in all respects, would be susceptible of little question; if there were no federal government, federal laws, federal judiciary, or federal officers: if important laws of the United States, by a series of violent, as well as of artful expedients, had not been frustrated in their execution for more than three years; if officers immediately charged with that execution, after suffering much and repeated insult, abuse, personal ill treatment, and the destruction of property, had not been compelled for safety to fly the places of their residence, and the scenes of their official duties; if the service of the processes of a court of the United States, had not been resisted, the marshal of the district made and detained for some time prisoner, and compelled for safety also to abandon the performance of his duty, and return by a circuitous route to the seat of government; if, in fine, a judge of the United States had not in due form of law notified to the president, 'that in the counties of Washington and Alleghany, in Pennsylvania, laws of the United States are opposed, and the execution thereof obstructed, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings or by the powers vested in the marshal of that district.' It is true, your excellency has remarked that in the plan suggested, you have only spoken as the executive magistrate of Pennsylvania, charged with a general superintendence and care, that the laws of the commonwealth be fully executed, leaving it implicitly to the judgment of the president to choose, on such evidence as he approves, the measures for discharging the analogous trust, which is confided to him in relation to the laws of the Union. But it is impossible not to think that the current of the observations in your letter, especially as to the consequences which may result from the employment of coercive measures previous to the preliminary course which is indicated in it, may be construed to imply a virtual disapprobation of that plan of conduct on the part of the general government in the actual stage of its affairs, which you acknowledge would be proper on the part of the government of Pennsylvania if arrived at a similar stage. Let it be assumed here (to be more particularly shown hereafter) that the government of the United States is now at that point, where it is admitted, if the government of Pennsylvania was, the employment of force, by its authority, would be justifiable; and let the following extracts be consulted for the truth of the inference which has been just expressed: 'Will not the resort to force inflame and cement the existing opposition? Will it not associate in a common resistance those who have hitherto peaceably, as well as those who have riotously, expressed their abhorrence of the excise? Will it not collect and combine every latent principle of discontent, arising from the supposed oppressive operations of the federal judiciary, the obstruction of the western navigation and a variety of other local sources? May not the magnitude of the opposition on the part of the ill disposed, or the dissatisfaction of a premature resort to arms on the part of the well disposed citizens of the state, eventually involve the necessity of employing the militia of other states? And the accumulation of discontent which the jealousy engendered by that movement may produce who can calculate, or who will be able to avert?'

"These important questions naturally give birth to the following serious reflections. The issue of human affairs is in the hand of Providence. Those entrusted with them in society have no other sure guide than the sincere and faithful discharge of their duty, according to the best of their judgment. In emergencies great and difficult, not to act with an energy proportioned to their magnitude and pressure, is as dangerous as any other conceivable course. In the present case, not to exert the means which the laws prescribe for effectuating their own execution, would be to sacrifice those laws, and with them the constitution, the government, the principles of social order, and the bulwarks of private right and security. What worse can happen from the exertion of those means? If, as cannot be doubted, the great body of the citizens of the United States are attached to the constitution, which they have established for the management of their common concerns; if they are resolved to support their own authority in that of the constitutional laws, against disorderly and violent combinations of comparatively small portions of the community; if they are determined to protect each other in the enjoyment of security to person and property; if they are decided to preserve the character of republican government, by evincing that it has adequate resources for maintaining the public order; if they are persuaded that their safety and their welfare are materially connected with the preservation of the Union, and consequently of a government adequate to its exigencies; in fine, if they are disposed to continue that state of respectability and prosperity which is now deservedly the admiration of mankind,—the enterprise to be accomplished, should a resort to force prove inevitable, though disagreeable and painful, cannot be arduous or alarming. If, in addition to these dispositions in the community at large, the officers of the governments of the respective states, feeling it to be not only a patriotic, but a constitutional duty (inculcated by the oath enjoined upon all the officers of a state, legislative, executive and judicial) to support in their several stations, the constitution of the United States, shall be disposed as occasion may require (a thing as little to be doubted as the former), with sincerity and good faith, to co-operate with the government of the United States to second with all their influence and weight its legal and necessary measures by a real and substantial concert; then the enterprise to be accomplished can hardly ever be deemed difficult.

"But if, contrary to the anticipations which are entertained of these favourable dispositions, the great body of the people should be found indifferent to the preservation of the government of the Union, or insensible to the necessity of vigorous exertions to repel the danger which threatens their most important interests; or if an unwillingness to encounter partial inconveniences should interfere with the discharge of what they owe to their permanent welfare; or if, either yielding to the suggestions of particular prejudices, or misled by the arts which may be employed to infuse jealousy and discontent, they should suffer their zeal for the support of public order to be relaxed by an unfavourable opinion of the merits and tendency of the measures, which may be adopted; if, above all, it were possible that any of the state governments should, instead of prompting the exertions of the citizens, assist directly or indirectly in damping their ardour, by giving a wrong bias to their

judgment, or by disseminating dissatisfaction with the proceedings of the general government, or should counteract the success of those proceedings by any sinister influence whatever— then indeed, no one can calculate, or may be able to avert, the fatal evils with which such a state of things would be pregnant; then, indeed, the foundations of our political happiness may be deeply shaken, if not altogether overturned. The president, however, can suppose none of these things. He cherishes an unqualified confidence in the virtue and good sense of the people, in the integrity and patriotism of the officers of the state governments, and he counts absolutely on the same affectionate support which he has experienced upon all former occasions, and which he is conscious that the goodness of his intentions now, not less than heretofore, merits. It has been promised to show more particularly hereafter, that the government of the United States is now at that point, where it is confessed, if the state government was, the employment of force on its part, would be justifiable. This promise remains to be fulfilled.

"The facts already noted, establish the conclusion, but to render it palpable, it will be of use to apply them to the positions which your excellency has been pleased to lay down. You admit that, as the offences committed respect the state, the military power of the government ought to be employed, where its judiciary authority, after a fair experiment, had proved incompetent to enforce obedience or to punish infractions of the law, that if the strength and audacity of a lawless combination shall baffle and destroy the efforts of the judiciary authority, to recover a penalty or inflict a punishment, that authority may constitutionally claim the auxiliary intervention of the military power,—that in the last resort, at the requisition, and as an auxiliary of the civil authority, the military force of the state would be called forth. And you declare, that the circumstances of the case evidently require a firm and energetic conduct on the part both of state and general government. For more than three years, as already observed, certain laws of the United States have been obstructed in their execution by disorderly combinations. Not only officers, whose immediate duty it was to carry them into effect, have suffered violent personal outrage and injury, and destruction of property, at different times, but similar persecution has been extended to private citizens, who have aided, countenanced, or only complied with the laws. The violences committed have been so frequent and such in their degree as to have been matter of general notoriety and alarm, and it may be added, that they have been abundantly within the knowledge and under the notice of the judges and marshals of Pennsylvania, of superior as well as of inferior jurisdiction. If, in particular instances, they have been punished by the exertions of the magistrates, it is at least certain that their effects have been in the main ineffectual. The spirit has continued, and, with some intervals of relaxation, has been progressive, manifesting itself in reiterated excesses. The judiciary authority of the United States has also, prior to the attempt which preceded the late crisis, made some fruitless efforts under a former marshal; an officer sent to execute process was deterred from it by the manifest danger of proceeding. These particulars serve to explain the extent, obstinacy, and inveteracy of the evil.

"But the facts which immediately decide the complexion of the existing crisis are these: Numerous delinquencies existed with regard to a compliance with the laws laying duties on spirits distilled within the United States and upon stills. An armed banditti, in disguise, had recently gone to the house of an officer of the revenue in the night, attacked it, broken open the doors, and by menaces of instant death enforced by pistols presented at him, and compelled a surrender of his commission and books of office; cotemporary acts of violence had been perpetrated in other quarters; processes issued out of a court of the United States to recover the penalties incident to non-compliance with the laws, and to bring to punishment the violent infractors of them, in the above-mentioned case, against two of whom indictments had been found. The marshal of the district went in person to execute these processes. In the course of his duty he was actually fired upon on the high road by a body of armed men. Shortly after other bodies of armed men (in the last instance amounting to several hundred persons) repeatedly attacked the house of the inspector of the revenue with the declared intention of compelling him to renounce his office, and of obstructing the execution of the laws. One of these bodies of armed men made prisoner of the marshal of the district, put him in jeopardy of his life, and did not release him till for safety and to obtain his liberty, he engaged to forbear the further execution of the processes with which he was charged. In consequence of further requisitions and menaces of the insurgents, the marshal, together with the inspector of the revenue, has been since under the necessity of flying secretly, and by a circuitous route, from the scene of these transactions towards the seat of government. An associate justice, pursuant to the provisions of the laws for that purpose, has, in the manner already stated, officially notified the president of the existence of combinations in two of the counties of this state to obstruct the execution of the laws, too powerful to be suppressed by the judiciary authority, or by the powers of the marshal. Thus, then, is it unequivocally and in due form ascertained, in reference to the government of the United States, that the judiciary authority, after a fair and full experiment, has proved incompetent to enforce obedience to or to punish infractions of the laws; that the strength and audacity of certain lawless combinations have baffled and destroyed the efforts of the judiciary authority to recover penalties or inflict punishment, and that this authority, by a regular notification of this state of things, has, in the last resort, as an auxiliary of the civil authority, claimed the intervention of the military power of the United States. It results from these facts that the case exists, when, according to the positions advanced by your excellency in reference to the state government, the military power may, with due regard to all the requisite cautions, be rightfully interposed. And that the interposition of this power is called for, not only by principles of a firm and energetic conduct, on the part of the general government, but by the indispensable duty which the constitution and the laws prescribe to the executive of the United States.

"In this conclusion, your excellency's discernment on mature reflection, cannot, it is presumed, fail to acquiesce, nor can it refuse its concurrence in the opinion which the president entertains, that he may reasonably expect, when called for, the zealous co-operation of the militia of Pennsylvania, that as citizens, friends to law and order, they may comply with the call without any thing that can properly be denominated 'a passive obedience to the mandates of government,' and that as freemen, judging rightly of the cause and nature of the service proposed to them, they will feel themselves under the most sacred of obligations to accept and to perform it with alacrity. The theory of our political institutions knows no difference between the obligations of our citizens in such a case, whether it relate to the government of the Union or of a state; and it is hoped and confided, that a difference will be as little known to their affections or opinions. Your excellency, it is also presumed, will as little doubt, on the like mature reflection, that in such a case the president could not, without an abdication of the undoubted rights and authorities of the United States and of his duty, postpone the measures, for which the laws of the United States provide, to a previous experiment of the plan which is delineated in your letter. The people of the United States have

established a government for the management of their general interests. They have instituted executive organs for administering that government; and their representatives have established the rules by which those organs are to act. When their authority and that of their government is attacked, by lawless combinations of the citizens of part of a state, they could never be expected to approve that the care of vindicating their authority, of enforcing their laws, should be transferred from the officers of their own government to those of a state; and this to wait the issue of a process so undeterminate in its duration, as that which it is proposed to pursue; comprehending a further and full experiment of the judiciary authority of the state, a proclamation 'to declare the sentiments of its government, announce a determination to prosecute and punish offenders, and to exhort the citizens at large to pursue a peaceable and patriotic conduct'; the sending of commissioners 'to address those who have embarked in the present combinations upon the lawless nature and ruinous tendency of their proceedings, to inculcate the necessity of an immediate return to the duty which they owe their country, and to promise, as far as the state is concerned, foregiveness of their past transactions upon receiving a satisfactory assurance that in future they will submit to the laws'; and finally, a call of the legislature of Pennsylvania, 'that the ultimate means of subduing the spirit of insurrection, and of restoring tranquility and order, may be prescribed by their wisdom and authority.' If there were no other objection to a transfer of this kind, the very important difference which is supposed to exist in the nature and consequences of the offences that have been committed in the contemplation of the laws of the United States, and of those of Pennsylvania, would alone be a very serious obstacle. The paramount considerations, which forbid an acquiescence in this course of proceeding, render it unnecessary to discuss the probability of its success; else it might have been proper to test the considerations, which have been mentioned as a ground of hope, by the inquiry what was the precise extent of the success of past experiment; and especially whether the execution of the revenue laws of Pennsylvania within the scene in question was truly and effectually accomplished by them, or whether they did not rather terminate in a tacit compromise, by which appearances only were saved.

"You are already, sir, advised that the president, yielding to the impressions which have been stated, has determined to take measures for calling forth the militia, and that these measures contemplate the assembling a body of between twelve and thirteen thousand men from Pennsylvania, and the neighbouring states of Virginia, Maryland and New Jersey. The recourse thus early to the militia of the neighbouring states proceeds from a probability of the insufficiency of that of Pennsylvania alone, to accomplish the object; your excellency having in your conference with the president confirmed the conclusion, which was deducible from the known local and other circumstances of the state, by the frank and express declaration which you made of your conviction of that insufficiency, in reference to the number which could be expected to be drawn forth for the purpose. But while the president has conceived himself to be under an indispensable obligation to prepare for that eventual resort, he has still consulted the sentiment of regret which he expressed to you, at the possible necessity of an appeal to arms; and to avert it, if practicable, as well as to manifest his attention to the principle, that 'a firm and energetic conduct does not preclude the exercise of a prudent and humane policy,' he has (as you have been also advised) concluded upon the measure of sending himself commissioners to the discontented counties, to make one more experiment of a conciliatory appeal to the reason, virtue and patriotism of their inhabitants, and has also signified to you how agreeable would be to him your co-operation in the same expedient, which you have been pleased to afford. It can scarcely be requisite to add, that there is nothing he has more at heart, than that the issue of this experiment, by establishing the authority of the laws, may preclude the always calamitous necessity of an appeal to arms. It would plant a thorn in the remainder of his path through life, to have been obliged to employ force against fellow-citizens, for giving solidity and permanency to blessings which it has been his greatest happiness to co-operate with them in procuring for a much loved country. The president receives with much pleasure the assurance you have repeated to him, that whatever requisition he may make, whatever duty he may impose, in pursuance of his constitutional and legal powers, will on your part be promptly undertaken and faithfully discharged; and acknowledging, as an earnest of this and even more, the measures of co-operation which you are pursuing, he assures you in return, that he relies fully on the most cordial aid and support from you in every way, which the constitution of the United States and of Pennsylvania shall authorize and present or future exigencies may require. And he requests that you will construe, with a reference to this assurance of his confidence, whatever remarks may have been made in the course of this reply to your letter; if it shall have happened that any of them have erred, through a misconception of the sentiments and views which you may have meant to communicate. With perfect respect, I have the honour to be, sir, your most obedient servant, Edm. Randolph, Secretary of State.

"(True copy. Geo. Taylor, Jr.)

"August 7th, 1794.

"His Excellency, Governor Mifflin."

Communication from Governor Mifflin to the president of the United States in answer to the secretary of state's, of 7th August:

"Sir: The secretary of state has transmitted to me, in a letter dated the 7th of August (but only received yesterday) your reply to my letter of the 5th instant. For a variety of reasons, it might be desirable at this time, to avoid an extension of our correspondence upon the subject to which those letters particularly relate; but the nature of the remarks contained in your reply, and the sincerity of my desire to merit, on the clearest principles, the confidence which you are pleased to repose in me, will justify, even under the present circumstances of the case, an attempt to explain any ambiguity, and to remove any prejudice, that may have arisen, either from an inaccurate expression, or an accidental misconception, of the sentiments and views which I meant to communicate. That the course which I have suggested as proper to be pursued, in relation to the recent disturbances in the western parts of Pennsylvania, contemplates the state in a light too separate and unconnected, is a position that I certainly did not intend to sanction in any degree that could wound your mind with a sentiment of regret. In submitting the construction of the facts, which must regulate the operation of the general government, implicitly to your judgment; in cautiously avoiding any reference to the nature of the evidence from which those facts are collected, or to the conduct which the government of the United States might pursue; in declaring that I spoke only as the executive magistrate of the state charged with the general superintendence and care, that its laws be faithfully executed; and, above all, in giving a full and unequivocal assurance, that whatever requisition you may make, whatever duty you may impose, in pursuance of your constitutional and legal powers, would, on my part, be promptly undertaken, and faithfully discharged; I thought that I had manifested the strongest sense of my federal obligations; and that, so far from regarding the state in a sep-

arate and unconnected light, I had expressly recognized the subjection of her individual authority to the national jurisdiction of the Union. It is true, however, sir, that I have only spoken as the executive magistrate of the state; but, in that character, it is a high gratification to find, that, according to your opinion, likewise, 'the propriety of the course which I suggested, would in most if not in all respects, be susceptible of little question.' Permit me then, to ask, in what other character could I have spoken, or what other language did the occasion require to be employed? If the co-operation of the government of Pennsylvania was the object of our conference, your constitutional requisition as the executive of the Union, and my official compliance as the executive of the state, would indubitably ensure it; but, if a preliminary, a separate, an unconnected conduct was expected to be pursued by the executive magistrate of Pennsylvania, his separate and unconnected power and discretion must furnish the rule of proceeding; and by that rule, agreeably to the admission which I have cited, 'the propriety of my course would in most, if not in all respects, be susceptible of little question.' It must, therefore, in justice be remembered, that a principal point in our conference, related to the expediency of my adopting, independent of the general government, a preliminary measure (as it was then termed) under the authority of an act of the legislature of Pennsylvania, which was passed on the 22d of September, 1783, and which the attorney general of the United States thought to be in force, but which had, in fact, been repealed, on the 11th of April, 1793.

"Upon the strictest idea of co-operative measures, however, I do not conceive, sir, that any other plan could have been suggested consistently with the powers of the executive magistrate, of Pennsylvania, or with a reasonable attention, on my part, to a systematic and energetic course of proceeding. The complicated nature of the outrage which was committed upon the public peace, gave a jurisdiction to both governments; but in the mode of prosecuting, or in the degree of punishing the offenders, the circumstance could not, I apprehend, alter or enlarge the powers of either. The state (as I observed in my last letter) could only exert itself in executing the laws or maintaining the authority of the Union, by the same means which she employed to execute and maintain her more peculiarly municipal laws and authority; and hence I inferred, and still venture to infer, that if the course which I have suggested is the same that would have been pursued, had the riot been unconnected with the system of federal policy, its propriety cannot be rendered questionable, merely by taking into our view (what I never have ceased to contemplate) the existence of a federal government, federal laws, federal judiciary and federal officers. But would it have been thought more consonant with the principle of co-operation, had I issued orders for an immediate, a separate, and an unconnected call of the militia, under the special authority which was supposed to be given by a law, or under the general authority which may be presumed to result from the constitution? Let it be considered, that you had already determined to exercise your legal powers in drafting a competent force of the militia; and it will be allowed, that if I had undertaken, not only to comply promptly with your requisition, but to embody a distinct corps for the same service, a useless expense would have been incurred by the state, an unnecessary burthen would have been imposed on the citizens; and embarrassment and confusion would probably have been introduced instead of system and co-operation. Regarding it in this point of light, indeed, it may be natural to think, that in the judiciary, as well as the military department, the subject should be left entirely to the management either of the state or

of the general government; for 'the very important difference which is supposed to exist in the nature and consequences of the offences that have been committed, in the contemplation of the laws of the United States, and of those of Pennsylvania,' must otherwise destroy that uniformity in the distinction of crimes, and the apportionment of punishments, which has always been deemed essential to a due administration of justice.

"But let me not, sir, be again misunderstood: I do not mean by these observations to intimate an opinion or to express a wish, that 'the care of vindicating the authority, or of enforcing the laws of the Union should be transferred from the offices of the general government to those of the state;' nor, after expressly avowing that I had cautiously avoided any reference to the conduct which the government of the United States might pursue on this important occasion, did I think an opportunity could be found to infer that I was desirous of imposing a suspension of your proceedings, for the purpose of waiving the issue of the process which I designed to pursue. If indeed, 'the government of the United States was at that point, where it was admitted, if the government of Pennsylvania was, the employment of force by its authority would be justifiable,' I am persuaded, that, on mature consideration, you will do more credit to my candour than to suppose that I meant to condemn, or to prevent the adoption of those measures on the part of the general government which, in the same circumstances, I should have approved and promoted on the part of Pennsylvania. The extracts that are introduced into the letter of the secretary of state, in order to support that inference, can only be justly applied to the case which was immediately in contemplation, the case of the state of Pennsylvania, whose judiciary authority had not then, in my opinion, been sufficiently tried. They ought not surely be applied to a case which I had cautiously excluded from my view, the case of the United States, whose judiciary authority had, in your opinion, proved inadequate to the execution of the laws, and the preservation of order. And if they shall be thus limited to their proper object, the justice and force of the argument which flows from them, can never be successfully controverted or denied. While you, sir, were treading in the plain path designated by a positive law; with no other care than to preserve the forms which the legislature had prescribed; and relieved from a weight of responsibility by the legal operation of a judge's certificate; I was called upon to act, not in conformity to a positive law, but in compliance with the duty which is supposed to result from the nature and constitution of the executive office. The legislature had prescribed no forms to regulate my course; no certificate to inform my judgment; every step must be dictated by my own discretion, and every error of construction or conduct would be charged on my own character. Hence, arose an essential difference in our official situations; and, I am confident, that on this ground alone, you will perceive a sufficient motive for my considering the objection, in point of law, to forbear the use of military force, till the judiciary authority has been tried, as well as the probable effects, in point of policy, which that awful appeal might produce. For, sir, it is certain, that at the time of our conference, there was no satisfactory evidence of the incompetency of the judicial authority of Pennsylvania to vindicate the violated laws: I, therefore, could not, as executive magistrate, proceed upon a military plan; but actuated by the genuine spirit of co-operation, not by a desire to sully the dignity or to alienate the powers of the general government, I still hoped and expected to be able on this, as on former occasions, to support the laws of the Union, to punish the violators of them, by an exertion of the civil authority of the state gov-

ernment, the state judiciary and the state officers. This hope prompted the conciliatory course, which I determined to pursue, and which, so far as respects the appointment of commissioners, you have been pleased to incorporate with your plan. And if, after all, the purposes of justice could be attained, obedience to the laws could be restored, and the horrors of a civil war could be averted by the auxiliary intervention of the state government, I am persuaded you will join me in thinking that the idea of placing the state in a separate and unconnected point of view, and the idea of making a transfer of the powers of the general government, are not sufficiently clear or cogent to supersede such momentous considerations.

"Having thus, generally, explained the principles contained in my letter of the 5th instant, permit me (without adverting to the material change that has since occurred in the state of our information relatively to the riots: and which is calculated to produce a corresponding change of sentiments and conduct) to remark, that many of the facts that are mentioned by the secretary of state, in order to show that the judiciary authority of the Union, after a fair and full experiment, had proved incompetent to enforce obedience, or to punish infractions of the laws, were, before that communication, totally unknown to me. But still, if it shall not be deemed a deviation from the restriction that I have determined to impose upon my correspondence, I would offer some doubts which in that respect occurred to my mind on the evidence as it appeared at the time of our conference. When I found that the marshal had, without molestation, executed his office in the county of Fayette; that he was never insulted or opposed, till he acted in company with General Neville; and that the virulence of the rioters was directly manifested against the person and property of the latter gentleman, and only incidentally against the person of the former. I thought there was ground yet to suppose (and as long as it was reasonable. I wished to suppose) that a spirit of opposition to the officers employed under the excise law, and not a spirit of opposition to the officers employed in the administration of justice, was the immediate source of the outrages which we deprecate. It is true that these sources of opposition are equally reprehensible; and that their effects are alike unlawful; but on a question respecting the power of the judiciary authority to enforce obedience, or to punish infractions of the law, it seemed to be material to discriminate between the cases alluded to, and to ascertain with precision the motives and the object of the rioters. Again: As the associate judge had not, at that time, issued his certificate, it was proper to scrutinize, with strict attention, the nature of the evidence on which an act of government was to be founded. The constitution of the Union, as well as of the state, had cautiously provided even in the case of an individual, that 'no warrant should issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' And a much higher degree of caution might reasonably be exercised in a case that involved a numerous body of citizens in the imputation of treason, or felony, and required a substitution of the military for the judicial instruments of coercion. The only affidavits that I recollect to have appeared at the time of our conference, were those containing the hearsay of Col. Mentges, and the vague narrative of the post rider. The letters that had been received from a variety of respectable citizens, not being written under the sanction of an oath or affirmation, could not acquire the legal force and validity of evidence from a mere authentication of the signatures of the respective writers. Under such circumstances, doubts arose, not whether the means which the laws prescribe for effectuating

their own execution, should be exerted, but whether the existence of a specific case, to which specific means of redress were appropriated by the laws, had been legally established; not whether the laws, the constitution, the government, the principles of social order, and the bulwarks of private right and security should be sacrificed; but whether the plan proposed, was the best calculated to preserve those inestimable blessings. And, recollecting a declaration, which was made in your presence, 'that it would not be enough for a military force to disperse the insurgents, and to restore matters to the situation in which they were, two or three weeks before the riots were committed, but that the force must be continued for the purpose of protecting the officers of the revenue and securing a perfect acquiescence in the obnoxious law.' I confess, sir, the motives to caution and deliberation strike my mind with accumulated force. I hope, however, that it will never seriously be contended, that a military force ought now to be raised with any view but to suppress the rioters; or that if raised with that view, it ought to be employed for any other. The dispersion of the insurgents is, indeed, obviously the sole object for which the act of congress has authorized the use of military force on occasions like the present; for with a generous and laudable precaution, it expressly provides that even before that force may be called forth, a proclamation shall be issued, commanding the insurgents to disperse, and retire peaceably to their respective abodes, within a limited time.

"But the force of these topics I again refer implicitly to your decision; convinced, sir, that the goodness of your intentions, now, not less than heretofore, merits an affectionate support from every description of your fellow-citizens. For my own part, I derive a confidence from the heartfelt integrity of my views, the sincerity of my professions, which renders me invulnerable by any insinuation of practising a sinister or deceitful policy. I pretend not to infallibility in the exercise of my private judgment, or in the discharge of my public functions: but in the ardour of my attachment, and in the fidelity of my services to our common country, I feel no limitations. And your excellency, therefore, may justly be assured, that in every way which the constitution of the United States, and of Pennsylvania, shall authorize and present, or future exigencies may require, you will receive my most cordial aid and support. I am with perfect respect, sir, your excellency's most obedient humble servant,

"Thomas Mifflin.
"Philadelphia, August 12, 1794.
"To the President of the United States."

Communication from the secretary of state to Governor Mifflin, in answer to his of 12th August to the president of the United States:

"Philadelphia, August 30, 1794.

"Sir: I am directed by the president to acknowledge the receipt on the 17th of your excellency's letter dated the 12th instant. The president feels with you the force of the motives which render undesirable an extension of correspondence on the subject in question. But the case being truly one of great importance and delicacy, those motives must yield, in a degree, to the propriety and utility of giving precision to every part of the transaction, and guarding effectually against ultimate misapprehension. To this end it is deemed advisable, in the first place, to state some facts which either do not appear, or are conceived not to have assumed an accurate shape in your excellency's letter. They are these:

"(1) You were informed at the conference that all the information which had been received had been laid before an associate justice, in order that he might consider and determine whether such a case as is contemplated by the second section of the act, which provides for calling forth the militia to execute the laws of

the Union, suppress insurrections, and repel invasions, had occurred; that is, whether combinations existed too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshal by that act; in which case, the president is authorized to call forth the militia to suppress the combinations and to cause the laws to be duly executed.

"(2) The idea of a preliminary proceeding by you was pointed to an eventual co-operation with the executive of the United States, in such plan as upon mature deliberation should be deemed advisable in conformity with the laws of the Union. The inquiry was particularly directed towards the possibility of some previous accessory step in relation to the militia, to expedite the calling them forth if an acceleration should be judged expedient and proper, and if any delay on the score of evidence should attend the notification from a judge, which the laws make the condition of the power of the president to require the aid of the militia, and turned more especially upon the point, whether the law of Pennsylvania of the 22d of September, 1783, was or was not still in force. The question emphatically was: Has the executive of Pennsylvania power to put the militia in motion, previous to a requisition from the president under the laws of the Union, if it shall be thought advisable so to do? Indeed it seems to be admitted by one part of your letter, that the preliminary measure contemplated did turn on this question, and with a particular eye to the authority and existence of the act just mentioned.

"(3) The information contained in the papers read at the conference, besides the violence offered to the marshal while in company with the inspector of the revenue, established, that the marshal had been afterwards made prisoner by the insurgents, put in jeopardy of his life, had been obliged to obtain safety and liberty by a promise guaranteed by Colonel Presley Neville, that he would serve no other process on the west side of the Alleghany Mountains; that, in addition to this, a deputation of the insurgents had gone to Pittsburg to demand of the marshal a surrender of the processes in his possession, under the intimation that it would satisfy the people and add to his safety, which necessarily implied that he would be in danger of further violence without such a surrender. That under the influence of this menace he had found it necessary to seek security by taking secretly and in the night a circuitous route.

"This recapitulation is not made to invalidate the explanation offered in your last letter of the view of the subject, which you assert to have led to the suggestions contained in your first, and of the sense which you wish to be received as that of the observations accompanying those suggestions. It is intended solely to manifest, that it was natural for the president to regard your communication of the 5th instant in the light under which it is presented in the reply to it. For, having informed you that the matter was before an associate justice, with a view to the law of the United States which has been mentioned, and having pointed what was said respecting a preliminary proceeding on your part to a call of the militia under the authority of a state law, by anticipation of a requisition from the general government, and in co-operation with an eventual plan to be founded upon the laws of the Union. It was not natural to expect, that you would have presented a plan of conduct entirely on the basis of the state government, even to the extent of resorting to the legislature of Pennsylvania after its judiciary had proved incompetent, 'to prescribe by their wisdom and authority the means of subduing the spirit of insurrection and of restoring tranquility and order;' a plan which, being incompatible with the course marked out in the laws of the United States, evidently could not have been acceded to without a sus-

pension, for a long and indefinite period, of the movements of the federal executive in pursuance of those laws. The repugnancy and incompatibility of the two modes of proceeding at the same time cannot, it is presumed, be made a question. Was it extraordinary, then, that the plan suggested should have been unexpected, and that it should even have been thought liable to the observation of having contemplated Pennsylvania in a light too separate and unconnected?

"The propriety of the remark, that 'it was impossible not to think that the current of the observations in your letter might be construed to imply a virtual disapprobation of that plan of conduct on the part of the general government, in the actual state of its affairs, which you acknowledged would be proper on the part of the government of Pennsylvania, if arrived at a similar stage,' must be referred to the general tenor and complexion of those observations, and to the inference they were naturally calculated to inculcate. If this inference was, that under the known circumstances of the case, the employment of force to suppress the insurrection was improper, without a long train of preparatory expedients: and if, in fact, the government of the United States (which has not been controverted) was at that point, where it was admitted that the government of Pennsylvania being arrived, the resort to force on its part would be proper—the impression which was made could not have been effaced by the consideration, that the forms of referring what concerned the government of the Union to the judgment of its own executive, were carefully observed. There was no difficulty in reconciling the intimation of an opinion unfavourable to a particular course of proceeding, with an explicit reference of the subject, officially speaking, to the judgment of the officer charged by the constitution to decide, and with a sincere recognition of the subjection of the individual authority of the state to the national jurisdiction of the Union.

"The disavowal by your excellency of an intention to sanction the inference which was drawn, renders what has been said a mere explanation of the cause of that inference, and of the impression which it, at first, made. It would be foreign to the object of this letter, to discuss the various observations which have been adduced to obviate a misapprehension of your views, and to maintain the propriety of the course pursued in your first communication. It is far more pleasing to the president to understand you in the sense you desire, and to conclude, that no opinion has been indicated by you inconsistent with that which he has entertained of the state of things, and of his duty in relation to it. And he remarks with satisfaction the effect which subsequent information is supposed calculated to produce, favouring an approximation of sentiments. But there are a few miscellaneous points, which, more effectually to prevent misconception anywhere, seem to demand a cursory notice.

"You observe, that the president had already determined to exercise his legal powers in drafting a competent force of the militia. At the point of time to which you are understood to refer, namely, that of the conference, the president had no legal power to call forth the militia. No judge had yet pronounced, that a case justifying the exercise of that power existed. You must be sensible, sir, that all idea of your calling out the militia by your authority was referred to a state of things antecedent to the lawful capacity of the president to do it by his own authority; and when he had once determined upon the call pursuant to his legal powers, it were absurd to have proposed to you a separate and unconnected call. How, too, it might be asked, could such a determination, if it had been made and was known to you, have comported with the plan suggested in your letter, which presupposes that the employment of

force had not already been determined upon? This passage of your letter is, therefore, construed to mean only, that the president had manifested an opinion predicated upon the event of such a notification from a judge as the law prescribes, that the nature of the case was such as would probably require the employment of force. You will, also, it is believed, recollect that he had not at the time finally determined upon anything, and that the conference ended with referring the whole subject to further consideration.

"You say, that if you had undertaken not only to comply promptly with the president's requisition, but to embody a distinct corps for the same service, a useless expense would have been incurred by the state, an unnecessary burthen would have been imposed on the citizens, and embarrassment and confusion would probably have been introduced instead of system and co-operation. But both were never expected. Your embodying the militia independent of a requisition from the president was never thought of, except as a preliminary and auxiliary step. Had it taken place when the requisition came, the corps embodied would have been ready towards a compliance with it, and no one of the inconveniences suggested could possibly have arisen. You say, in another place, that you 'was called upon to act, not in conformity to a positive law, but in compliance with the duty which is supposed to result from the nature and constitution of the executive office.' It is conceived that it would have been more correct to have said, 'you was called upon to be consulted whether you had power in the given case to call forth the militia without a previous requisition from the general government.' The supposition that you might possess this power was referred to a law of Pennsylvania, which appeared, on examination, to have been repealed. A gentleman who accompanied you, thought that the power, after a due notification of the incompetency of the judiciary, might be deduced from the nature and constitution of the executive office.

"It has appeared to your excellency fit and expedient to animadvert upon the nature of the evidence produced at the conference, and to express some doubts which had occurred to your mind concerning it. As the laws of the United States have referred the evidence in such cases to the judgment of a district judge or associate justice; and foreseeing that circumstances so peculiar might arise as to render rules relating to the ordinary and peaceable state of society inapplicable, have forborne to prescribe any; leaving it to the understanding and conscience of the judge, upon his responsibility, to pronounce what kind and degree of evidence should suffice. The president would not sanction a discussion of the standard or measure by which evidence in those cases ought to be governed. He would restrain himself by the reflection, that this appertains to the province of another, and that he might rely, as a guide, upon the decision which should be made by the proper organ of the laws for that purpose. But it may be no deviation from this rule to notice to you, that the facts stated in the beginning of this letter, under the third head, appear to have been overlooked in your survey of the evidence, while they seem to be far from immaterial to a just estimate of it. You remark, that 'when you found that the marshal had, without molestation, executed his office in the county of Fayette; that he was never insulted or opposed until he acted in company with General Neville; and that the virulence of the rioters was directly manifested against the person and property of the latter gentleman, and only incidentally against the person of the former; you thought there was ground yet to suppose that a spirit of opposition to the officers employed under the excise law, and not a spirit of opposition to the officers employed in the administration of justice, was the immediate source of the outrages which are deprecated.' It is natural to inquire how this supposition could consist with the additional facts

which appeared by the same evidence, namely, that the marshal, having been afterwards made prisoner by the rioters, had been compelled, for obtaining safety and liberty, to promise to execute no more processes within the discontented scene; and that subsequently again to this, in consequence of a deputation of the rioters deliberately sent to demand a surrender of the processes in his possession, enforced by a threat, he had found it necessary to seek security in withdrawing by a secret and circuitous route. Did not these circumstances unequivocally denote, that officers employed in the administration of justice were as much objects of opposition as those employed in the execution of the particular laws, and that the rioters were at least consistent in their plan? It must needs be that these facts escaped your excellency's attention: else they are too material to have been omitted in your review of the evidence, and too conclusive not to have set aside the supposition which you entertained, and which seems to have had so great a share in your general view of the subject.

"There remains only one point on which your excellency will be longer detained,—a point, indeed, of great importance, and consequently demands serious and careful reflection. It is the opinion you so emphatically express, that the mere dispersion of the insurgents is the sole object for which the militia can be lawfully called out, or kept in service after they may have been called out. The president reserves to the last moment the consideration and decision of this point. But there are arguments weighing heavily against the opinion you have expressed which, in the mean time, are offered to your candid consideration. The constitution of the United States (article 1, § 8) empowers congress 'to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions,' evidently from the wording and distribution of the sentence contemplating the execution of the laws of the Union as a thing distinct from the suppression of insurrections. The act of May 2d, 1792, for carrying this provision of the constitution into effect, adopts for its title the very words of the constitution, being 'An act to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions,' continuing the constitutional distinction. The first section of the act provides for the cases of invasion and of insurrection, confining the latter to the case of insurrection against the government of a state. The second section provides for the case of the execution of the laws being obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals. The words are these: 'Whenever the laws of the United States shall be opposed, or the execution thereof obstructed in any state by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act, the same being notified to the president of the United States by an associate justice or the district judge, it shall be lawful for the president of the United States to call forth the militia of such state to suppress such combinations, and to cause the laws to be duly executed.' Then follows a provision for calling forth the militia of other states. The terms of this section appear to contemplate and describe something that may be less than insurrection. 'The combinations' mentioned may, indeed, amount to insurrections, but it is conceivable that they may stop at associations not to comply with the law, supported by riots, assassinations and murders, and by a general spirit in a part of the community which may baffle the ordinary judiciary means with no other aid than the posse comitatus, and may even require the stationing of military force for a time to awe the spirit of riot, and countenance the magistrates and officers in the execution of their duty. And the objects for which the mili-

tia are to be called are expressly, not only to suppress these combinations (whether amounting to insurrections or not), but to cause the laws to be duly executed.

"It is, therefore, plainly contrary to the manifest general intent of the constitution, and of this act, and to the positive and express terms of the 2d section of the act, to say that the militia called forth are not to be continued in service for the purpose of causing the laws to be duly executed, and, of course, until they are so executed. What is the main and ultimate object of calling forth the militia? 'To cause the laws to be duly executed.' Which are the laws to be executed? Those which are opposed and obstructed in their execution by the combinations described in the present case, the laws laying duties upon spirits distilled within the United States, and upon stills, and, incidentally, those which uphold the judiciary functions. When are the laws executed? Clearly when the opposition is subdued; when penalties for disobedience can be enforced; when a compliance is effectuated. Would the mere dispersion of insurgents, and their retiring to their respective homes, do this? Would it satisfy either member of the provision, the suppression of the combinations, or the execution of the laws? Might not the former notwithstanding the dispersion, continue in full rigour, ready at any moment to break out into new acts of resistance to the laws? Are the militia to be kept perpetually marching and countermarching towards the insurgents while they are embodied, and from them when they have separated and retired? Suppose the insurgents hardy enough to wait the experiment of a battle, are vanquished, and then disperse and retire home: are the militia immediately to retire also, to give them an opportunity to reassemble, recruit, and prepare for another battle? And is this to go on and be repeated without limit? Such a construction of the law, if true, were certainly a very unfortunate one, rendering its provisions essentially nugatory, and leading to endless expense and as endless disappointment. It could hardly be advisable to vex the militia by marching them to a distant point where they might scarcely be arrived before it would be legally necessary for them to return, not in consequence of having effected their object, of having 'caused the laws to be executed,' but in consequence of the mere stratagem of a deceitful dispersion and retiring. Thus far the spirit as well as the positive letter of the law, combats the construction which you have adopted. It remains to see if there be any other part of it which compels to a renunciation both of the letter and spirit of the antecedent provisions. The part which seems to be relied upon for this effect is the third section, which, by way of proviso, enjoins, 'that whenever it may be necessary, in the judgment of the president, to use the military force by that act directed to be called forth, he shall forthwith, and previous thereto, by proclamation, command the insurgents to disperse, and retire peaceably to their respective abodes within a limited time.' But, does this affirm, does it even necessarily imply, that the militia, after the dispersion and retiring, are not to be used for the purpose for which they are authorized to be called forth; that is, 'to cause the laws to be duly executed,' to countenance by their presence, and in case of further resistance to protect and support by their strength, the respective civil officers in the execution of their several duties, whether for bringing delinquents to punishment, or otherwise for giving effect to the laws? May not the injunction of this section be regarded as a merely humane and prudent precaution, to distinguish previous to the actual application of force a hasty tumult from a deliberate insurrection; to give an opportunity for those who may be accidentally or inadvertently mingled in a tumult or disorderly rising, to separate and withdraw from those who are designedly and deliberately actors? to prevent, if possible, bloodshed in a con-

flict of arms, and if this cannot be done, to render the necessity of it palpable by a premonition to the insurgents to disperse and go home? And are not all these objects compatible with the further employment of the militia for the ulterior purpose of causing the laws to be executed, in the way which has been mentioned? If they present a rational end for the proviso, without defeating the main design of the antecedent provision, it is clear they ought to limit the sense of the former, and exclude a construction which must make the principal provision nugatory. Do not the rules of law and reason unite in declaring that the different parts of a statute shall be so construed as if possible to consist with each other; that a proviso ought not to be understood, or allowed to operate, in a sense tending to defeat the principal clause; and that an implication (if, indeed, there be any such implication as is supposed in the present case) ought not to overrule an express provision, especially at the sacrifice of the manifest general intent of a law, which, in the present case, undoubtedly is, that the militia shall be called forth 'to cause the laws to be duly executed?'

"Though not very material to the merit of the argument, it may be remarked, that the proviso which forms the third section contemplates merely the case of insurrection. If the combinations described in the second section may be less than insurrection, then the proviso is not commensurate with the whole case contained in the second section, which would be an additional circumstance to prove that it cannot work an effect which shall be a substitute for the main purpose of the first section. I have the honour to be, with perfect respect, sir, your excellency's most obedient servant,

"Edm. Randolph.
"(True copy. Geo. Taylor, Jun.)"

Mr. Randolph's personal opinion, however, was adverse to calling out the militia, differing in this respect from the president and the rest of the cabinet; and the following letter was addressed by him to the president immediately after the conference with Governor Mifflin.

Edmund Randolph to the president:
"Philadelphia, 5th August, 1794.

"Sir: The late events in the neighbourhood of Pittsburg appeared, on the first intelligence of them, to be extensive in their relations. But subsequent reflection, and the conference with the governor of Pennsylvania, have multiplied them in my mind tenfold. Indeed, sir, the moment is big with a crisis which would convulse the eldest government, and if it should burst on ours its extent and dominion can be but faintly conjectured. At our first consultation, in your presence, the indignation which we all felt, at the outrages committed, created a desire that the information received should be laid before an associate justice, or the district judge: to be considered under the act of May 2, 1792. This step was urged by the necessity of understanding, without delay, all the means vested in the president for suppressing the progress of the mischief. A caution, however, was prescribed to the attorney general, who submitted the documents to the judge, not to express the most distant wish of the president that the certificate should be granted. The certificate has been granted, and although the testimony is not, in my judgment, yet in sufficient legal form to become the groundwork of such an act, and a judge ought not à priori to decide that the marshal is incompetent to suppress the combinations by the posse comitatus, yet the certificate, if it be minute enough, is conclusive, that, 'in the counties of Washington and Alleghany, in Pennsylvania, laws of the United States are opposed, and the execution thereof obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshal of that district.' But the certificate specifies no particular law which has been opposed. This defect I remarked to Judge Wilson, from whom the cer-

tificate came, and observed, that the design of the law being that a judge should point out to the execu''ve, where the judiciary stood in need of military aid, it was frustrated if military force should be applied to laws which the judge might not contemplate. He did not yield to my reasoning, and therefore I presume that the objection will not be received against the validity of the certificate.

"Upon the supposition of its being valid, a power arises to the president to call forth the militia of Pennsylvania, and eventually the militia of other states which may be convenient. But as the law does not compel the president to array the militia in consequence of the certificate, and renders it lawful only for him so to do; the grand inquiry is, whether it be expedient to exercise this power at this time. On many occasions have I contended that, whensoever military coercion is to be resorted to in support of law, the militia are the true, proper and only instruments which ought to be employed. But a calm survey of the situation of the United States has presented these dangers and these objections, and banishes every idea of calling them into immediate action: (1) A radical and universal dissatisfaction with the exercise pervades the four transmontane counties of Pennsylvania, having more than sixty-three thousand souls in the whole, and more than fifteen thousand white males above the age of sixteen. The counties on the eastern side of the mountains, and some other populous counties, are infected by similar prejudices, inferior in degree, and dormant, but not extinguished. (2) Several counties in Virginia, having a strong militia, participate in these feelings. (3) The insurgents themselves numerous, are more closely united by like dangers, with friends and kindred scattered abroad in different places, who will enter into all the apprehensions, and combine in all the precautions of safety adopted by them. (4) As soon, too, as any event of eclat shall occur, around which persons discontented on other principles, whether of aversion to the government or disgust with any measures of the administration, may rally, they will make a common cause. (5) The governor of Pennsylvania has declared his opinion to be, that the militia which can be drawn forth will be unequal to the task. (6) If the militia of other states are to be called forth, it is not a decided thing that many of them may not refuse. And if they comply, is nothing to be apprehended from a strong cement growing between all the militia of Pennsylvania, when they perceive that another militia is to be introduced into the bosom of their country? The experiment is at least untried. (7) The expense of a military expedition will be very great; and with a devouring Indian war, the commencement of a navy, the sum to be expended for obtaining a peace with Algiers, the destruction of our mercantile capital by British depredations, the uncertainty of war or peace with Great Britain, the impatience of the people under increased taxes, the punctual support of our credit; it behoves those who manage our fiscal matters to be sure of their pecuniary resources, when so great a field of new and unexpected expense is to be opened. (8) Is there any appropriation of money which can be immediately devoted to this use? If not, how can money be drawn? It is said that appropriations are to the war department generally, but it may deserve inquiry whether they were not made upon particular statements of a kind of service essentially distinct from the one proposed. (9) If the intelligence of the overtures of the British to the western counties be true, and the inhabitants should be driven to accept their aid, the supplies of the western army, the western army itself may be destroyed; the reunion of that country to the United States will be impracticable; and we must be engaged in a British war. If the intelligence be probable only, how difficult will it be to reconcile the world to believe that we have been consistent in our con-

duct; when, after running the hazard of mortally offending the French by the punctilious observance of neutrality; after deprecating the wrath of the English by every possible act of government; after the request of the suspension of the settlement at Presque Isle, which has in some measure been founded on the possibility of Great Britain being roused to arms by it; we pursue measures which threaten collision with Great Britain and which are mixed with the blood of our fellow-citizens! (10) If miscarriage should befal the United States in the beginning, what may not be the consequence? And if this should not happen, is it possible to foresee what may be the effect of ten, twenty, or thirty thousand of our citizens being drawn into the field against as many more? There is another enemy in the heart of the southern states who would not sleep with such an opportunity of advantage. (11) It is a fact well known that the parties in the United States are highly inflamed against each other; and that there is but one character which keeps both in awe. As soon as the sword shall be drawn, who will be able to restrain them?

"On this subject the souls of some good men bleed: they have often asked themselves why they are always so jealous of military power, whenever it has been proposed to be exercised under the form of a succour to the civil authority? How has it happened that with a temper not addicted to suspicion, nor unfriendly to those who propose military force, they do not court the shining reputation which is acquired by being always ready for strong measures? This is the reason: that they are confident that they know the ultimate sense of the people: that the will of the people must force its way in the government; that, notwithstanding the indignation which may be raised against the insurgents, yet if measures unnecessarily harsh, disproportionably harsh, and without a previous trial of everything which law or the spirit of conciliation can do, be executed, that indignation will give way and the people will be estranged from the administration which made the experiment. There is a second reason: one motive assigned in argument, for calling forth the militia, has been, that a government can never be said to be established until some signal display has manifested its power of military coercion. This maxim, if indulged, would heap curses upon the government. The strength of a government is the affection of the people; and while that is maintained, every invader, every insurgent, will as certainly count upon the fear of its strength as if it had with one army of citizens mown down another. Let the parties in the United States be ever kindled into action, sentiments like these will produce a flame which will not terminate in a common revolution. Knowing, sir, as I do, the motives which govern you in office, I was certain that you would be anxious to mitigate, as far as you thought it practicable, the military course which has been recommended. You have accordingly suspended the force of the preceding observations, by determining not to call forth the militia immediately to action, and to send commissioners who may explain and adjust, if possible, the present discontents.

"The next question then is, whether the militia shall be directed to hold themselves in readiness, or shall not be summoned at all? It has been supposed by some gentlemen that when reconciliation is offered with one hand, terror should be borne in the other, and that a full amnesty and oblivion shall not be granted unless the excise laws be complied with in the fullest manner. With a language such as this the overtures of peace will be considered delusive by the insurgents and the most of the world. It will be said and believed that the design of sending commissioners was only to gloss over hostility, to endeavour to divide, to sound the strength of the insurgents, to discover the most culpable persons to be marked out

for punishment, to temporize until congress can be prevailed upon to order further force, or the western army may be at leisure from the savages to be turned upon the insurgents, and many other suspicions will be entertained which cannot be here enumerated. When congress talked of some high-handed steps against Great Britain, they were disapproved as counteracting Mr. Jay's mission, because it could not be expected she would be dragooned. Human nature will, to a certain point, show itself to be the same, even among the Alleghany Mountains. The mission will, I fear, fail; though it would be to me the most grateful occurrence in life to find my prediction falsified. If it does·fail, and in consequence of the disappointment, the militia should be required to act, then will return that fatal train of events, which I have stated above, to be suspended for the present. What · would be the inconvenience of delay? The result of the mission would be known in four weeks, and the president would be master of his measures without any previous commitment. Four weeks could not render the insurgents more formidable; that space of time might render them less so, by affording room for reflection; and the government will have a sufficient season remaining to action. Until every peaceable attempt shall be exhausted, it is not clear to me that as soon as the call is made, and the proclamation issued, the militia may not enter into some combination, which will satisfy the insurgents that they need fear nothing from them, and spread those combinations among the militia.

"My opinion, therefore, is that the commissioners will be furnished with enough on the score of terror, when they announce that the president is in possession of the certificate of the judge. It will confirm the humanity of the mission; and, notwithstanding some men might pay encomiums on decision, vigour of nerves, &c. &c., if the militia were summoned to be held in readiness, the majority would conceive the merit of the mission incomplete if this were to be done. It will not, however, be supposed that I mean that these outrages are to pass without animadversion. No, sir. That the authority of government is to be maintained is not less my position than that of others. But I prefer the accomplishment of this by every experiment of moderation in the first instance. The steps, therefore, which I would recommend are: (1) A serious proclamation, stating the mischief, declaring the power possessed by the executive, and announcing that it is withheld from motives of humanity and a wish for conciliation. (2) Commissioners, properly instructed to the same objects. (3) If they fail in their mission, let the offenders be prosecuted according to law. (4) If the judiciary authority is, after this, withstood, let the militia be called out.

"These appear to me to be the only means for producing unanimity in the people; and without their unanimity government may be mortified and defeated. If the president shall determine to operate with the militia, it will be necessary to submit some animadversions upon the interpretation of the law. For it ought closely to be considered, whether, if the combinations should disperse, the execution of processes is not to be left to the marshal and his posse. But these will be deferred until orders shall be discussed for the militia to march. I have the honour, sir, to be, with the highest respect and sincerest attachment, your most obedient servant,
                              "Edmund Randolph."

As the text shows, however, Gen. Washington, concurring with the majority of his cabinet, determined at once to put the militia in motion. The objects of the expedition cannot be better stated than in the language of the instructions from the secretary of the treasury to Governor Lee.

          "Bedford, 20th October, 1794.
"Sir: I have it in special instruction from the president of the United States, now at this place, to convey to you on this behalf, the following instructions for the general direction of your conduct, in the command of the militia army, with which you are charged. The objects for which the militia have been called forth, are: (1) To suppress the combinations which exist in some of the western counties of Pennsylvania, in opposition to the laws, laying duties upon spirits distilled within the United States, and upon stills. (2) To cause the laws to be executed. These objects are to be effected in two ways: (1) By military force. (2) By judiciary process and other civil proceedings. The objects of the military force are twofold: (1) To overcome any armed opposition which may exist. (2) To countenance and support the civil officers in the means of executing the laws.

"With a view to the first of these two objects, you will proceed as speedily as may be, with the army under your command, into the insurgent counties, to attack, and as far as shall be in your power subdue all persons whom you may find in arms, in opposition to the laws above mentioned. You will march your army in two columns, from the places where they are now assembled, by the most convenient routes, having regard to the nature of the roads, the convenience of supply, and the facility of cooperation and union; and bearing in mind that you ought to act until the contrary shall be fully developed, on the general principle of having to contend with the whole force of the counties of Fayette, Westmoreland, Washington and Alleghany, and of that part of Bedford which lies westward of the town of Bedford, and that you are·to put as little as possible to hazard. The approximation, therefore, of your columns is to be sought, and the subdivision of them, so as to place the parts out of mutual supporting distance, to be avoided, as far as local circumstances will permit. Parkinson's Ferry appears to be a proper point, towards which to direct the march of the columns for the purpose of ulterior measures. When arrived within the insurgent country, if an armed opposition appear, it may be proper to publish a proclamation, inviting all good citizens, friends of the constitution and laws, to join the standard of the United States. If no armed opposition exist, it may still be proper to publish a proclamation, exhorting to a peaceable and dutiful demeanour, and giving assurances of performing with good faith and liberality, whatsoever may have been promised by the commissioners to those who have complied with the conditions prescribed by them, and who have not forfeited their title by subsequent misconduct. Of those persons in arms, if any, whom you may make prisoners; leaders, including all persons in command, are to be delivered to the civil · magistrate: the rest to be disarmed, admonished and sent home, (except such as may have been particularly violent, and also influential,) causing their own recognizances for their good behaviour to be taken, in the cases in which it may be deemed expedient.

"With a view to the second point, namely, the countenance and support of the civil officers in the execution of their respective duties; for bringing offenders and delinquents to justice; for seizing the stills of delinquent distillers, as far as the same shall be deemed eligible by the supervisor of the revenue or chief officer of inspection; and also for conveying to places of safe custody such persons who may be apprehended and not admitted to bail. The objects of judiciary process and other civil proceedings will be: (1) To bring offenders to justice. (2) To enforce penalties ·on delinquent distillers by suit. (3) To enforce the penalty of forfeiture on the same persons by the seizure of their stills and spirits. The better to effect these purposes, the judge of the district, Richard Peters, Esquire, and the attorney of the district, William Rawle, Esquire, accompany

the army. You are aware that the judge cannot be controlled in his functions. But I count on his disposition to co-operate in such a general plan as shall appear to you consistent with the policy of the case. But your method of giving a direction to legal proceedings, according to your general plan, will be by instruction to the district attorney. He ought particularly to be instructed, (with due regard to time and circumstances). First. To procure to be arrested all influential actors in riots and unlawful assemblies, relating to the insurrection, and combinations to resist the laws; or having for object to abet that insurrection and those combinations; and who shall not have complied with the terms offered by the commissioners, or manifested their repentance in some other way, which you may deem satisfactory. Secondly. To cause process to issue for enforcing penalties on delinquent distillers. Third. To cause offenders who may be arrested, to be conveyed to jails, where there will be no danger of rescue: those for misdemeanour, to the jails of New York and Lancaster: those for capital offences, to the jail of Philadelphia, as more secure than the others. Fourth. To prosecute indictable offences in the courts of the United States: those for penalties on delinquents, under the laws before mentioned, in the courts of Pennsylvania. As a guide in the case, the district attorney has with him a list of the persons who have availed themselves of the offers of the commissioners, on the day appointed. The seizure of stills is of the province of the supervisor and other officers of inspection. It is difficult to chalk out a precise line concerning it. There are opposite considerations, which will require to be nicely balanced, and which must be judged of by those officers on the spot. It may be found useful to confine the seizure of stills of the most leading and refractory distillers. It may be advisable to extend them far in the most refractory county.

"When the insurrection is subdued, and the requisite means have been put in execution to secure obedience to the laws, so as to render it proper for the army to retire, (an event which you will accelerate as much as shall be consistent with the object,) you will endeavour to make an arrangement for detaching such a force as you may deem adequate, to be stationed within the disaffected country, in such manner as best to afford protection to well disposed citizens, and to the officers of the revenue, and to repress by their presence the spirit of riot and opposition to the laws. But, before you withdraw the army, you will promise, on behalf of the president, a general pardon to all such as shall not have been arrested with such exceptions as you shall deem proper. The promise must be so guarded as not to affect pecuniary claims under the revenue laws. In this measure, it is advisable, there should be co-operation with the governor of Pennsylvania. On the return of the army, you will adopt some convenient and certain arrangements for restoring to the public magazines the arms, accoutrements, military stores, tents and other articles of 'camp equipage, and entrenching tools, which have been furnished and shall not have been consumed or lost. You are to exert yourself by all possible means, to preserve discipline among the troops, particularly a scrupulous regard to the rights of persons and property, and a respect for the authority of the civil magistrates, taking especial care to inculcate, and cause to be observed this principle, that the duties of the army are confined, to the attacking and subduing of armed opponents of the laws, and to the supporting and aiding of the civil officers in the execution of their functions. It has been settled that the governor of Pennsylvania will be second, the governor of New Jersey third, in command; and that the troops of the several states in line, on the march and upon detachment, are to be posted according to the rule which prevailed in the army during the late war, namely, in moving towards the seaboard, the most southern troops will take the right: in moving westward, the most northern will take the right. These general instructions, however, are to be considered as liable to such alterations and deviations in the detail. as from local and other causes may be found necessary, the better to effect the main object upon the general principles which have been indicated. With great respect, I have the honour to be, sir, your obedient servant,

"(Signed) Alexander Hamilton."

"Truly copied from the original. B. Dandridge. Secretary to the President of the United States."

NOTE 8. The proceedings adopted by the state of Pennsylvania, appear by the following report of Mr. Dallas, then secretary of the commonwealth, made to the legislature which convened after the quelling of the insurrection:

"In compliance with the request of the committee 'appointed to inquire into the causes of the militia not turning out promptly on the late requisition of the president of the United States, to suppress an insurrection in the western counties of this state,' the secretary of the commonwealth has the honour to furnish copies of all official papers and documents relative to the expedition, and in explanation thereof, he respectfully reports, that from time to time. as the intelligence of the rise and progress of the riots in the county of Alleghany was received, the subject was contemplated by the governor in all the aspects which its nature and importance could present: (1) He viewed it as immediately requiring the animadversions of the judicial power; (2) as affecting the rights and jurisdictions of the federal government; (3) as claiming a prudent interposition of the executive authority, for averting the evils of a civil war; (4) as involving the interesting question, whether our existing militia system was competent to enforce obedience to the laws; and (5) as eventually creating a necessity for the personal exertions of the executive magistrate, lest the commonwealth should suffer an irreparable injury.

"1. That, accordingly, to stimulate the public officers to an exemplary discharge of their duty, the governor directed a circular letter, dated the 25th day of July, 1794, (the day succeeding the receipt of the intelligence of the riots,) to be addressed to the president and judges of the courts of common pleas; to every justice of the peace; to all the sheriffs: and, to each brigade inspector of the four western counties. This letter, having stated the daring and cruel outrage that had been committed in the county of Alleghany by a lawless body of armed men, 'requests, in the most earnest manner, that those to whom it was addressed would exert all their influence and authority to suppress, within their jurisdiction, so pernicious and unwarrantable a spirit—that they would ascertain, with all possible dispatch, the circumstances of the offence—and that they would pursue, with the utmost vigilance, the lawful steps for bringing the offenders to justice.' It declared that every honest citizen must feel himself personally mortified at the conduct of the rioters, which (particularly if it passed with impunity) was calculated to fix an indelible stigma on the honour and reputation of the state; and it assured all the public officers of the governor's warmest support and approbation in the prosecution of every lawful measure which their better knowledge of the facts and of other local circumstances might suggest on the occasion. Presuming, from the state of intelligence at that time. that a draft from the militia might readily be made and would be sufficient to overawe the riotous disposition of the malcontents, in pursuance of the governor's instructions a letter of the same date was also

written to Major-General Gibson declaring a disposition 'to employ all the energy of the government to bring the offenders to an early and exemplary justice,' and intimating that 'if the civil authority can be supported by the assistance of the militia, the exercise of General Gibson's discretion for that purpose, upon the request of the magistrates, must be highly agreeable to the governor.' The attorney-general was likewise desired 'to ascertain, with legal formality, the circumstances of the offence and the names of the offenders, as the governor would be anxious to enforce every instrument that could be employed effectually, to subdue the lawless spirit of the rioters and to bring them to punishment.'

"2. That the riots having been committed in the course of a lawless opposition to the execution of certain acts of congress, were not only deemed offences against the state, but also against the Union. Hence a conference between the president and the governor was thought advisable, in order to avoid a collision of jurisdiction, and to settle the general principles and form of proceeding as far as the state was concerned. That conference gave rise to the correspondence which was laid before the legislature at the opening of the last session, and from which it appears that the governor's conduct was influenced by the following considerations: First. In regard to his character as an executive magistrate, no positive law existed under the authority of the state, defining the exigency that would justify an appeal from the judicial to the military power, or regulating and prescribing the evidence that should prove the occurrence of that exigency. Whatever, therefore, might eventually be the obligation resulting from the constitutional injunction to 'take care that the laws be faithfully executed,' it was thought that not only the non-execution of the laws and the incompetency of the courts of justice to punish offenders, should first be authoritatively declared by the judicial magistrates, but that the act of interposing the aid of the military power should likewise be founded upon their requisition. At the time of the conference alluded to, the judicial magistrates of Pennsylvania had not made any such authoritative declaration and requisition; the governor, therefore, did not then think it justifiable, upon principle, to sanction the interposition of the militia in any other manner than that suggested in the above-mentioned letter to General Gibson; and a variety of arguments, in point of policy and conveniency, occurred to fortify his opinion. But the determination of the general government to pursue the most vigorous measures for suppressing the insurrection and punishing the insurgents, seemed to preclude the state government from any choice upon the subject. The constitution of the United States imposes upon the president (as the constitution of the state imposes upon the governor) the same general trust to 'take care that the laws be faithfully executed;' and an act of congress has defined the exigency that would justify an appeal from the judicial to the military power of the Union, as well as the evidence to prove the occurrence of that exigency. When, therefore, a judicial magistrate of the general government had declared the incompetency of the officers of justice to execute the laws, and the president had declared his determination to enforce obedience by the aid of the military power, it was thought that the governor, paying a reasonable attention to a systematic and efficient course of proceeding, ought to forbear issuing any order for an immediate, a separate and an unconnected call of the militia. But, second, in regard to his character as an officer, responsible, in certain cases, to the federal government, it was observed that all the purposes of dispatch and energy would as readily be attained by obeying the call of the president, as by acting upon the governor's original authority. Hence, a full and unequivocal

assurance was given that whatever requisition the president might make, whatever duty he might impose, in pursuance of his constitutional and legal powers, would, on the part of the governor, be promptly undertaken and faithfully discharged.

"3. That, with a view to the reputation and stability of the republican system, as well as from a consideration of the actual state of our foreign and domestic affairs, it was thought expedient not only to try the full effect of judicial animadversion, but likewise to make a solemn and liberal appeal to the good sense and virtue of the people before the hazard of a civil war should be encountered. On the part of the state, therefore (and a similar measure was adopted on the part of the general government), commissioners were appointed for the purpose of addressing the inhabitants of the western counties in general, and especially those who had been engaged in the riots, upon the lawless nature and dangerous tendency of such proceedings. The commissioners were instructed, particularly, 'to exert themselves in developing the folly of a riotous opposition to those governments and laws which were made by the spontaneous authority of the people, and which, by the same legitimate authority, may, in a peaceable and orderly course, be amended or repealed—in explaining how incompatible it is with the principles of a republican government, how dangerous it is in point of precedent, that a minority should attempt to control the majority, or a part undertake to prescribe to the whole; in demonstrating the painful but indispensable obligation imposed upon the officers of the government, to employ the public force for the purpose of subduing and punishing the offenders, and in exhorting the deluded rioters to return to that duty, a longer deviation from which must be destructive of their happiness, as well as injurious to the reputation and prosperity of their country.' The commissioners were earnestly requested to promote 'the views of the general government, on the same occasion, and, should their exertions produce a satisfactory assurance of future submission to the laws, they were authorized, as far as the state of Pennsylvania was concerned, 'to promise an act of pardon and oblivion for the past.' To obtain, likewise, the aid of the legislative wisdom and authority on this emergency, as well for devising the means of conciliation, as for strengthening, in the last resort, the instruments of coercion, the government summoned an extraordinary meeting of the general assembly.

"4. That as the accounts from the scene of insurrection soon evinced the incompetency of the judicial power to execute its functions, and it was necessary to prepare, at all events, to maintain the authority of government, the president, while the commissioners were employed in their pacific mission, issued his requisition, dated the 7th (but received on the 8th) of August, 1794, 'for organizing and holding in readiness to march at a moment's warning, a corps of the militia of Pennsylvania, amounting to 5,200 commissioned officers, non-commissioned officers and privates.' Accordingly, on the 8th of August, as soon as the plan for organizing the corps could be formed, the governor, in conformity to the mode prescribed by law, transmitted his general orders to the adjutant-general, 'for calling into actual service, and holding in readiness to march at a moment's warning, the part of the militia specified in the roll, which designated the quota of the several counties, by the classes most convenient to the citizens, and best adapted to a prompt compliance with the president's requisition, the part so called not exceeding four classes of the militia of the respective brigades,' agreeably to the restrictions contained in the seventeenth section of the militia act. These general orders were immediately transmitted by express to the respective brigade inspectors. The period limit-

ed by the president's proclamation, for the dispersion of the insurgents, expiring on the 1st of September, the governor repeatedly expressed the greatest solicitude that the corps, thus directed to be drafted and organized, should be in readiness to march on that day; and, in pursuance of his instructions, the adjutant-general addressed another circular letter to the brigade inspectors, dated the 27th of August, in which they were entreated to make an immediate report of the progress that had been made in executing the preceding general orders. This opportunity was likewise taken to convey the governor's ideas of the importance of the service to the brigade inspectors, and the militia in general; for it was represented to them that 'the eyes of their fellow citizens throughout the Union, as well as in Pennsylvania, were fixed upon their conduct: that they must be sensible, therefore, that the slightest appearance of a want of zeal, or energy, to embark in support of the violated authority of the laws, would produce that reproach and disgrace which it was the duty of the public officers if possible to prevent,—and which it would be their misfortune, more than any other part of the community, to encounter,—and that the occasion was interesting to every man who felt his obligations to society and was desirous to preserve from the fury of anarchy, as well as from the encroachments of despotism, the independence of a freeman.' The 1st of September having arrived, the recent intelligence from the commissioners placed the success of conciliatory measures in a very doubtful point of view. The want of information, respecting the progress which had been made in preparing the militia to march, became, therefore, more and more painful; and the receipts of the following returns seemed to extinguish every hope of seasonably complying with the president's requisition, by means of the ordinary process of the law. First. The inspector of the city of Philadelphia brigade, almost daily, called at the secretary's office, with representations of the embarrassment which he experienced in complying with the requisition, and repeatedly expressed his doubt of success, in consequence of the defects in the existing militia law. Second. A return was received from the county of Philadelphia, dated the 29th day of August, 1794, stating inconveniences in complying with the requisition on account of the effects of the exoneration laws formerly passed, and a general disapprobation of the militia law; and concluding with a declaration that there is 'very little prospect of commanding the quota of the county.' Third. A return was received from the county of Bucks, dated the 5th of September, 1794, stating that 'the pay of the militia is so universally objected to, that there is no hope of completing the quota of the county, upon the present terms of service.' This county did not send its quota into the field. Fourth. A return was received from the county of Montgomery, dated the 3d September, 1794, stating that 'agreeably to the orders of the 8th of August, 1794, for drafting 332 militia, officers included, the said corps is held in readiness to march at a moment's warning.' The first part of this return, however, states such difficulties as greatly diminish the probability of success in obtaining an actual organization of the corps; nor did this county send its quota into the field. Fifth. A return was received from the county of Chester, dated the 28th of August, 1794, stating that some officers had actually resigned, and others wished to resign, and concluding with this remark: 'The west and north-west parts of this county seem to dislike the service they are now ordered upon; and in a great number of other quarters are people who, as they say, are principled against taking up arms on any occasion; so that, I believe, unless the law is rigorously executed, it will be with great difficulty I shall make up our quota, but be assured no exer-

tions shall be wanting,' &c. Sixth. A return was received from the county of Delaware, dated the 6th September, 1794, stating a variety of difficulties that left little hope of procuring, by regular drafts, the quota of this county. Seventh. A return was received from the county of Dauphin, dated the 29th August, 1794, stating that drafts had been made, and orders given to hold the quota of this county in readiness to march; but concluding with this remark: 'According to the information I have received from several parts of the county, it appears that the militia are not willing to march to quell the insurrection in the western parts of Pennsylvania: they say that they are ready to march according to the former orders, against a foreign enemy, but not against the citizens of their own state; so that, from circumstances, I have great reason to believe they will not turn out on the last call.' Eighth. A return was received from York county, dated the 6th of September, 1794, stating that 'too great a delay has taken place in drafting the quota of militia required by the orders of the 8th of August last, not so much from backwardness in the militia of this county to step forward on the present important occasion, as from the unprepared state of the brigade inspector to make a draft, through the former negligence or non-compliance of some regiments with the militia law, particularly with respect to classing the men.' The brigade inspector adds, that he expects the required quota to be in readiness in the course of the ensuing week, but concludes his report with a declaration that 'the law as it stands, he is sorry to say, holds forth no encouragement but rather appears calculated to have a contrary tendency.' Ninth. A return was received from Franklin county, dated the 4th September, 1794, stating that notwithstanding the urgent measures taken to draft and organize the quota of this county, 'seven captains had made no returns, and the number returned who are willing to hold themselves in readiness to march, does not amount to more than twenty-nine privates, and they are without arms and equipments,' &c. The brigade inspector concludes his report with a declaration 'that he has reason to believe that few of those who are returned, as holding themselves in readiness to march, will march when the orders are given.' Tenth. A return was received from Northampton county, dated the 14th September, 1794, stating that all the attempts to have the quota of this county completed, had proved unsuccessful. The brigade inspector observes 'that until now he has not been able to procure particular returns, of which the enclosed general, though the incomplete one, is composed; and he is apprehensive, that even those men in the same, except the volunteers (of which denomination the men in the fifth regiment chiefly consist) will not march.' With a view to show the disposition of the people of Northampton county generally, the brigade inspector annexed to his report the copy of a letter from the lieutenant-colonel of the first regiment, and asserts 'that the same spirit prevails in almost every regiment; consequently, under the present militia system, he fears the quota of his brigade will not be completed.' The letter referred to contains the following language: 'I have received in writing of some of the captains, and others by word, on the 5th of September, 1794, who inform me that the first class of all, and every company, were met on purpose to turn out to do militia duty; but as the matter is that they are called to fight against their own fellow-subjects and brethren at Fort Pitt, on account of the excise law, which people in that part are very much against, and will not submit to be under the same, which makes much disturbance and disunion in our United States —they are not willing to turn out. But whenever called upon to fight against the enemy or others whatever, they were then willing to do

duty as the matter may require.' This county did not send its quota into the field.

"5. That the intelligence which was received from the commissioners, continuing to render the success of government, without the use of coercive measures. more and more doubtful, the season for military operations passing rapidly away, and an ultimate requisition for the march of the militia being hourly expected, the governor did not hesitate to conclude, from the documents above stated, as well as from other general sources of information, that a strict adherence to the forms of the existing militia system would not enable him to furnish that prompt and efficient aid to enforce obedience to the laws, which he conceived all the principles of duty, policy and honour, claimed from the government of Pennsylvania. It would not, indeed, have been consistent with his ideas of the executive authority, with his official character, or perhaps with his personal security, to deviate from those forms, until their inefficacy was fairly ascertained; but after the experiment was made, he thought himself justifiable in resorting to any means within the spirit of the law, lest the commonwealth should suffer an irreparable injury. Considering, therefore, that the nineteenth section of the militia act declares 'that it shall be lawful for any person called to do a tour of duty, to find a sufficient substitute,' the governor determined, on the spirit of that provision, to invite the citizens to supply the deficiency in the regular drafts by a voluntary enrollment as substitutes. Accordingly, he successively convened the officers of the militia in the city of Philadelphia, and the several counties, and publicly addressed them on the state of the insurrection, and the necessity of an immediate patriotic exertion. The determination to pursue this measure was communicated to the general assembly, in the governor's message of the 2d of September (F. I.); and it received a legislative sanction by the act that was passed on the 19th of the same month (G. I.). The necessity of undertaking it, appeared not only from the general state of the militia under the requisition to prepare for marching, but from the urgent terms of the call for the immediate march of the troops. On the 9th of September that call was communicated to the governor (H. I.). It stated 'that the last intelligence from the western counties leaves the issue of measures for an amicable accommodation so very doubtful, and the season for military operations is wearing away so fast, that the president, with great reluctance, finds himself under the necessity of putting in motion, without further delay, all the militia which had been called for.' It requested, 'that the governor would immediately cause the quota of this state to assemble.' And it concluded with declaring that 'the president, in making this final call, entertains a full confidence, that Pennsylvania will, upon an occasion which so immediately affects herself, as well as the general interests, display such zeal and energy as shall maintain unsullied her character for discernment, love of order and true patriotism; and that the part she shall act is of peculiar consequence to the welfare and reputation of the whole Union.' On the 16th of September another letter was transmitted from the war department, representing that 'every moment brings fresh proofs of a spirit excessively disseminated, fatal to the principles of good order; that disagreeable symptoms had appeared in the two most western counties of Maryland, &c.; that everything was done to push forward the Jersey militia to Carlisle, &c.; that it is of the highest moment that the spreadings of so mischievous a spirit should be checked by every practicable effort; and that the president is convinced that the governor will omit nothing that can contribute to this desirable end.' The next day brought a repetition of the solicitude of the general government for the march of the troops. The let-

ter states that 'it becomes every moment more and more urgent, that the junction between the Pennsylvania and Maryland militia at Carlisle, should be accelerated; and to this end, that the corps should march successively as fast as they can be made ready; that Governor Howell, of New Jersey, was in motion with the van of the militia of that state; that if the cavalry and infantry of Philadelphia could be hastened onward, it would be particularly desirable; and that the artillery corps should be taken under their care, with all the pieces of artillery ready.' On the 20th of September the result of the meetings of the people in the western counties as far as the 13th, to give the stipulated test of their submission to the government, was announced to the governor in a letter from the war department; according to which 'it was become the more indispensable and urgent to press forward the forces destined to act against the insurgents, with all possible activity and energy, for the advanced season left no time to spare: it was extremely important to afford speedy protection to the well disposed, and to prevent the preparation and accumulation of greater means of resistance, and the extension of combinations to abet the insurrection.' It is proper here to recollect, that while these interesting and urgent communications were received from the general government. the reports of the brigade inspectors (dated nearly at the same period) were calculated to excite the most painful apprehensions of disappointment and defeat in every attempt to embody our quota of the militia. Under such inauspicious circumstances, therefore, the governor commenced his tour through the counties; but the scene quickly changed. For, according to the representation contained in his last address to the legislature, 'as soon as the situation of our country was truly described and understood, the daring and cruel career of the malcontents, the subversion of the judicial authority, the failure of every conciliatory effort, and the resulting necessity of an appeal to arms, produced, in perfect unison with the governor's anticipation, one common sentiment of resentment, one common determination to defend the peace and order of society, against the machinations of licentiousness and anarchy.' Still, however, the critical season of the year, with respect to commercial and agricultural pursuits, and the limited period for assembling the troops, made it impracticable to complete the quota of the state: a circumstance which adds to the proofs that demonstrate the necessity of the governor's personal exertions."